UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN DOE ONE, et al.,

Plaintiffs,

v.

CVS PHARMACY, INC., et al.,

Defendants.

Case No. 18-cv-01031-EMC

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

Docket Nos. 87, 89, 97, 113

Plaintiffs bring this putative class action alleging that they have been discriminatorily denied benefits under their employer-offered prescription drug benefit plans. The complaint names two sets of defendants: CVS Pharmacy, Inc., Caremark, LLC., and Caremark California Specialty Pharmacy, LLC (collectively "CVS"), and Amtrak, Lowe's Companies, and Time Warner, Inc. (collectively "Employer Defendants"). CVS contracted with Employer Defendants to provide prescription drug benefits to Plaintiffs. Plaintiffs allege that their benefit plans allow them to obtain their HIV/AIDS medications at favorable "in-network" prices only via mail or from a CVS pharmacy. Compared to the non-CVS "community pharmacies" from which Plaintiffs were previously able to obtain their medications, the mail order and CVS Pharmacy pickup options do not offer the same level of privacy, convenience, reliability, and service.

Plaintiffs bring eight causes of action: (1) violation of the anti-discrimination provision of the Affordable Care Act ("ACA"); (2) violation of Title III of the Americans with Disabilities Act ("ADA"); (3) violation of the California Unruh Civil Rights Act; (4) violation of the California Unfair Competition Law ("UCL"); (5) claim for benefits due under plans governed by the Employee Retirement Income Security Act ("ERISA"); (6) claim for breach of fiduciary duties under ERISA; (7) failure to provide full and fair review under ERISA; and (8) declaratory relief.

United States District Court
Northern District of California

Counts 1–4 are against CVS only.  Counts 5–8 are against all Defendants.  CVS and each of the Employer Defendants have moved to dismiss the complaint.

For the reasons discussed below, the Court **GRANTS** CVS and Employer Defendants' motions to dismiss.  Plaintiffs' ACA and ADA claims fail because the benefit plan restrictions they challenge do not discriminate on the basis of HIV/AIDS status or disability generally; the restrictions apply to medications that treat disabilities as well as those that do not.  Plaintiffs' Unruh Act claim fails because they cannot show intentional discrimination on the part of CVS.  They have not stated a claim under the UCL because the benefit restrictions are neither "unlawful" nor "unfair."  Plaintiffs' ERISA claims against CVS fail because their benefit plans do not entitle them to the benefit they seek, and because CVS is not an ERISA fiduciary with respect to the benefit plans.  Plaintiffs' ERISA claims against Employer Defendants fail for similar reasons.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The First Amended Complaint alleges the following.  Plaintiffs[1] are individuals living with HIV/AIDS who are enrolled in employer-sponsored health plans.  Docket No. 75 ("FAC") ¶ 1.  CVS Defendants "act as agents of one another and operate as a single entity for purposes of administering pharmacy benefits and providing prescription drugs to health plans and health plan members." *Id.* ¶ 14.  One of the CVS Defendants, CVS Caremark, administers the prescription drug benefits under Plaintiffs' plans. *Id.* ¶ 1.  In order to qualify for lower "in-network" drug prices under their plans, Plaintiffs are required by CVS Caremark to obtain their HIV/AIDS medications from Caremark California Specialty Pharmacy, which delivers medications in one of two ways: by mailing the medications to Plaintiffs directly, or by mailing them to a CVS Pharmacy for pickup. *Id.*  Otherwise, Plaintiffs "must either pay more out-of-pocket or pay full-price" to procure their HIV/AIDS medication from an "out-of-network" community pharmacy. *Id.*  Plaintiffs refer to this CVS-mandated scheme for obtaining medications as "the Program." *Id.*  All drugs designated in the benefit plans as "specialty medications" are subject to the Program's restrictions, not just drugs that treat HIV/AIDS.  However, Plaintiffs allege that HIV/AIDS

---

[1] Plaintiffs are proceeding under pseudonyms due to the sensitive nature of this action.  FAC at 1 n.3.

patients are "disproportionately impacted by the Program" due to the "complex nature of their disease and medications." *Id.* ¶¶ 92, 94. CVS Caremark offers "financial inducements" to health plan sponsors—Plaintiffs' employers—to enroll Plaintiffs in benefit plans subject to the Program. *Id.* ¶ 2.

Before their employers enrolled Plaintiffs in the Program, each of the Named Plaintiffs was able to purchase their HIV/AIDS medications through their benefit plan from any in-network pharmacy, including non-CVS pharmacies, with full insurance benefits. *See id.* ¶¶ 9–13. Many of them had long obtained their medications from their local "community pharmacies" and had developed relationships with their pharmacists. *Id.* These in-person appointments with expert pharmacists who were familiar with Plaintiffs and their medical histories serve a critical function because the pharmacists can "detect potentially life-threatening adverse drug interactions and dangerous side effects, some of which may only be detected visually"; immediately prescribe new drug regimens as Plaintiffs' conditions progress and evolve; and provide essential counseling to help Plaintiffs and their families navigate the challenges of living with a chronic condition. *Id.* ¶¶ 70, 80–84, 89.

Since being enrolled in the Program, however, Plaintiffs have faced numerous difficulties and indignities in their efforts to obtain their HIV/AIDS medications. Those who opted to have the medication mailed to their homes have experienced delivery problems. *Id.* ¶¶ 37, 46, 51. For example, in some instances the packages containing their medications were left "baking in the afternoon sun," which could "quickly degrade the potency and stability" of the medication. *Id.* ¶ 24. Out of concerns about parcel theft, some Plaintiffs have had to wait at home on the days their medications are scheduled for delivery, resulting in missed doctor appointments and missed days of work. *Id.* ¶¶ 46, 51. Those who have opted to pick up their prescriptions from CVS Pharmacies have also encountered problems. For some, the closest CVS Pharmacy is many miles away. *Id.* ¶ 34. Some have had to make multiple trips to and from a pharmacy to deal with incorrectly filled prescriptions. *Id.* Others have experienced "CVS personnel shout[ing] the name of their HIV/AIDS Medications across the room in front of other customers, raising severe privacy concerns." *Id.* ¶ 76. Many Plaintiffs have reached out to CVS in an attempt to resolve their

3

problems, only to encounter bureaucracy and long wait-times. *See id.* ¶¶ 29, 35, 40, 91.

Reportedly, CVS representatives also "appear to have no specialized knowledge about HIV/AIDS

Medications or the concerns of HIV patients." *Id.* ¶¶ 39, 48, 85.

In short, Plaintiffs allege, the Program forces them into a "potentially life-threatening"

decision: to either "forego essential counseling from an expert pharmacist at a community

pharmacy and face risks to their privacy that are inherent in the Program," or "pay hundreds or

thousands of dollars out-of-pocket monthly for their medications at their non-CVS community

pharmacy." *Id.* ¶ 69. Thus, the Program "constitutes a material and discriminatory change in

[Plaintiffs'] coverage, a significant reduction in or elimination of prescription drug benefits, and a

violation of the standards of good health care and clinically appropriate care for HIV/AIDS

patients." *Id.* ¶ 78.

Many Plaintiffs have attempted to opt-out of the Program, but their requests were denied.

*Id.* Some have made formal, written opt-out requests, appealed the denial of those requests, and

ultimately received "final determinations" affirming the denials. *See id.* ¶ 27.

Plaintiffs seek to represent the following class:

> All persons currently or previously enrolled in or covered by a
> health plan since January 1, 2015 in which the prescription drug
> benefit is or was administered by CVS Caremark, and who: (i)
> obtained or may obtain HIV/ADIS Medications; and (ii) have been
> or may in the future be required to participate in the Program with
> no right to opt-out or notice thereof, but not including individual
> claims for personal injury or bodily harm.

*Id.* ¶ 131.

Plaintiffs filed their original class action complaint on February 16, 2018. *See* Docket No.

1. After CVS and Amtrak each filed a motion to dismiss, Plaintiffs filed the operative First

Amended Class Action Complaint on June 18, 2018. *See* Docket No. 75. Each Defendant filed a

motion to dismiss thereafter. *See* Docket Nos. 87 ("CVS Mot."), 89 ("Amtrak Mot."), 97

("Lowe's Mot."), 113 ("Time Warner Mot.").

## II.     LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint must contain a "short and plain statement of the claim showing that the pleader is

entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain sufficient factual allegations, accepted as true, "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

If it grants a motion to dismiss, a court is generally required to allow the plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246–47 (9th Cir. 1990). In determining whether amendment would be futile, the court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990).

## III.    CVS'S MOTION TO DISMISS

A.    Group Pleading Against CVS Defendants

Plaintiffs have named CVS Pharmacy, Inc., Caremark, LLC., and Caremark California Specialty Pharmacy, LLC as defendants in this action and collectively termed them "CVS Caremark." FAC at 1. The complaint asserts that the "various CVS/Caremark Defendants act as agents of one another and operate as a single entity for purposes of administering pharmacy benefits and providing prescription drugs to health plans and health plan members," *id.* ¶ 14, and for the most part makes its allegations against "CVS Caremark" generally. CVS contends that the complaint engages in undifferentiated pleading that fails to make clear what claims are being alleged against each defendant. CVS Mot. at 7.

As an initial matter, Plaintiffs are incorrect to state that "the prohibition against group pleading only applies in cases of fraud." Docket No. 115 ("Opp.") at 3. While Federal Rule of Civil Procedure 9(b) sets forth a heightened pleading requirement in fraud cases, the general

pleading standard articulated in Rule 8(a) requires a complaint to "provide sufficient notice to all of the Defendants as to the nature of the claims being asserted against them." *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 964 (N.D. Cal. 2015); *see Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988) (finding that a complaint in which "all defendants are lumped together in a single, broad allegation" failed to satisfy the notice requirement of Rule 8(a)(2)).

Plaintiffs have painted their allegations with a broad brush. The majority of their allegations are made against the collective "CVS Caremark," without specifying what role each CVS Defendant played. Their claim that the CVS Defendants "act as agents of one another and operate as a single entity" is conclusory and unsupported by factual allegations. At no point does the complaint describe what kind of entities CVS Pharmacy, Inc. and Caremark, LLC are or generally what type of business they conduct. Nevertheless, the complaint does make clear the role Caremark California Specialty Pharmacy, LLC plays in filling prescriptions by mail. *See* FAC ¶ 1. And, construing the pleadings in the light most favorable to Plaintiffs, it is also sufficiently clear from the complaint that Plaintiffs intend the allegations regarding the "CVS Caremark" collective to apply to all the CVS defendants. *See Adobe Sys.*, 125 F. Supp. 3d at 965 (finding that defendants were put on sufficient notice where "the gravamen of Adobe's allegations . . . are that all the Defendants infringed on Adobe's trademarks and copyrights"). Finally, the complaint is specific and detailed as to what unlawful actions "CVS Caremark" has allegedly engaged in, and therefore put CVS Defendants on notice of "what conduct is at issue." *Id.*

On balance, Plaintiffs have done just enough to meet the pleading requirements of Rule 8.[2]

B.    ACA Discrimination Claim

Count One of the complaint asserts that CVS's alleged conduct violates the anti-discrimination provision at Section 1557 of the ACA. Section 1557 provides that "an individual

---

[2] CVS protests that Plaintiffs' claims arise out of a pharmacy benefit management service's ("PBM") design of a prescription plan, and that two of the CVS Defendants are not PBMs but rather pharmacies. CVS Mot. at 8. However, these disputes over questions of fact are not appropriate for resolution on a motion to dismiss.

6

shall not, on the ground prohibited under[, *inter alia*,] section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). In turn, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

CVS puts forth two primary reasons why Plaintiffs' ACA claim should be dismissed. Each is addressed below.

### 1. Offered Benefit

First, CVS argues that Plaintiffs are not entitled to the benefit which they claim is being denied—to be able to purchase specialty medication from non-CVS pharmacies at in-network prices. *See* CVS Mot. at 11. In fact, Plaintiffs were specifically told that their plans do *not* allow them to do so. *See, e.g.*, FAC ¶¶ 21–22, 40. CVS reasons that Plaintiffs could not have been unlawfully denied a benefit to which they were not entitled in the first place. This argument fails, however, because it is at odds with the text of the ACA and the Rehabilitation Act.

Both § 1557 and § 504 use identical, disjunctive language to describe the conduct they proscribe. *See* 42 U.S.C. § 18116(a) ("be excluded from participation in, be denied the benefits of, *or* be subjected to discrimination under . . .") (emphasis added); 29 U.S.C. § 794(a) ("be excluded from the participation in, be denied the benefits of, *or* be subjected to discrimination under . . .") (emphasis added). Courts have understood this disjunctive language, as well as substantially similar language in the ADA, to bar the operation of a program in a discriminatory manner even when a specific offered benefit is not being denied. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir. 1996) (rejecting as "flaw[ed] . . . the assumption that no violation of the ADA occurs unless a service or benefit of the state is provided in a manner that discriminates against disabled individuals" given the "insertion of 'or' between exclusion from/denial of benefits on the one hand and discrimination by a public entity on the other" in the statutory text); *Halpern v. Wake Forest*

*Univ. Health Scis.*, No. 1:09CV00474, 2010 WL 3057597, at *15 n.23 (M.D.N.C. July 30, 2010) ("The disjunctive nature of the two prongs of the third element effectively recognizes that Section 504 creates two different types of claims: "a plaintiff must show that she was [1] excluded from participation in, or denied the benefits of, a program or service offered by a public entity, *or* [2] subjected to discrimination by that entity."), *aff'd*, 669 F.3d 454 (4th Cir. 2012); *Brewer v. Wisconsin Bd. of Bar Examiners*, No. 04-C-0694, 2006 WL 3469598, at *5 (E.D. Wis. Nov. 28, 2006) ("Brewer's claim is not just that she was excluded from, or denied access to, the Board's services, but also that she was otherwise discriminated against by the Board. The language of the [ADA] is disjunctive; it prohibits exclusion from participation, denial of benefits, *or* discrimination against by reason of disability.").

Accordingly, Plaintiffs' ACA claim is not doomed just because they have not alleged that their benefit plan entitles them to obtain HIV/AIDS medication for favorable prices at non-CVS pharmacies. They may proceed on the theory that the benefit plan operates in a way that discriminates against them by reason of disability. *See, e.g.*, FAC ¶ 92 (alleging that "HIV/AIDS patients are particularly hard hit and discriminated against by [the benefit plan] requiring patients to obtain their specialty medications exclusively under the Program").

2.    Disparate Impact/Meaningful Access

CVS next contends that Plaintiffs fail to sufficiently allege that the Program discriminates against Plaintiffs on the basis of their HIV/AIDS status.

No consensus has yet emerged as to the standard for assessing ACA anti-discrimination claims. *See Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 737 (N.D. Ill. 2017). At least one court has held that "§ 1557 creates a 'health-specific' anti-discrimination claim 'subject to a singular standard, regardless of a plaintiff's protected class status.'" *Id.* (quoting *Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *11 (D. Minn. Mar. 16, 2015)). Others have concluded that § 1557 imports the standard corresponding to the civil rights statute on which the plaintiff's ACA claim is premised. *See id.*; *Se. Pennsylvania Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 698 (E.D. Pa. 2015). Thus, an ACA claim based on allegations of § 504 violations would be analyzed under the substantive standard for § 504

cases. Both parties here agree that § 504 case law serves as a useful guide for evaluating what kind of disability-based discrimination violates the ACA, and neither has suggested applying a standard different from that applicable under Section 504. *See* CVS Mot. at 8; Opp. at 5. Applying the § 504 standard here also comports with "Health and Human Services Department's rules emphasiz[ing] that the [ACA] nondiscrimination provision 'is not intended to apply lesser standards for the protection of individuals from discrimination than the standards under . . . Section 504.'" *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 687 (S.D.N.Y. 2018) (quoting 81 Fed. Reg. 31381 (2016)).

Section 504 protects persons with disabilities from both intentional and disparate-impact discrimination.[3] *Crowder*, 81 F.3d at 1484 (citing *Alexander v. Choate*, 469 U.S. 287, 295 (1985)). CVS points out, and Plaintiffs appear to concede, that they are not alleging an intentional discrimination claim under § 504.[4] *See* Opp. at 9 (characterizing CVS's intentional discrimination argument as "a *non sequitur*, as Plaintiffs in this action allege a disparate *impact* on HIV/AIDS patients") (emphasis in original).

As for disparate impact, the Supreme Court has rejected "the boundless notion that all disparate-impact showings constitute prima facie cases under § 504"; an instance of disparate impact is actionable only where it "effectively denies otherwise qualified handicapped individuals the meaningful access" to programs or benefits to which they are entitled. *Alexander*, 469 U.S. at 299–301; *see Crowder*, 81 F.3d at 1484 (explaining that *Alexander* "determined it more useful to assess whether disabled persons were denied 'meaningful access'" to benefits in order to identify

---

[3] The Office for Civil Rights in the Department of Health and Human Services also promulgated a rule "interpret[ing] Section 1557 as authorizing a private right of action for claims of disparate impact discrimination on the basis of any of the criteria enumerated in" that section. 81 Fed. Reg. 31375, 31440 (May 18, 2016).

[4] Under their Unruh Act claim, however, Plaintiffs contend that they "*do* allege actual [intentional] discrimination." Opp. at 14 (emphasis in original). The allegations they identify, however, would be insufficient to support an intentional discrimination claim under § 504 for the same reasons they fail under the Unruh Act; the allegations are wholly conclusory and undermined by the complaint's descriptions of accommodations CVS made to assist Plaintiffs in accessing their HIV/AIDS medications. *See* Part III.D, *infra*.

discrimination cognizable under § 504). Thus, to state a § 504 disparate impact claim, Plaintiffs must show (1) that the Program's restrictions had a disparate impact on enrollees with HIV/AIDS, and (2) that the impact was so significant as to deny those enrollees "meaningful access" to their benefits. Plaintiffs' allegations fail in both respects.

First, Plaintiffs have not sufficiently alleged that enrollees with HIV/AIDS are disparately impacted by the Program's restrictions relative to other enrollees. As CVS points out, Plaintiffs themselves acknowledge that "*all* specialty medicines must be filled through the Program," not just those that treat HIV/AIDS. FAC ¶ 43 (emphasis added). These specialty medicines treat a wide variety of conditions in addition to HIV/AIDS. *See* FAC ¶ 94 (listing medicines and conditions). In a recent decision, the Western District of Tennessee found no disparate impact under the ACA on allegations essentially the same as those made here—that employer health plans discriminated against individuals with HIV/AIDS by classifying their HIV/AIDS medication as "specialty medication" that can only be obtained by mail or at designated in-network pharmacies. *See Doe v. Bluecross Blueshield of Tennessee, Inc.*, No. 217CV02793TLPCGC, 2018 WL 3625012, at *5–8 (W.D. Tenn. July 30, 2018). The *Bluecross Blueshield* court observed that the specialty medications "list includes medications for conditions that are not disabilities under the ADA or the Rehab Act," so "plan enrollees who are not disabled yet take specialty medications subject to the Program must endure the same procedural and logistical hurdles that HIV/AIDS patients face." *Id.* at *8. Here, as in *Bluecross Blueshield*, this fact is "fatal to Plaintiff[s'] claim" because it means they cannot allege that they were treated differently on the basis of their HIV/AIDS status. *Id.* Other cases are in accord. *See E.S. by & through R.S. v. Regence BlueShield*, No. C17-01609 RAJ, 2018 WL 4566053, at *3 (W.D. Wash. Sept. 24, 2018) (holding that plaintiffs with hearing impairments failed to show disparate impact based on their health plan's exclusion from coverage of hearing loss treatment because the "coverage exclusion is applied to all insureds, whether disabled or not"); *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d at 686–88 (finding no disparate impact under the ACA where plaintiffs alleged that their health plan set inflated prices for HIV drugs designated as "specialty medications" but did not allege that the rates they actually paid for their HIV medication were higher than for other,

non-HIV related drugs); *Gilead Scis., Inc.*, 102 F. Supp. 3d at 700 (holding that plaintiffs could not show that a drug manufacturer's pricing scheme that allegedly overcharged for Hepatitis C drugs had a disparate impact based on disability because there were "no allegations that [the manufacturer] changes the prices of its drugs depending upon whether the potential consumer has Hepatitis C").[5] Given the breadth of the drugs subject to the Program's restrictions, Plaintiffs cannot show that they are discriminated against as HIV/AIDS patients or as patients with disabilities.

Plaintiffs respond that, "[d]ue to the complex nature of their disease and medications, . . . . patients with HIV and AIDS are disproportionately impacted by the Program . . . even compared to patients prescribed non-HIV/AIDS specialty medications." FAC ¶ 92. The challenges particular to individuals with HIV/AIDS include "stigma and discrimination," a "high number of known adverse side effects and adverse drug interactions associated with HIV/AIDS Medications that need to be monitored," the "psychological and social issues involved" with living with HIV/AIDS, the "continua[l] mutat[ion]" of the HIV/AIDS virus necessitating timely changes in treatment, and the sensitivity of HIV/AIDS medications to "[s]torage at high temperatures." *Id.* ¶¶ 24, 74, 80, 86, 89. As a result, Plaintiffs argue that forcing enrollees with HIV/AIDS to obtain their medications either in-person from CVS pharmacists untrained to provide HIV/AIDS-related counseling or via mail impacts them in a way that is "unique." Opp. at 7.

The Court does not discount the struggles individuals with HIV/AIDS continue to experience in their daily lives or the difficulties Plaintiffs face in obtaining their medications through the Program. But Plaintiffs have "alleged no statistical evidence sufficient to show that Defendant's Program has a 'significantly adverse or disproportionate impact' on . . . HIV/AIDS patients." *Bluecross Blueshield*, 2018 WL 3625012, at *8. Nor does the complaint compare the Program's impact on HIV/AIDS patients with its impact on non-HIV/AIDS patients in any other

---

[5] Plaintiffs argue that "*Gilead* was decided before the federal regulations authorizing disparate impact claims under the ACA were issue" and thus inapposite. Opp. at 9. However, *Gilead* nevertheless applied the disparate impact framework articulated in *Alexander*, which continues to guide courts in analyzing § 504 disparate impact claims. *See Gilead*, 102 F. Supp. 3d at 699–700 & n.4.

way.  In fact, Plaintiffs acknowledge that HIV/AIDS is not the only condition that is stigmatized.  *See* FAC ¶ 93 ("[The Program] is not appropriate for all patients with complex, chronic conditions, especially *illnesses* subject to social stigma where privacy is a significant concern *like HIV/AIDS* . . . .") (emphases added).  For example, Plaintiffs note that drugs for treating opioid dependency and addiction are also included in the specialty medicine formulary, and the ADA "aims to protect [individuals recovering from addiction] from the stigma associated with their addiction."  *Jones v. City of Boston*, 752 F.3d 38, 58 (1st Cir. 2014) (citing 42 U.S.C. § 12114(a), (b)).  Thus, the allegations in the complaint are not sufficient to support Plaintiffs' claim that the Program's impact on enrollees with HIV/AIDS is "unique."  *Rodde v. Bonta*, 357 F.3d 988, 998 (9th Cir. 2004) (observing that discrimination is actionable under the "meaningful access" standard where it "disproportionately burdens the disabled because of their *unique needs*") (emphasis added).  The *Bluecross Blueshield* court rejected a disparate impact theory similarly based on allegations that "[c]ompared to nondisabled patients who received non-HIV/AIDS specialty medications," patients with HIV/AIDS have to endure "the social stigma and discrimination associated with being HIV/AIDS positive," "the potentially serious effect of missing a dose of HIV/AIDS medication, the potential for heat damage to HIV/AIDS medications, and . . . a heightened need for access to in-person consultations with community pharmacists."  2018 WL 3625012, at *5, *8.

Second, even accepting that the Program does disproportionately impact enrollees with HIV/AIDS, that impact is not so significant as to constitute a denial of "meaningful access" to Plaintiffs' prescription drug benefits.  The Supreme Court's decision in *Alexander*, which established the "meaningful access" standard, is instructive.  *Alexander* was an action brought under § 504 in response to the Tennessee Medicaid program's decision, in response to budget pressures, to reduce from 20 to 14 the number of inpatient hospital days that Tennessee Medicaid would cover for a Medicaid recipient annually.  469 U.S. at 289.  The plaintiffs contended that the 14-day limitation would have a discriminatory effect on disabled individuals because statistical evidence showed that a higher percentage of Medicaid patients with disabilities required more than 14 days of inpatient care that non-disabled patients.  *Id.* at 290.  The Supreme Court denied

12

1   the claim.  It reasoned that because "both classes of users [were] subject to the same durational

2   limitation," patients with disabilities, just like non-disabled patients, would still "benefit

3   meaningfully from the coverage they will receive under the 14-day rule."  *Id.* at 302.

4         The *Alexander* Court went on to reject as "simply unsound" the plaintiffs' suggestion that

5   "their greater need for prolonged inpatient care means that, to provide meaningful access to

6   Medicaid services, Tennessee must single out the handicapped for *more* than 14 days of

7   coverage."  *Id.*  As the Court explained, "Medicaid programs do not guarantee that each recipient

8   will receive that level of health care precisely tailored to his or her particular needs" but rather

9   provide "a particular package of health care services" with "the general aim of assuring that

10  individuals will receive necessary medical care."  *Id.* at 303.  *Alexander* concluded that "Section

11  504 does not require the State to alter this definition of the benefit being offered simply to meet

12  the reality that the handicapped have greater medical needs"; it "seeks to assure evenhanded

13  treatment and the opportunity for handicapped individuals to participate in and benefit from

14  programs receiving federal assistance" rather than to "guarantee the handicapped equal results."

15  *Id.* at 303–04 (citation omitted).

16        Likewise here, § 504 does not require CVS to alter the terms of their benefit plants to

17  provide the Plaintiffs "meaningful access" to specialty medications at favorable prices outside the

18  Program's network.  Like the 14-day inpatient coverage limitation in *Alexander*, the Program is

19  "neutral on its face"—its restrictions apply on the basis of the type of medication sought and "do[]

20  not distinguish between" enrollees based on disability.  *Id.* at 302.  And although the Program

21  limits the ways in which enrollees can obtain their specialty medication, it "does not exclude

22  [them] from or deny them the [prescription drug] benefits" provided under their plan.  Plaintiffs

23  are able to access their HIV/AIDS drugs at in-network prices as long as they go to a CVS

24  Pharmacy or subscribe to delivery by mail.  *Id.*  Plaintiffs seek exemption from the Program's

25  restrictions on the ground that HIV/AIDS patients have a "greater need" for ready access to their

26  medications, but they do not allege that their benefit plans guarantee them the "level of health care

27  precisely tailored to [their] particular needs."  *Id.* at 302–03.

28        At bottom, Plaintiffs are seeking to change the terms of their benefit plan so that they (and

13

not other plan enrollees) can obtain their HIV/AIDS medication from non-CVS pharmacies at in-network prices. *Alexander* makes clear that "Section 504 does not require the [benefit provider] to alter this definition of the benefit being offered simply to meet the reality that [Plaintiffs] have greater medical needs." *Id.* at 303. Rewriting the benefit plan in this way would be "virtually unworkable." *Id.* at 308. "Before taking any across-the-board action affecting [benefit plan enrollees], an analysis of the effect of the proposed change" on the enrollees would have to be performed, "broken down by class of handicap" or type of disability, that "balance[s] the harms and benefits to various groups to determine, on balance, the extent to which the action disparately impacts the handicapped." *Id.* The logical extension of Plaintiffs' discrimination challenge could threaten the basic structure of Health Maintenance Organizations ("HMOs") and Preferred Provider Organization insurance plans ("PPOs"). HMOs and PPOs are able to provide insurance coverage at favorable rates by requiring enrollees to access care from a defined set of in-network physicians. *See California v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1062 (N.D. Cal.), *aff'd*, 217 F.3d 846 (9th Cir. 2000). If enrollees could avail themselves of out-of-network providers at in-network rates by contending that in-network care is inferior for any particular disability, then the basis of the HMO/PPO model would be undermined. "[T]here is nothing in the [ACA] or its legislative history to suggest that this type of expansion was Congress' intent when enacting the [statute]." *Regence BlueShield*, 2018 WL 4566053, at *3 (rejecting plaintiffs' request under § 1557 to remove a coverage exclusion for hearing loss treatments under their health plan because § 504 does not "require insurers to offer coverage for all [medical needs] regardless of the health condition, injury, or illness"). CVS "need not redefine its [benefits] program to eliminate . . . limitations on [prescription drug] coverage." *Alexander*, 469 U.S. at 308–09.

Further, the obstacles Plaintiffs have to surmount to obtain their HIV/AIDS medication under the Program, while understandably a source of frustration and stress, do not rise to a level that deprives Plaintiffs of "meaningful access" to their benefits. Cases finding a denial of meaningful access have required significantly more severe deprivations. *See, e.g.*, *Crowder*, 81 F.3d at 1484–85 (Hawaii law requiring all dogs, including guide dogs, entering the state to be quarantined "*effectively preclude[d]* visually-impaired persons from using a variety of public

services") (emphasis added); *Rodde*, 357 F.3d at 991, 997 (upholding a preliminary injunction preventing the closure of a hospital that "provide[d] services disproportionately required by the disabled and available *nowhere else in the County*") (emphasis added).

The Court agrees with the observation in *BlueCross BlueShield*: "Although the Court understands the inconvenience facing that HIV/AIDS patients like Plaintiff as a result of Defendant's policy, interpreting Section 504 of the Rehab Act to reach the claims in the Amended Complaint would flout the Supreme Court's cautionary instructions in *Alexander*." 2018 WL 3625012, at *8. Accordingly, CVS's motion to dismiss Plaintiffs' ACA claim is **GRANTED without leave to amend**.[6]

## C.    ADA Discrimination Claim

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). To prevail on a discrimination claim under Title III, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of his disability. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007). The parties dispute whether Plaintiffs have sufficiently pleaded the second and third elements. A review of Plaintiffs' claim shows that they have not.

### 1.    "Place of Public Accommodation"

CVS argues that the alleged discrimination in this case arises from the administration of Plaintiffs' *benefit plan*, which is not a "place of public accommodation" subject to the ADA. CVS Mot. at 14. Plaintiffs respond that it is the *community pharmacies* to which CVS is denying access, and the ADA expressly designates pharmacies as places of public accommodation. Opp.

---

[6] Because Plaintiffs failed to establish they have been denied meaningful access to their benefits, the Court need not reach CVS's separate argument that Plaintiffs have also failed to sufficiently plead that CVS "receiv[es] Federal financial assistance," as required by the ACA. 42 U.S.C. § 18116(a).

United States District Court
Northern District of California

at 11 (citing 42 U.S.C. § 12181(7)(F)).  Plaintiffs' argument is foreclosed by Ninth Circuit law.

In *Weyer v. Twentieth Century Fox Film Corp.*, the plaintiff sued the insurance company administering the disability benefits policy offered by her employer because the policy allegedly provided more benefits for physical disabilities than for mental disabilities.  198 F.3d 1104, 1107 (9th Cir. 2000).  The Ninth Circuit held that the plaintiff failed to establish the "place of public accommodation" element of a Title III claim.  *Id.* at 1114.  The court explained that although, in a literal sense, "an insurance office is a place where the public generally has access," the case at its core was a "dispute . . . over the terms of a contract that the insurer markets through an employer, [which] is not what Congress addressed in the public accommodations provisions."  *Id.*  Citing precedent from the Third and Sixth Circuits, *Weyer* concluded that "[a] benefit plan offered by an employer is not a good offered by a place of public accommodation."  *Id.* at 1115 (quoting *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 612–13 (3d Cir. 1998); citing *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1010–11 (6th Cir. 1997) (en banc)).

Plaintiffs' claims are unavailing for the same reason.  Although Plaintiffs attempt to reframe the argument to cast community pharmacies as the "places of public accommodation" at issue, CVS does not "bar Plaintiffs and Class Members' access to" those pharmacies.  Opp. at 13.  Rather, the *terms* of the benefit plan administered by CVS force Plaintiffs to pay higher prices for specialty medications if they choose to fill their prescriptions at community pharmacies.  Thus, it is of no moment that the Plaintiffs allege CVS "exercise[s] their direct and contractual control over establishing which pharmacies are available to Plaintiffs," *id.*, because "Title III does not address the terms of the policies that [a benefit plan administrator] sells," *Weyer*, 198 F.3d at 1115.  It is the *term* of the insurance plan overall that is at issue here.  *See Bluecross Blueshield*, 2018 WL 3625012, at *10 (dismissing Title III claim because it was "based on the terms of BCBST's coverage for specialty medications, not the availability of coverage for those medications—even when the effect of those terms is that Plaintiff may not obtain his HIV/AIDS medication from a community pharmacy without incurring exorbitant costs").

2.      "On the Basis of Disability"

The complaint also fails to adequately allege that Plaintiffs were discriminated against on

16

the basis of their disability.  The ADA "protect[s] disabled persons not just from intentional discrimination but also from thoughtlessness, indifference, and benign neglect." *Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 846 (9th Cir. 2004) (citation and internal quotation marks omitted).  Actionable discrimination can therefore take the form of "outright intentional exclusion" as well as "the discriminatory effects of . . . failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." *Id.* at 846–47 (citing 42 U.S.C. § 12182(b)(2)(A)(ii); 42 U.S.C. § 12101(a)(5)).

Plaintiffs have not shown that the Program has a discriminatory *effect* on them that is cognizable under the ADA.  The Ninth Circuit in *Weyer* held, in line with seven other circuits, that "there is no discrimination under the [ADA] where disabled individuals are given the same opportunity as everyone else, so insurance distinctions that apply equally to all employees cannot be discriminatory." *Weyer*, 198 F.3d at 1116.  Thus, a plan administrator that does not "vary the terms of its plan depending on whether or not the employee was disabled" does not violate the ADA.  *Id.* (quoting *E.E.O.C. v. CNA Ins. Companies*, 96 F.3d 1039, 1044 (7th Cir. 1996)). Because the Program's restrictions apply equally to all enrollees, whether or not they have HIV/AIDS and whether or not they have a disability within the meaning of the ADA, the same rationale compels dismissal of Plaintiffs' claims in this case.[7]

Plaintiffs counter that there is evidence the Program *intentionally* discriminates on the basis of disability because "the reality is that all but two of the hundreds of medications subject to the Program treat disabilities." Opp. at 14.  In other words, only disability medications are subject to the Program's restrictions.  The complaint supports this contention by listing all of the drugs on CVS's specialty formulary and explaining why the conditions they treat qualify as "disabilities" under the ADA.  *See* FAC ¶ 94.  But, even assuming these explanations are correct,[8] Plaintiffs

---

[7] This ADA analysis is consistent with that for disability-based discrimination under the ACA and § 504.  *See* Part III.B, *supra*; *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act.").

[8] CVS cites a number of cases in which courts have found that conditions treated by specialty

1   undermine their own argument by conceding that there are at least two drugs on the formulary that

2   do not treat a disability.  *See id.* ¶ 94 n.8.  Plaintiffs believe that CVS included the two outlier

3   drugs as a "fig leaf to avoid an ADA or ACA violation," an impermissible act of "subterfuge to

4   evade the purposes of [Title III]" that is proscribed by 42 U.S.C. § 12201(c).  Opp. at 14.  In

5   making this allegation, however, Plaintiffs offer only a formulaic recitation of the language of

6   § 12201(c) and the bare assertion that "CVS cannot seriously contend that a disability-based

7   distinction does not exist with regard to the Program."  Opp. at 14.  Without more specific factual

8   allegations supporting the inference that CVS intentionally compiled the specialty formulary to

9   discriminate against persons with disabilities while evading accountability under the ADA,

10  Plaintiffs have not made a sufficient showing that the Program discriminates on the basis of

11  disability.  *See Twombly*, 550 U.S. at 555 (a pleading consisting of "labels and conclusions" or "a

12  formulaic recitation of the elements of a cause of action" cannot survive a motion to dismiss);

13  *Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 104 (2d Cir. 1999) (holding that "the

14  subterfuge clause in [§ 12201(c)] should be construed . . . to require an intent to evade").

15      Because the terms of Plaintiffs' benefit plan do not constitute "a place of public

16  accommodation," a required element of a Title III claim, granting Plaintiffs leave to amend

17  "would be futile" even if they can establish through amendment that CVS discriminated against

18  them on the basis of disability.  *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041

19  (9th Cir. 2011); *see Molski*, 481 F.3d at 730 (listing elements of Title III claim).  Accordingly,

20  CVS's motion to dismiss Plaintiffs' ADA claim is **GRANTED without leave to amend**.

21  D.   California Unruh Civil Rights Act Claim

22      The California Unruh Civil Rights Act provides that all persons within the State of

23  California are "entitled to the full and equal accommodations, advantages, facilities, privileges, or

24  services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).  The

25  Unruh Act expressly incorporates the ADA by providing that a "violation of the right of any

26  individual under the federal Americans with Disabilities Act . . .  shall also constitute a violation

27  _____

28  medication subject to the Program are not per se disabilities under the ADA.  *See* Docket No. 118
    at 7 n.8.

of this section." *Id.* § 51(f). Otherwise, only facial or intentional discrimination is actionable under the Unruh Act. The Act generally "does not extend to practices and policies that apply equally to all persons." *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (quoting *Turner v. Ass'n of Am. Med. Colls.*, 167 Cal. App. 4th 1401, 1408 (2008)). "Thus, to establish a violation of the Unruh Act independent of a claim under the [ADA], [a plaintiff] must 'plead and prove *intentional discrimination* in public accommodations in violation of the terms of the Act." *Id.* (emphasis added).

As explained above, Plaintiffs have failed to state a claim under the ADA. Therefore, to state an Unruh Act claim, they must plausibly allege intentional discrimination on the part of CVS, which in this context means "willful, affirmative misconduct . . . more than the disparate impact of a facially neutral policy." *Id.* (citation and internal quotation marks omitted). Plaintiffs have not met that standard. They can point to only two allegations of intentional discrimination in the complaint, both of which are conclusory and therefore insufficient to meet the pleading standards of Rule 8(a). *See* FAC ¶ 114 ("Defendants' intentionally discriminatory actions have denied Plaintiffs and members of the Class full and equal enjoyment of . . . prescription drug benefit."); ¶ 153 ("By implementing the Program . . . the CVS Caremark Defendants have specifically and intentionally targeted individuals on the basis of a particular disability and affirmatively discriminated against such persons on the basis of their disability.").

What is more, the allegations of intentional discrimination are undermined by references in the complaint to instances where CVS made accommodations or assisted Plaintiffs in accessing their prescription drug benefits. For example, a "CVS Caremark gave [Plaintiff John Doe Three] a one-time exception" from the Program's restrictions "and allowed his [community] pharmacy to fill his HIV/AIDS Medications," FAC ¶ 43, and "CVS Caremark sen[t] a same day courier with [Plaintiff John Doe Five's] HIV/AIDS medications" when he did not receive his original order, *id.* ¶ 60. "That Defendants provided some, but not all, accommodations to Plaintiff tends to negate an inference that Defendants' conduct was purposefully discriminatory." *Wilkins-Jones v. Cty. of Alameda*, 859 F. Supp. 2d 1039, 1052 (N.D. Cal. 2012); *see Greater Los Angeles*, 742 F.3d at 426 (finding assertions that "CNN intentionally excluded deaf and hard of hearing individuals from

accessing CNN.com" were "belied by the record" indicating that CNN offered caption-based services and was prepared to comply with the FCC's then-pending captioning rules).

Because Plaintiffs' ADA claim is dismissed with prejudice, and Plaintiffs' conclusory allegations of intentional discriminations are contradicted by other allegations in their complaint, CVS's motion to dismiss Plaintiffs' Unruh Act claim is **GRANTED without leave to amend**. *See United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (leave to amend would be futile if the deficiencies in a complaint can only be cured by amendments that "contradict the allegations in the original complaint").

E.     California Unfair Competition Law Claim

The California UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capitol One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010). Here, Plaintiffs explicitly assert that CVS's actions violate the "unlawful" prong of the UCL. *See* FAC ¶ 186. This coverage under this prong is "broad and sweeping, and embraces 'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1102 (S.D. Cal. 2017) (quoting *Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)). "By proscribing 'any unlawful' business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns*, 20 Cal. 4th at 180 (citation omitted). Because Plaintiffs' predicate ACA, ADA, and Unruh Act claims all fail, they cannot sustain a claim under the UCL "unlawful" prong. *See Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1190 (N.D. Cal. 2009) ("[S]ince the Court has dismissed all of Plaintiff's predicate violations, Plaintiff cannot state a claim under the unlawful business practices prong of the UCL.").

Plaintiffs assert one other basis for an "unlawful" prong claim. They allege that CVS violated 45 C.F.R. § 156.122(e)(1), a regulation implementing the ACA, which provides that a health plan providing "essential health benefits . . . must allow enrollees to access prescription drug benefits at in-network retail pharmacies, unless (i) The drug is subject to restricted

distribution by the U.S. Food and Drug Administration; or (ii) The drug requires special handling, provider coordination, or patient education that cannot be provided by a retail pharmacy." There is no indication that CVS's alleged conduct violates § 156.122(e)(1). Plaintiffs' benefit plan *does* allow them to access their specialty medications at in-network retail pharmacies—CVS pharmacies. *See* FAC ¶ 1. The regulation does not guarantee Plaintiffs' access to out-of-network pharmacies. Plaintiffs therefore have not stated a claim under the UCL "unlawful" prong.

In their opposition brief, Plaintiffs also assert that CVS violated the "unfair" prong of the UCL even though the complaint did not expressly allege an unfairness prong claim. CVS urges dismissal of the claim because it was "not well pled." CVS Mot. at 18 n.21. However, the complaint contains an allegation that echoes the legal standards for assessing UCL unfairness claims. *Compare* FAC ¶ 189 ("The gravity of the consequences of the CVS Caremark Defendants' conduct . . . outweighs any justification, motive or reason therefor, and is immoral, unethical, and unscrupulous, offends established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, or is substantially injurious to Plaintiffs and other members of the Class."), *with In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1115 (N.D. Cal. 2015) (The analysis under the unfairness prong "asks whether the alleged business practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.") (citation and internal quotation marks omitted), *and Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 613 (2014) (An unfairness claim must be "predicated on public policy" which is "tethered to specific constitutional, statutory or regulatory provisions."). Plaintiffs' allegation in FAC ¶ 189 is "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010). Hence, this case is distinguishable from *Moss v. Infinity Ins. Co.*, 197 F. Supp. 3d 1191, 1199 (N.D. Cal. 2016), cited by Defendant.

Plaintiffs' unfairness claim nevertheless fails on the merits. "The standard for determining what business acts or practices are 'unfair' under the UCL for consumer actions remains unsettled." *Graham*, 226 Cal. App. 4th at 612. "One line of cases applie[s] a . . . balancing test"

weighing the utility of the defendant's conduct against the gravity of the harm to the victim. *Id.* Another assesses whether the defendant's conduct offends a "public policy . . . tethered to specific constitutional, statutory or regulatory provisions." *Id.* at 613.

Plaintiffs have not met the first test. They allege that the Program causes them harm in the form of less convenient access to their prescription medication, and that Defendants' decision to enroll Plaintiffs in the Program was "ultimately motivated by profit." FAC ¶ 79. But California courts have generally held that merely entering into a contract or transaction with for profit does not make the contract or transaction "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" for the purposes of the UCL. *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001); *see, e.g.*, *Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466, 483–84 (2006) (finding no UCL violation where plaintiff claimed defendant charged an insurance coverage fee that constituted a 100% markup on its cost of obtaining the coverage); *Searle v. Wyndham International, Inc.*, 102 Cal. App. 4th 1327, 1333 (2002) (not unfair for hotel to assess a mandatory service charge on guests).

The second test presents a closer question. Plaintiffs allege that CVS's conduct "offends established public policy that is tethered to legislatively declared policies as set forth in" the ACA, ADA, 45 C.F.R. 156.122(e), and the Unruh Act. FAC ¶¶ 186, 189. However, Plaintiffs have failed to show that CVS has violated any of the listed substantive statutes or regulations. The complaint elsewhere references the "right to privacy" guaranteed by "Article I, section 1 of the California Constitution," and alleges that "the Program violates Class Members' inalienable right to privacy by eliminating their choice to keep their medical condition private, by requiring public delivery of their medications by someone they do not know and from CSP personnel who may not be sensitive to or have extensive knowledge of their condition." FAC ¶ 116.

///

///

///

///

///

22

To be sure, the protections afforded by article I, section 1 of the California Constitution extend to an individual's medical privacy.[9]  For example, the California Court of Appeal has held that article I, section 1 protects the confidentiality of medical records.  *See Bd. of Med. Quality Assurance v. Gherardini*, 156 Cal. Rptr. 55, 61 (Ct. App. 1979), *disapproved of on other grounds by Williams v. Superior Court*, 398 P.3d 69 (Cal. 2017).  And, particularly pertinent to this case, the court in *Urbaniak v. Newton* affirmed that "disclosure of HIV positive status may under appropriate circumstances be entitled to protection under article 1, section 1."  277 Cal. Rptr. 354, 360 (Ct. App. 1991).  But not every disclosure of medical information violates a patient's privacy right.  "The California Constitution and the common law set a high bar for an invasion of privacy claim," and "[a]ctionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right."  *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) (quoting *Hill v. Nat'l Collegiate Athletic Assn.*, 865 P.2d 633, 655 (Cal. 1994)).

Only one of Plaintiffs' allegations makes out a violation of article I, section 1.  According to the complaint, Plaintiffs "have reported that CVS personnel shouted the name of their HIV/AIDS Medications across the room in front of other customers, raising severe privacy concerns and making it untenable to pick up their medications at a CVS pharmacy in the future."  FAC ¶ 76.  Such indiscretion on the part of CVS personnel in announcing to anyone within earshot that Plaintiffs were taking HIV/AIDS drugs could be sufficiently serious to be actionable under the California Constitution, because "even negligent disclosure of HIV-positive status can be an egregious violation of social norms if it causes harm—including psychological harm—to the patient."  *Doe v. Beard*, 63 F. Supp. 3d 1159, 1170 (C.D. Cal. 2014).  However, Plaintiffs do not allege this is a regular or widespread practice, as opposed to an isolated incident, sufficient to entitle Plaintiffs to equitable and injunctive relief directed against the Program as a whole.  There

---

[9] The California Supreme Court has made clear that "the Privacy Initiative in article I, section 1 of the California Constitution creates a right of action against private as well as government entities."  *Hill v. Nat'l Collegiate Athletic Assn.*, 865 P.2d 633, 644 (Cal. 1994).

is no allegation this incident was integrally or inevitably part of the Program.

Accordingly, CVS's motion to dismiss Plaintiffs' UCL claim is **GRANTED without leave to amend**.

F.     ERISA Claims

1.     Denial of Benefits

Section 502(a)(1)(B) of ERISA allows for recovery of benefits due "under the terms of [an ERISA] plan." 29 U.S.C. § 1132(a)(1)(B). "In order to state a claim for denial of benefits under ERISA, Plaintiffs must allege plausible facts showing they were owed benefits under the . . . Plan. This requires Plaintiffs to allege (1) the existence of an ERISA plan, and to identify (2) the provisions under the plan that entitle [them] to benefits." *B.R. v. Beacon Health Options*, No. 16-CV-04576-MEJ, 2017 WL 5665667, at *3 (N.D. Cal. Nov. 27, 2017) (citations and internal quotation marks omitted). Here, Plaintiffs have alleged that the benefit plan administered by CVS is an ERISA plan, *see* FAC ¶ 126, but have not identified the provisions of the plan that entitle them to the benefits they seek. Indeed, their challenge is to the overall scope of the plan, not denial of benefits under the plan.

Plaintiffs argue in broad terms that they are "entitled to prescription medication benefits under the terms of their plans," and that "Defendants have effectively denied Plaintiffs" these benefits "by, *inter alia*, denying access to a local, knowledgeable pharmacist, by requiring a process that risks missed medications and lost or stolen shipments as well as other obstacles." Opp. at 16–17. Accordingly, Plaintiffs "seek the benefit of continued access to community pharmacies as an 'in-network' benefit." FAC ¶ 201. However, they are unable to point to any allegation in the complaint specifying which terms under their plans entitle them to such a benefit. Indeed, the complaint attributes the "designation of the community pharmacy as now being 'out-of-network'" to "Defendants' changes to Class Members' health plans' prescription drug benefit." *Id.* ¶ 197. Hence, their plans do not confer the benefit they seek.

"A plaintiff who brings a claim for benefits under ERISA must identify a specific plan term that confers the benefit in question." *Steelman v. Prudential Ins. Co. of Am.*, No. CIV S-06-2746 LKKGGH, 2007 WL 1080656, at *7 (E.D. Cal. Apr. 4, 2007) (quoting *Stewart v. National*

*Educ. Ass'n*, 404 F. Supp. 2d 122, 130 (D.D.C. 2005), *aff'd*, 471 F.3d 169 (D.C. Cir. 2006)).

Simply alleging violations of the plan "without reference to the terms of the controlling plans" is not sufficient. *Forest Ambulatory Surgical Assocs., L.P. v. United HealthCare Ins. Co.*, No. 10-CV-04911-EJD, 2011 WL 2748724, at *5 (N.D. Cal. July 13, 2011). Thus, the lack of any specific reference to plan provisions which affords the benefits to which they contend they are entitled warrants dismissal of Plaintiffs' denial-of-benefits ERISA claim. *See id.* (finding that plaintiff's "conclusory allegations" that "[u]nder the terms of the relevant written ERISA plans and written Assignment Agreements, [defendant] was obligated to pay [plaintiff] the amount of the Claims submitted under the ERISA plans for the procedures performed by [plaintiff's] medical staff" were insufficient to plead an ERISA claim).

Accordingly, Plaintiffs' denial of benefits claim under ERISA is **DISMISSED with prejudice.**

### 2. Breach of Fiduciary Duty

Plaintiffs next argue that CVS breached its fiduciary duties in administering the benefit plans. There are two types of ERISA fiduciaries: "named" and "functional." *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 837 (9th Cir. 2018). CVS argues it is neither a named nor a functional fiduciary with respect to Plaintiffs' benefit plans. CVS seeks to introduce the prescription benefits services contracts between CaremarkPCS and three of the Employer Defendants (Amtrak, Time Warner, and Lowe's). *See* Docket Nos. 88-1, 88-2, 88-4. Plaintiffs object to CVS's attempt to introduce the contracts. *See* Docket No. 116. On a motion to dismiss, "courts may take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (citation, internal quotations marks, and alterations omitted).

As an initial matter, Plaintiffs "question the authenticity of these contracts having not had an opportunity to confirm whether these are, in fact, the correct and complete contracts between the parties through discovery." Docket No. 116 at 2. In response, CVS quotes the Ninth Circuit's statement in *Davis* that "[w]hether or not [the plaintiff] had access to and reviewed the proffered

documents is a matter unrelated to their authenticity—i.e., whether the documents are 'what its proponent claims.'" Docket No. 119 at 2 (quoting *Davis*, 691 F.3d at 1161). However, this quote is taken out of context. *Davis* was assessing the claim of a plaintiff who insisted that he had properly challenged the authenticity of documents proffered by the defendant before the district court by simply asserting that he had not been able to review the documents. *See Davis*, 691 F.3d at 1160. It was in response to this argument that the Ninth Circuit explained that objecting to a lack of access to documents is not equivalent to challenging the authenticity of documents. *See id.* at 1161.

In contrast to the plaintiff in *Davis*, Plaintiffs in this case have explicitly questioned the authenticity of the contracts, which are between CVS and Plaintiffs' employers. However, Plaintiffs' "ongoing and substantial reliance on the [contracts] as a basis for [their] allegations substantially weakens [their] position." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), *abrogated on other grounds as recognized in South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Among other things, the complaint alleges that "one of CVS Caremark's roles as a prescription drug benefit administrator . . . is to establish and contractually control which, if any, non-CVS pharmacies are "in-network," thereby determining where Class Members may purchase their prescription drugs with full insurance coverage, FAC ¶ 68; that "CVS Caremark is specifically identified in the Summary Plan Descriptions of certain employers' health benefit plans . . . as a fiduciary," *id.* ¶ 100; that Employer Defendants "have entered into a series of agreements [with CVS] that reduced the health benefits available to their members and resulted in discriminatory conduct against them," *id.* ¶ 102; that CVS exercises "significant direct and indirect control over their subsidiary CVS pharmacies and Class Members' access to their preferred community pharmacies . . . through contractual agreements and financial arrangements," *id.* ¶ 163; and that "AMTRAK, Lowe's, and Time Warner each knowingly participated in CVS's breach of its fiduciary duties through its agreement with CVS subjecting members of its health plan to the Program," *id.* ¶ 209. These allegations belie Plaintiffs' contention that they "do not reference or rely on the agreements between CVS and Plaintiffs' employers." Docket No. 116 at 2. Accordingly, the Court will consider the contracts in reviewing Plaintiffs' breach of fiduciary

duty claim.  *See Silicon Graphics*, 183 F.3d at 986 (affirming district court's consideration of SEC filings under incorporation by reference doctrine despite plaintiff's challenge to their authenticity because plaintiff "raised questions about [defendants'] stock sales, based [her] allegations on [defendants'] SEC filings, and submitted expert declarations that rely on the SEC forms at issue"); *see also Santomenno*, 883 F.3d at 836 n.2 (incorporating ERISA documents by reference where the complaint referred to the documents).

The contracts show that the CVS Defendants are neither named nor functional fiduciaries with respect to Plaintiffs' benefit plans.  A "'named fiduciary' means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly." 29 U.S.C. § 1102(a)(2).  The contracts here do not name any of the CVS Defendants in this action as a fiduciary.  They only provide that CaremarkPCS—a non-party—shall be a "fiduciary solely for the purposes of initial claim adjudication and appeals relating to the coverage of prescription drug benefits" (neither of which is at issue here), but otherwise "shall not be . . . a named fiduciary with respect to the Plan for purposes of ERISA."  Docket Nos. 88-1 at Pricing Schedule A § 16, 88-2 § 6.2, 88-4 § 6.2.  Because none of the CVS Defendants in this case is named in the plan instrument, none is a named fiduciary.

A party not named in an ERISA plan is deemed a functional fiduciary if:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  The CVS Defendants sued in this action are neither parties to the contracts with Plaintiffs' employers nor given any "discretionary authority or discretionary control" under the terms of the contracts over the management or administration of the benefit

plans.  The actual party contracting with each employer is "CaremarkPCS Health L.L.C."  Docket

Nos. 88-1 at 1, 88-2 at 1, 88-4 at 1.  "[B]ecause [the CVS Defendants] [are] not . . . part[ies] to the

. . . PBM Agreement," they are not fiduciaries with respect to Plaintiffs' plans.  *Bickley v.*

*Caremark Rx, Inc.*, 361 F. Supp. 2d 1317, 1326 (N.D. Ala. 2004), *aff'd*, 461 F.3d 1325 (11th Cir.

2006).

   But, even assuming CaremarkPCS had been named as a defendant here, the terms of the

contract undermine any argument that CaremarkPCS "exercises significant if not sole

discretionary authority" over management of the benefit plans.  FAC ¶ 205.  The CaremarkPCS-

Amtrak contract makes clear that Amtrak "retain[s] the sole and absolute authority to design,

amend, terminate, or modify . . . the Plan," as well as "complete discretionary, binding and final

authority to construe the terms of the Plan . . . [and] to make factual determinations regarding the

payment of Claims or provisions of benefits."[10]  Docket No. 88-1 at Pricing Schedule A § 16.  The

contract expressly disclaims any discretionary authority in CaremarkPCS; it states that

CaremarkPCS "shall not be . . . the administrator of the Plan for any purpose," "delegated

discretionary authority . . . with respect to the Plan or its administration," or "deemed a fiduciary

with respect to the Plan for purposes of ERISA."  *Id.*  Near-identical provisions appear in the

Timer Warner and Lowe's contracts.  *See* Docket Nos 88-2 § 6.2, 88-4 § 6.2.  It also appears from

the contracts that while CaremarkPCS designates drugs as "specialty medications" subject to the

Program's restrictions, the Employer Defendants retain the ultimate authority to exempt drugs so

designated from the restrictions.  *See* Docket No. 88-2 § 2.6(a) (providing that Employer can

"elect[] to treat" certain drugs "designated as excluded from coverage" as "Covered Drugs."), 88-4

§ 2.6(a) (same).

   Relying on similar express contract terms limiting the discretionary authority of the PBM,

---

[10] CaremarkPCS is designated as a fiduciary "solely for the purposes of initial claim adjudication and appeals relating to the coverage of prescription drug benefits."  Docket Nos. 88-1 at Pricing Schedule A § 16, 88-2 § 6.2, 88-4 § 6.2.  But the Plaintiffs do not allege that CVS breached its fiduciary duty with respect to those two functions.  *See Del Prete v. Magellan Behavioral Health, Inc.*, 112 F. Supp. 3d 942, 946 (N.D. Cal. 2015) ("[A]n entity may be a fiduciary under ERISA for some purposes and not for others . . . .") (citing *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000)).  CaremarkPCS is not afforded discretionary authority over the *design* of the plan.

Courts have consistently determined that the PBM is not a functional fiduciary.[11] In *Moeckel v. Caremark, Inc.*, as in this case, the plaintiff alleged that the benefit plan administrator served as an ERISA fiduciary by exercising discretion in determining what drugs to include on the formulary. 622 F. Supp. 2d 663, 686 (M.D. Tenn. 2007). But because the agreement between the administrator and the employer offering the plan expressly provided that the employer "retained exclusive control and authority over the . . . Plan and its administration, including with respect to its formulary(ies) and associated programs," the court concluded that the administrator's "formulary design and management activities with respect to its proprietary formularies are not fiduciary in nature." *Id.* at 687. *See also Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 474–77 (7th Cir. 2007) (holding that plan administrator was not a fiduciary for the purposes of managing the formulary, negotiating prices with drug retailers, and managing rebates where "[t]he express language of the contracts contradicts th[e] characterization of [the administrator's] authority over these programs"); *Bickley*, 361 F. Supp. 2d at 1333–34 (finding that PBM was not acting as fiduciary in negotiating "rebates, discounts, and other pricing advantages"); *Bd. of Trustees of W. Lake Superior Piping Indus. Pension Fund v. Am. Benefit Plan Adm'rs, Inc.*, 925 F. Supp. 1424, 1429 (D. Minn. 1996) (concluding that corporation which performed administrative services on behalf of a benefit plan was not a fiduciary based on "the express terms of the Agreement" providing that "the functions it performed, in administering the Fund, were 'purely ministerial'").

The cases cited by Plaintiffs do not change the analysis. *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.* found that a PBM managing a drug benefit program was a functional fiduciary "[i]n choosing whether to fill a prescription or shift a participant to a different drug," because "it exercise[d] discretion over the plans' assets." 465 F.3d 1123, 1124

---

[11] Plaintiffs make the argument that the Court "cannot find that a PBM [like CaremarkPCS is [not] a fiduciary" based on "adjudicated facts set forth in other courts' opinions," because in ruling on a motion to dismiss, a court may not take judicial notice of another court's opinion "for the truth of the facts recited therein." Opp. at 19 n.3. The rule Plaintiffs cite has no application here, because these opinions conclude, in light of the terms of the governing contracts, that plan administrators are not fiduciaries as a matter of law; this Court is not taking judicial notice of facts, but of the persuasiveness of the construction of similar contracts.

United States District Court
Northern District of California

United States District Court
Northern District of California

(9th Cir. 2006). But there was no indication that the contract at issue expressly limited the PBM's discretionary authority over those functions. In *In re Express Scripts, Inc., PBM Litig.*, the court recited the general proposition that "once the PBM contracts were formed, [the PBM] was a fiduciary to the extent (if any) it exercised discretion over the management of a plan or disposition of plan assets." No. 4:05-MD-01672 SNL, 2008 WL 2952787, 10* (E.D. Mo. July 30, 2008). Immediately following that sentence, however, the court observed that "[u]nder the [relevant] Contract(s), [the PBM] had no discretion over" drug prices, and accordingly ruled that it was not a fiduciary for drug pricing purposes. *Id.* Because the contracts here similarly divest CaremarkPCS of discretion with respect to its challenged functions under the plan, *Express Scripts* supports CVS's contention that it is not a fiduciary.

Plaintiffs' contention that the CaremarkPCS contracts should be ignored because "a contract exonerating an ERISA fiduciary from fiduciary responsibilities is void as a matter of law" is likewise inapposite. Opp. at 21 (quoting *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1418 (9th Cir. 1997)); *see* 29 U.S.C. § 1110(a). While the rule cited by Plaintiffs is valid, it does not apply until *after* a court has resolved the "'threshold question' of whether a party 'was performing a fiduciary function when taking the action subject to complaint.'" *Santomenno*, 883 F.3d at 840–41 (quoting *Pegram*, 530 U.S. at 226). It is only "*[i]f* [CVS] is a fiduciary . . .[that] any interpretation of the Plan which prevents [CVS] acting in a fiduciary capacity from being found liable as a fiduciary is void." *IT Corp.*, 107 F.3d at 1418 (citation, internal quotation marks, and alterations omitted). Plaintiffs' argument ignores the threshold question that begs to be answered. For the reasons stated above, neither the named CVS Defendants nor CaremarkPCS was performing a fiduciary function with respect to the alleged wrongdoing here, so the rule Plaintiffs cite does not come into play.

Finally, Plaintiffs raise for the first time in their opposition brief the claim that CVS also violated Section 510 of ERISA, which prohibits an employer from taking any adverse employment action against an employee "for exercising any right to which he is entitled under the provisions of an employee benefit plan," or "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140.

Section 510 is designed to "prevent persons and entities from taking actions which might cut off or interfere with a participant's ability to collect present or future benefits or which punish a participant for exercising his or her rights under an employee benefit plan." *Lessard v. Applied Risk Mgmt.*, 307 F.3d 1020, 1024 (9th Cir. 2002) (quoting *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir. 1992)). "Where a plaintiff alleges discriminatory interference under section 510, a showing of the defendant's 'specific intent' to interfere with ERISA rights is . . . required." *Schuman v. Microchip Tech. Inc.*, 302 F. Supp. 3d 1101, 1122–23 (N.D. Cal. 2018). This requires evidence that the exercise of the plaintiff's ERISA rights was "the motivating force" for the adverse actions he suffered. *See Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 881 (9th Cir. 1989). No action lies where the alleged loss of rights "is a mere consequence, as opposed to a motivating factor behind the [adverse employment action]." *Dytrt v. Mountain States Tel. & Tel. Co.*, 921 F.2d 889, 896 (9th Cir. 1990).

Here, Plaintiffs claim that CVS violated Section 510 "by intentionally discriminating against Plaintiffs because of their health conditions." Opp. at 19. But they have alleged no facts that give rise to an inference that CVS implemented the Program's restrictions with the specific intent of denying Plaintiffs their prescription drug benefits. Instead, the complaint throughout emphasizes that Defendants' "decision to force Class Members to accept CSP as their exclusive provider under the Program" were "ultimately motivated by profit." FAC ¶ 79; *see also id.* ¶ 78 ("By implementing [the Program], CVS Caremark effectively reduces the quality of prescription drug care provided to Class Members, . . . allowing CVS Caremark to profit . . . ."), ¶128 ("Defendants have put their own interests above their subscribers through their conduct of discrimination and self-dealing by mandating the use of CSP . . . . all the time profiting as a result thereof."), ¶ 210 ("CVS Caremark has decreased or eliminated plan benefits in order to increase their own profits by requiring enrollees to only use CSP . . . ."). These allegations do not state a Section 510 claim. *See Powers v. AT&T*, No. 15-CV-01024-JSC, 2015 WL 5188714, at *7 (N.D. Cal. Sept. 4, 2015) (dismissing Section 510 claim where allegations in complaint "give rise to an inference that the [plaintiff's] constructive discharge occurred due to age discrimination, but not that Plaintiff's supervisor or [employer] more generally had some plan to force Plaintiff into

retirement to deprive him of otherwise available benefits").

Accordingly, CVS's motion to dismiss Plaintiffs' breach of fiduciary duty claim under ERISA is **GRANTED without leave to amend.**

### 3. Co-Fiduciary Liability

Plaintiffs additionally contend that CVS and Employer Defendants are co-fiduciaries, and thus liable for each other's fiduciary breaches under ERISA. Opp. at 20. Co-fiduciary liability under ERISA is codified at 29 U.S.C. § 1105(a), which provides:

> [A] fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

However, as explained below, the Employer Defendants were not acting as fiduciaries with respect to their alleged conduct in this case, and therefore co-fiduciary liability cannot attach to CVS. *See* Part IV.B.2, *infra*. Accordingly, CVS's motion to dismiss Plaintiffs' co-fiduciary liability claim under ERISA is **GRANTED without leave to amend.**

### 4. Full and Fair Review

ERISA requires an employee benefit plan to "afford a reasonable opportunity to any participant whose claim for benefits has been denied . . . a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). Regulations set forth the minimum requirements that employee benefit plans must include to ensure a full and fair review. *See* 29 C.F.R. § 2560.503-1(a)–(o).

Plaintiffs allege they were denied a full and fair review by CVS's "fail[ure] to provide a reasonable procedure for opting-out of the Program." FAC ¶ 224. Put another way, the "benefit"

as to which their claim is being denied is the option to obtain HIV/AIDS medication from a non-CVS pharmacy at in-network prices. *See id.* ¶ 228 ("Plaintiffs seek the aforementioned benefit of continued access to community pharmacies as an 'in-network' benefit . . . ."). But Plaintiffs' complaint reveals that they are not entitled to such a benefit under the Program, since they allege that their employers entered into contracts with CVS with a "'non-opt-out' plan option that subjects members to the Program" with "no right to request exemption from the Program." FAC ¶ 102. Plaintiffs cannot be denied a full and fair review of a claim for a benefit they do not have. *See* 29 C.F.R. § 2560.503-1(e) (defining "a claim for benefits" as "a request for a *plan benefit or benefits* made by a claimant in accordance with a plan's reasonable procedure for filing benefit claims") (emphasis added).

In any event, Plaintiffs have not identified any procedural defects in the opt-out process. They allege that each of the named Plaintiffs followed the prescribed opt-out procedures and each was ultimately denied. *See id.* ¶ 220. On this basis, they argue that "the review process was neither meaningful nor performed in good faith," without alleging any particular procedural deficiencies or bad faith on the part of CVS. Opp. at 24. Their assertion that "the outcome denying Plaintiffs' claims was foreordained," *id.*, demonstrates that their complaint is directed to the result of the review, not the process.

Accordingly, CVS's motion to dismiss Plaintiffs' full and fair review claim under ERISA is **GRANTED without leave to amend.**

G.    Declaratory Relief

Plaintiffs' claim for declaratory relief "rises or falls with [their] other claims." *Surf & Sand, LLC. v. City of Capitola*, No. C 07-05043 RS, 2008 WL 2225684, at *2 n.5 (N.D. Cal. May 28, 2008). Because Plaintiffs' other claims fail, their claim for declaratory relief is **DISMISSED.**

## IV.    EMPLOYER DEFENDANTS' MOTIONS TO DISMISS

A.    Rule 8(a) Pleading Standard

Employer Defendants argue that the complaint fails to meet the pleading requirements of Federal Rule of Civil Procedure 8(a) because it makes general allegations against undifferentiated defendants, and does not identify which named Plaintiff is employed by which Defendant. *See*

33

Amtrak Mot. at 6–7; Lowe's Mot. at 9–10; Time Warner Mot. at 9–10.

The complaint is not a model of clarity. But it does make clear that Counts 1 through 4 are only brought "brought against the CVS Caremark Defendants." *See* FAC ¶¶ 140, 151, 170, 184. No such express statement accompanies Counts 5 through 8, but it is fair to understand them as being against all Defendants, since in contrast to the references to only "CVS Caremark" or "Employer Defendants" elsewhere in the complaint, those Counts largely use the general term "Defendants." *See, e.g., id.* ¶¶ 196–97, 208, 232. Within these Counts, the complaint also continues to use "CVS Caremark" to make allegations against CVS specifically, *see, e.g., id.* ¶¶ 198, 205, 220–26, and to use "Employer Defendant" or the names of individual employers when making allegations against them specifically, *see, e.g., id.* ¶¶ 196, 206, 209. Thus, for example, Plaintiffs' denial of benefits claim under ERISA against CVS is based on the allegation that it "caused a reduction in or elimination of Plaintiffs' and Class Members' benefits by exclusively requiring their use of CSP to acquire these specialty medications," *id.* ¶ 198, whereas the same claim against Employer Defendants is based on their "entering into agreements with CVS that did not provide an ability to opt-out of the Program, . . . as well as the failure to provide clear notice thereof," *id.* ¶ 196. The complaint is sufficient to give Employer Defendants "fair notice of the claim[s] [against them] and the grounds upon which [they] rest[]." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

The complaint's failure to indicate which Named Plaintiff corresponds to which Employer Defendant is more problematic. To be sure, the Named Plaintiffs make the same legal claims based on similar underlying facts: each of them, prior to enrolling in the Program, obtained his HIV/AIDS medications from a non-CVS pharmacy but is now subject to the requirements of the program, *see* FAC ¶ 20, 29, 32, 43, 50, 58; has experienced problems with prescription deliveries under the Program, *see id.* ¶¶ 24, 34, 46, 51, 59; has not experienced satisfactory consultation or counseling services at CVS Pharmacies under the Program or with CVS service representatives, *see id.* ¶ 25, 39, 48, 55, 63; (with the exception of John Doe Four) has requested to opt-out of the Program without success, *see id.* ¶¶ 23, 41, 45, 67; and has suffered significant stress as a result of having to navigate the Program, *see id.* ¶¶ 30, 42, 49, 57, 66. But without knowing which specific

Named Plaintiff is enrolled in its benefit plan, an Employer Defendant cannot verify allegations about that Plaintiff, such as when and how they requested to opt-out, and what difficulties they experienced in obtaining their medications. *See Corazon v. Aurora Loan Servs., LLC*, No. 11-00542 SC, 2011 WL 1740099, at *4 (N.D. Cal. May 5, 2011) (a "complaint fails to state a claim [where] plaintiffs do not indicate which individual defendant or defendants were responsible for which alleged wrongful act," because a defendant "should not be required to guess which allegations pertain to it"). The complaint therefore does not give Employer Defendants "fair notice" of the claims against them, as required by Rule 8(a). *See In re Sagent Tech., Inc., Derivative Litig.*, 278 F. Supp. 2d 1079, 1094 (N.D. Cal. 2003).

Ordinarily, pleading defects like this can be cured by amendment with more specific allegations. Here, however, the Court declines to grant Plaintiffs leave to amend the complaint, because their claims against Employer Defendants also fail on the merits, as explained below.

B.    ERISA Claims

1.    Denial of Benefits

Plaintiffs' claim for denial of benefits under Section 502(a)(1)(B) of ERISA against Employer Defendants fails for the same reason as against CVS. According to Plaintiffs, they have "allege[d] that they are entitled to prescription medication benefits from the in-network pharmacist of their choice under the terms of their employer sponsored plans." *See* Docket No. 121 at 6. However, they have not "identif[ied] a specific term that confers the benefit[s] in question," as is required for such a Section 502(a)(1)(B) claim. *Steelman*, 2007 WL 1080656, at *7; *see* Part III.F.1, *supra*. The paragraphs from the complaint cited by Plaintiffs merely allege that the Named Plaintiffs were able to obtain their HIV/AIDS medications from community pharmacies "*prior to* the implementation of the Program." FAC ¶ 32 (emphasis added); *see also id.* ¶¶ 43, 50 (Plaintiffs "had *previously* been able to obtain" medications from community pharmacies) (emphasis added). They do not allege that under the Program, they are *still* entitled to the same benefit.

Plaintiffs' citation to *Central Laborers' Pension Fund v. Heinz* for the proposition that "an amendment placing materially greater restrictions on the receipt of the benefit 'reduces' the benefit" does not change the analysis. 541 U.S. 739, 744 (2004). *Heinz* reviewed the effect of a

plan amendment on accrued benefits in a pension plan, which, once vested, "may not be decreased by an amendment of the plan" under what is known as the "anti-cutback rule." *Id.* at 744 (quoting 29 U.S.C. § 1054(g)(1)). The anti-cutback rule "does not apply to 'employee welfare benefit plans.'" *Anderson v. Suburban Teamsters of N. Illinois Pension Fund Bd. of Trustees*, 588 F.3d 641, 650 (9th Cir. 2009) (quoting 29 U.S.C. § 1051(1)). Plaintiffs have not alleged that they have any vested pension benefits reduced by the Program.

### 2. Breach of Fiduciary Duty

Plaintiffs' claim against Employer Defendants for breach of fiduciary duty under ERISA fails because Employer Defendants did not act in a fiduciary capacity with respect to the challenged conduct.

ERISA deems an entity a fiduciary only "to the extent" that it acts in a fiduciary capacity in relation to an ERISA plan. 29 U.S.C. § 1002(21)(A). "In every case charging breach of ERISA fiduciary duty, then, the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). The Supreme Court has emphasized that "[n]othing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) (citation omitted). Therefore, "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Id.* at 890 (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)). "When employers undertake those actions, they do not act as fiduciaries . . . ." *Id.* (citations omitted).

Here, most of the allegations against Employer Defendants relate to non-fiduciary plan design functions. Plaintiffs allege that Employer Defendants "decreased or eliminated Plaintiffs' and Class Members' plan benefits." FAC ¶ 213. But "without exception, '[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries.'" *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 445 (1999) (quoting *Lockheed Corp.*, 517 U.S. at 890). Plaintiffs next allege that Employer Defendants "exercise[d] discretion over whether and which pharmacy

United States District Court
Northern District of California

benefits manager to select for administering pharmacy benefits for the health plans in which their employees are enrolled." FAC ¶ 206. But "[Employer Defendants'] decision to enter into the PBM Agreement with [CVS], and to agree to the various terms contained therein, was a plan design decision, exempt from fiduciary review." *Moeckel*, 622 F. Supp. 2d at 678.

The remaining allegations fall into three categories. First, Plaintiffs argue that Employer Defendants engaged in "financial self-dealing" in implementing the Program, FAC ¶ 208, presumably because they accepted "financial incentives" from CVS to choose the Program over other benefit plans, *id.* ¶ 79. But this is just an attempt to challenge the design of the plan in another guise. Plaintiffs' own language in the complaint demonstrates this allegation concerns the form of the plan and its structuring of benefits: "CVS Caremark provid[ed] financial incentives to self-funded plans and other plan sponsors *to select the Program over a prescription drug benefit plan that allows enrollees to use the pharmacy of their choice*." FAC ¶ 79 (emphasis added). "ERISA's fiduciary duty requirement simply is not implicated where [an employer] . . . makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts." *Hughes Aircraft Co.*, 525 U.S. at 444.

The distinction between plan design, which does not implicate a fiduciary duty, and plan administration, which does, is illustrated by the two cases Plaintiffs cite. In *Caplan v. CNA Short Term Disability Plan*, an employer created a conflict of interest by outsourcing the review of benefits claims to a third-party that allegedly had a financial incentive to deny claims. 479 F. Supp. 2d 1108, 1109 (N.D. Cal. 2007). Similarly, in *Finkelstein v. Guardian Life Ins. Co. Am.*, the breach of fiduciary duty arose from the issuer of a benefit plan "systematically den[ying] legitimate claims in an attempt to boost profits." No. C 07-01130 CRB, 2007 WL 4287329, at *4 (N.D. Cal. Dec. 5, 2007). Reviewing benefits claims is a prototypical aspect of plan administration. In contrast, deciding to adopt a particular prescription drug benefit plan is an aspect of plan design, and "ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan." *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 646 (8th Cir. 2007).

Second, Plaintiffs argue that Employer Defendants "are liable under ERISA for their

37

failure to monitor CVS in adopting this discriminatory Program."  Docket No. 121 at 12.  "Failure to monitor" was not expressly alleged as a claim in the complaint, but Plaintiffs now argue that the claim is grounded in the allegation in FAC ¶ 103: "Amtrak, Lowe's, and Time Warner have each knowingly participated in CVS's breach of its fiduciary duties through its agreement with CVS subjecting members of its health plan to the Program," and "having expressly agreed to subject its members to the Program, each knew of CVS's breach of its fiduciary duties and failed to make reasonable efforts to remedy the breach."  To the contrary, it is clear that FAC ¶ 103 pertains to Plaintiffs' ERISA co-fiduciary claim, not a failure to monitor claim.  The language of the allegation echoes the language of 29 U.S.C. § 1105(a), which imposes co-fiduciary liability where a fiduciary "participates knowingly in . . . an act or omission of such other fiduciary, knowing such act or omission is a breach," and where "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."  Paragraph 103 is also sandwiched between FAC ¶ 102, which alleges that "[t]he employers . . . act as co-fiduciaries with CVS," and ¶ 104, which alleges that "CVS is also a co-fiduciary with each of Amtrak, Lowe's, and Time Warner in that CVS . . . had knowledge of the breach by each of those employers and failed to make reasonable efforts to remedy the breach."

Even if the allegation is construed as a "failure to monitor" claim, it is again a challenge to the plan design packaged in another guise.  Plaintiffs make clear that the "breach" at issue is CVS and Employer Defendants' "agreement" to provide a benefit plan that has terms Plaintiffs feel are unfavorable.  The challenge is to the Employer Defendants' "decision regarding the form or structure of the Plan" offered to employees.  *Hughes Aircraft Co.*, 525 U.S. at 444.  That decision does not create a fiduciary duty.

In any case, "[t]he duty of an ERISA fiduciary to review the performance of its appointees is a limited one.  Specifically, a fiduciary must review the performance of its appointees at reasonable intervals in such a manner as may be reasonably expected to ensure compliance with the terms of the plan and statutory standards."  *In re Calpine Corp.*, No. C-03-1685 SBA, 2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005) (citing 29 C.F.R. § 2509.75-8, FR-17).  Here, Plaintiffs have not alleged any facts to show that Employer Defendants "failed to periodically

review the performance of [CVS]." *Id.*

Third, Plaintiffs raise for the first time in their opposition brief, as they did against CVS, the argument that Employer Defendants violated Section 510 of ERISA. That argument fails for the same reasons as against CVS. *See* Part III.F.2, *supra*.

### 3. Co-Fiduciary Liability

Plaintiffs' claim against Employer Defendants for co-fiduciary liability under ERISA fails because CVS did not breach its fiduciary duties. *See* Part III.F.2, *supra*; 29 U.S.C. § 1105(a).

### 4. Full and Fair Review

It is not clear whether Plaintiffs are bringing the "full and fair review" claim against only CVS or against all Defendants. There are allegations that three of the named Plaintiffs submitted opt-out requests to both CVS and their employers. *See* FAC ¶ 220. But otherwise the complaint attributes the lack of a full and fair review process solely to CVS. *See id.* ¶¶ 224–26. Plaintiffs argue in their opposition to Lowe's and Time Warner's motions to dismiss that they pleaded the "full and fair review" claim against Employer Defendants. *See* Docket No. 121 at 15.

Even if this claim was adequately plead against Employer Defendants, it fails for the same reasons it fails against CVS. First, Plaintiffs are not entitled to the benefit of being able to opt out of the Program under their plans, so Plaintiffs cannot be denied a full and fair review of an opt-out request. Second, as noted above, Plaintiffs have not identified any procedural defects in the opt-out process. *See* Part III.F.4, *supra*.

Accordingly, Employer Defendants' motions to dismiss Plaintiffs' ERISA claims is **GRANTED without leave to amend.**

### 5. Declaratory Relief

Because Plaintiffs have not successfully stated claims for relief against Employer Defendants under ERISA, their claim for declaratory relief is **DISMISSED**.

///

///

///

///

United States District Court
Northern District of California

## V.     <u>CONCLUSION</u>

For the foregoing reasons, CVS and Employer Defendants' motions to dismiss are

**GRANTED**. Plaintiffs' claims are **DISMISSED with prejudice**.

The Clerk is instructed to enter judgment and close the file.

This order disposes of Docket Nos. 87, 89, 97, and 113.


**IT IS SO ORDERED**.


Dated: December 12, 2018

_____
EDWARD M. CHEN
United States District Judge