**WHATLEY KALLAS, LLP**
Joe R. Whatley, Jr. (admitted *pro hac vice*)
jwhatley@whatleykallas.com
Edith M. Kallas (admitted *pro hac vice*)
ekallas@whatleykallas.com
C. Nicholas Dorman (admitted *pro hac vice*)
ndorman@whatleykallas.com
152 West 57th Street, 41st Floor
New York, NY 10019
Tel: (212) 447-7060
Fax: (800) 922-4851

Alan M. Mansfield (Of Counsel, SBN: 125998)
amansfield@whatleykallas.com
16870 W. Bernardo Dr., Suite 400
San Diego, CA 92127
Tel: (858) 674-6641
Fax: (855) 274-1888

**CONSUMER WATCHDOG**
Jerry Flanagan (SBN: 271272)
jerry@consumerwatchdog.org
Benjamin Powell (SBN: 311624)
ben@consumerwatchdog.org
Daniel L. Sternberg (SBN: 329799)
danny@consumerwatchdog.org
6330 San Vicente Blvd., Suite 250
Los Angeles, CA 90048
Tel: (310) 392-0522
Fax: (310) 392-8874

**Attorneys for Plaintiffs**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN DOE ONE, JOHN DOE TWO, JOHN DOE THREE, JOHN DOE FOUR, and JOHN DOE FIVE, on behalf of themselves and all others similarly situated and for the benefit of the general public,<br><br>Plaintiffs,<br><br>v.<br><br>CVS PHARMACY, INC.; CAREMARK, L.L.C.; CAREMARK CALIFORNIA SPECIALTY PHARMACY, L.L.C.; GARFIELD BEACH CVS, L.L.C.; CAREMARKPCS HEALTH, L.L.C.; and DOES 1–10, inclusive,<br><br>Defendants. | Case No. 3:18-CV-1031-EMC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR**:<br><br>**(1)  Violation of Anti-Discrimination Provisions of Affordable Care Act, 42 U.S.C. § 18116; and**<br><br>**(2)  Violation of California Business & Professions Code § 17200, *et seq.***<br><br><br>**Jury Trial Demanded On All Claims So Triable** |

Plaintiffs, by and through the undersigned attorneys, bring this action on behalf of themselves and all others similarly situated and as applicable for the benefit of the general public against Defendants CVS Pharmacy, Inc.; Caremark, L.L.C.; Caremark California Specialty Pharmacy, L.L.C.; CaremarkPCS Health, L.L.C.; and Garfield Beach CVS, L.L.C. (hereafter collectively "CVS Caremark" or "Defendants"). Plaintiffs allege the following on information and belief, which allegations are likely to have evidentiary support after a reasonable opportunity for investigation and discovery, except as to those allegations that pertain to the named Plaintiffs, which are alleged on personal knowledge:

## NATURE OF THE ACTION

1.      Plaintiffs anonymously bring this action to challenge Defendants' discriminatory business practices targeting those persons whose prescription drug benefit is administered by CVS Caremark and who are prescribed specialty medications for the treatment or prevention of HIV/AIDS ("HIV/AIDS Medications").[1] Many enrollees in health plans where CVS Caremark controls and administers the pharmacy benefits are told they are required to obtain their HIV/AIDS Medications from Caremark Specialty Pharmacy d/b/a CVS/Specialty and/or Caremark California Specialty Pharmacy, L.L.C. ("CSP"), a wholly-owned subsidiary of CVS Health Corporation. CSP only delivers such medications by mail order or mails them to a CVS Pharmacy as a drop shipment location purely for pickup. This program threatens HIV/AIDS patients' health and privacy. If HIV/AIDS patients in those plans do not obtain their HIV/AIDS Medications from CSP, then they must either pay more out-of-pocket or pay full price with no insurance benefits whatsoever—thousands of dollars or more each month—to purchase their medications at an in-network community pharmacy where they can receive counseling from a pharmacist and other services they may need to stay alive (hereafter, the "Program"). CVS Caremark has effectively denied and continues to deny Class Members access to in-network non-CVS pharmacies and pharmacists by

---

[1] Due to the sensitive nature of this action, Plaintiffs have chosen to file under fictitious names. *See, e.g., Doe v. Kaweah Delta Hosp.*, 2010 U.S. Dist. LEXIS 135808 (E.D. Cal., Dec. 22, 2010) (HIV/AIDS patient permitted to proceed anonymously); *Does I thru XXIII v. Advanced Textile Corp*. 214 F.3d 1058, 1068 (9th Cir. 2000) (holding that one of the grounds for proceeding anonymously was that anonymity was necessary "to preserve privacy in a matter of sensitive and highly personal nature").

utilizing its discretion and incentivizing employers to make those pharmacies and pharmacists "out-of-network" for HIV/AIDS Medications, or not properly advising enrollees they can elect not to use that Program.

2.     CVS Caremark does not merely administer a prescription drug benefit plan design directed by the sponsor of the plan such as, for example, an employer sponsor providing a health plan that includes prescription drug benefits provided by CVS Caremark to Class Members. CVS Caremark offers financial inducements to plan sponsors in order to incentivize plan sponsors to enroll Class Members in prescription drug benefit plans subject to the Program with no ability for Class Members to exclude themselves from the Program ("opt out") and obtain their medications at an in-network community pharmacy of their choice, or to claim they permit that ability to opt out but not properly advise consumers of that option. CVS also utilizes its discretion to not consistently accept rebates and discounts applicable to such medications, increasing the cost of such medications to plan enrollees. As such, CVS Caremark effectively controls and directs the pharmacy benefits of such plans. Furthermore, as a result of periodic plan renewals with plan sponsors, CVS Caremark has an ongoing ability to alter plan terms and the prescription drug benefits provided thereunder to Class Members.

3.     CVS Caremark has implemented the Program and has not provided Class Members a right to opt out of the Program, or if and when there is such an opt out process, has not provided proper notice thereof. Each Plaintiff has been subjected to the Program. Each Plaintiff has been harmed or has been threatened with imminent harm, and/or has been forced to expend additional monies as a result of being forced to use the Program.

4.     Plaintiffs seek an order of this Court declaring CVS Caremark's conduct to be in violation of federal and state law and enjoining such continued violations of law. Plaintiffs also seek damages, restitution and disgorgement based on out-of-pocket expenses Class Members either have or may incur as a result of the Program or the profits generated by Defendants' conduct that violates the laws set forth below, as appropriate for the particular causes of action set forth below.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the parties to this action. Several named Plaintiffs are residents of California, Defendants transact business in California, and the members of the Class are resident citizens of California as well as other states where the Program has been implemented.

6.      Jurisdiction over Defendants is also proper because they have purposely availed themselves of the privilege of conducting business activities in California and because they currently maintain systematic and continuous business contacts with this State and/or are based here, and do business with thousands of affected enrollees who are residents of this State.

7.      Venue is proper in this District under 28 U.S.C. section 1391 because Defendants maintain substantial operations in this District; at least one of the Plaintiffs and many Class Members either reside or did business with Defendants in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and Defendants entered into transactions and received substantial profits from enrollees who reside in this District.

8.      This Court has subject matter jurisdiction over this action. Federal question jurisdiction exists based on the assertion of claims for violations of the Affordable Care Act ("ACA"). Plaintiffs also allege subject matter jurisdiction for the state law claims based on the Class Action Fairness Act (28 U.S.C. § 1332(d)), as the parties are from different states and the amount in controversy may be in excess of $5 million.

## THE PARTIES

9.      On personal knowledge, JOHN DOE ONE is a resident of Napa County, California. JOHN DOE ONE has received his pharmacy benefits through CVS Caremark since 2004, but until 2015 JOHN DOE ONE could purchase his HIV/AIDS Medications from any in-network pharmacy, including from non-CVS pharmacies, with full insurance benefits. For over six years, JOHN DOE ONE purchased his HIV/AIDS Medications from a non-CVS pharmacy located in Napa, California and developed a personal relationship with his pharmacist. Since January 2015, the HIV/AIDS Medication prescribed to JOHN DOE ONE is subject to the Program. He has been

SECOND AMENDED CLASS ACTION COMPLAINT

required to pay full price with no insurance benefits to obtain his medication from the in-network pharmacy of his choice or use the Program he does not wish to use. His requests to opt out of the Program have been denied.

10.     On personal knowledge, JOHN DOE TWO is a resident of Ventura County, California. For the past 20 years, JOHN DOE TWO has purchased his HIV/AIDS Medications from Eddie's Pharmacy, a local specialty pharmacy located in Los Angeles, California that serves HIV/AIDS patients. Since at least 2013, JOHN DOE TWO has received his pharmacy benefits through CVS Caremark, but until January 1, 2016, JOHN DOE TWO could purchase his HIV/AIDS Medications from any in-network pharmacy, including from non-CVS pharmacies, with full insurance benefits. Since January 2016, the HIV/AIDS Medications prescribed for JOHN DOE TWO have been subject to the Program. Beginning in January 2016, JOHN DOE TWO was required to obtain his medications under the Program, putting his health and privacy at risk. JOHN DOE TWO contacted CVS Caremark on numerous occasions in an attempt to opt out of the Program, including by making requests in writing. However, JOHN DOE TWO's requests to opt out of the Program have consistently been denied.

11.     On personal knowledge, JOHN DOE THREE is a resident of Los Angeles County, California. For the past 15 years, JOHN DOE THREE has purchased his HIV/AIDS Medications from a community pharmacy located in Los Angeles, California. Since at least 2013, JOHN DOE THREE has received his pharmacy benefits through CVS Caremark, but until 2016 JOHN DOE THREE could purchase his HIV/AIDS Medications from any in-network pharmacy, including from non-CVS pharmacies, with full insurance benefits. As of January 2016, the HIV/AIDS Medications prescribed for JOHN DOE THREE are subject to the Program. JOHN DOE THREE contacted his employer's health insurance carrier in an attempt to opt out of the Program. However, JOHN DOE THREE's requests to opt out of the Program have been denied. He is now required to utilize the Program or pay full price with no insurance benefits to obtain his medications from his community pharmacy, and he can no longer use the specialty pharmacist of his choice. He has been forced to use the Program he does not wish to use.

12.     On personal knowledge, JOHN DOE FOUR is a resident of Los Angeles County,

- 4 -
SECOND AMENDED CLASS ACTION COMPLAINT

California. For the past eight years, JOHN DOE FOUR has purchased his HIV/AIDS Medications from a community pharmacy located in Los Angeles, California. Since at least 2013, JOHN DOE FOUR has received his pharmacy benefits through CVS Caremark, but until 2016 JOHN DOE FOUR could purchase his HIV/AIDS Medications from any in-network pharmacy, including from non-CVS pharmacies, with full insurance benefits. As of January 2016, the HIV/AIDS Medications prescribed for JOHN DOE FOUR were subject to the Program. He was required to utilize the Program or pay full price with no insurance benefits to obtain his medications from his community pharmacy, and could no longer use the specialty pharmacist of his choice.

13.     On personal knowledge, JOHN DOE FIVE is a resident of Midland, Texas. JOHN DOE FIVE has received his pharmacy benefits through CVS Caremark since being on an employer plan, but until January 2015, JOHN DOE FIVE could purchase his HIV/AIDS Medications from any in-network pharmacy, including from non-CVS pharmacies, with full insurance benefits. Until 2015, JOHN DOE FIVE had purchased his HIV/AIDS Medications from a community pharmacy located in Midland, Texas. As of January 2015, however, the HIV/AIDS Medications prescribed for JOHN DOE FIVE were subject to the Program. He was required to utilize the Program or pay full price with no insurance benefits to obtain his medications from his community pharmacy, and as a result could no longer use the specialty pharmacist of his choice.

14.     Defendants CVS Pharmacy, Inc.; Caremark, L.L.C.; Caremark California Specialty Pharmacy, L.L.C.; CaremarkPCS Health, L.L.C.; and Garfield Beach CVS, L.L.C. are either domestic or foreign corporations or limited liability companies organized under the laws of this State or the States of Rhode Island, Delaware, or Arizona, with their principal places of business and registered agents for service of process being located in at least those states, and/or are registered to do business in this State or are transacting the business of administering pharmacy benefits and filling specialty prescription requests made in and from this State.

15.     Defendant Caremark, L.L.C is a pharmacy benefit manager ("PBM") that owns and exercises control over CSP. CSP fills the prescription and is the entity that actually ships out medications.

SECOND AMENDED CLASS ACTION COMPLAINT

16.     Employer plan sponsors contract with defendant Caremark, L.L.C. as part of the arrangement to use specialty pharmacy services. Caremark, L.L.C. is also the entity responsible for establishing the Specialty Pharmacy Distribution Drug List (formulary) discussed *infra.*

17.     The Garfield Beach CVS, L.L.C. defendant operates CVS retail pharmacies in California.

18.     The various CVS Caremark defendants act as agents of one another and operate as a single entity for purposes of administering pharmacy benefits and providing prescription drugs to health plans and health plan members.

19.     The true names, roles and/or capacities of Defendants named as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs and, therefore, are named as Defendants under fictitious names as permitted by the rules of this Court. Plaintiffs will identify their true identities and their involvement in the wrongdoing at issue if and when they become known.

20.     Defendants' conduct described herein was undertaken or authorized by Defendants' officers or managing agents who were responsible for supervision and operations decisions relating to the Program. The described conduct of said managing agents and individuals was therefore undertaken on behalf of Defendants. Defendants had advance knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized, and approved by such managing agents. By engaging in the conduct described herein, Defendants have reached agreements as to each Plaintiff's and Class Member's health plan requiring Class Members to use the wholly-owned CVS Health Corporation's specialty pharmacy subsidiary under the Program, providing members with no realistic alternative or clear notice of their option not to do so, to the exclusion of their trusted community pharmacy and/or specialty pharmacist. As a result of such agreements, Defendants conspired and aided and abetted each other in violating the laws set forth herein, which conduct is ongoing.

## PLAINTIFFS' FACTUAL ALLEGATIONS

### *JOHN DOE ONE*

21.     On personal knowledge, JOHN DOE ONE has been HIV-positive since approximately August 1998. JOHN DOE ONE receives health insurance from his employer. The

SECOND AMENDED CLASS ACTION COMPLAINT

pharmacy benefit for his health plan is administered by CVS Caremark. JOHN DOE ONE currently takes one HIV/AIDS Medication subject to the Program, Triumeq.

22.     On January 19, 2015, JOHN DOE ONE received a phone call from his local pharmacy. His pharmacist informed him that his prescriptions were no longer approved at the pharmacy. JOHN DOE ONE called CVS Caremark and spoke to a CVS Caremark representative, who informed him that he must obtain his prescriptions under the Program or pay full price for his medications. A month's supply of his HIV/AIDS Medication costs more than $2,000. JOHN DOE ONE explains, "I received no written notice to prepare for this impending policy change. I had to scramble into action since I only had a seven-day supply remaining." Running low on his HIV/AIDS Medication, JOHN DOE ONE had no choice but to enroll in the Program.

23.     That same evening, JOHN DOE ONE called CVS Caremark and spoke to a representative. JOHN DOE ONE demanded to get his medication from his local pharmacy. The CVS Caremark representative reiterated that he had to get his prescriptions through the Program if he wanted his medication, or else pay out-of-pocket.

24.     JOHN DOE ONE has, on several occasions, expressly requested to opt out of the Program. JOHN DOE ONE has emailed CVS Caremark and requested an explanation on "why [his] medications were halted at the retail pharmacy." In response, CVS Caremark said that his medications must be filled by CVS Caremark's Specialty Pharmacy Program.

25.     On January 21, 2015, JOHN DOE ONE received his first shipment of Triumeq. When JOHN DOE ONE returned home he found his 90-day supply of HIV/AIDS Medication baking in the afternoon sun. Storage at high temperatures can quickly degrade the potency and stability of many medications.

26.     After the disastrous experience with his first mail-order shipment, JOHN DOE ONE has picked up his HIV/AIDS Medication at a CVS Pharmacy. CVS Caremark mails the medication to a CVS Pharmacy, but only as a drop shipment location purely for pickup, with no advice provided by a pharmacist. JOHN DOE ONE has never received or been offered a consultation with a pharmacist regarding his HIV/AIDS Medication during his pickups. Unlike JOHN DOE ONE's community pharmacy, which is now considered "out-of-network,"

CVS Caremark does not provide reminders when his prescription needs to be renewed. Furthermore, CVS Caremark does not coordinate with the AIDS Drug Assistance Program ("ADAP"), a government program that provides co-pay assistance for HIV/AIDS Medications. Now, in order to receive assistance from ADAP, JOHN DOE ONE must "pay the co-pay first at CVS Pharmacy, wait for the invoice, and then submit the claim to ADAP for reimbursement." JOHN DOE ONE "never received the invoice for October 2015—despite calling and asking for it—and missed ADAP's 60-day period in which to file for reimbursement." JOHN DOE ONE's out-of-pocket loss for October 2015 alone was $60.00.

27.     To make matters worse, JOHN DOE ONE's HIV/AIDS Medication were filled by CVS Caremark and his non-HIV/AIDS Medications, including bupropion, an antidepressant, are filled by his local pharmacy. JOHN DOE ONE has to manage his prescriptions and spend time going between his local pharmacy and CVS Caremark. CVS Caremark does not have a full and accurate record of all of the medications JOHN DOE ONE is taking and cannot anticipate or warn against potential adverse drug interactions, which are common with HIV/AIDS Medications.

28.     On March 30, 2016, JOHN DOE ONE submitted, via certified mail, a letter to both his employer and CVS Caremark formally requesting that he be allowed to opt out of the Program. JOHN DOE ONE received a letter dated April 4, 2016 from CVS Caremark denying his request and directing him to file a second level appeal. On May 17, 2016, JOHN DOE ONE filed the second level appeal as directed. In a letter from CVS Caremark dated May 20, 2016, CVS Caremark informed JOHN DOE ONE that CVS Caremark had made a "final determination" denying his opt out request. JOHN DOE ONE followed the appeal process as set forth in his plan documents.

29.     The Program raises both practical and privacy concerns. JOHN DOE ONE is away from home several days a week. JOHN DOE ONE must pick up his medications before he leaves to ensure that he does not run out of his medications while he is away. If his medications were delivered to his home, they would be left on his doorstep.

30.     JOHN DOE ONE has built a very close relationship with his local pharmacy. JOHN DOE ONE's local pharmacy coordinated his ADAP payments and reminded him when his

medications were ready for pickup. JOHN DOE ONE's local pharmacy can also provide essential counseling services regarding his HIV/AIDS Medication. In comparison, when JOHN DOE ONE called CVS Caremark for counseling services, he was transferred multiple times and told to call back.

31.     JOHN DOE ONE's present and ongoing experience with CVS Caremark's Program has dramatically increased his stress. Stress plays a part in undermining the human immune system and is detrimental to people with chronic illness. In the words of JOHN DOE ONE, the Program has resulted in a "fractured and splintered medication retrieval" system that serves only to add additional stress to JOHN DOE ONE's life.

*JOHN DOE TWO*

32.     On personal knowledge, JOHN DOE TWO has been HIV-positive since 1996. In addition, JOHN DOE TWO has several chronic health conditions, including congestive heart failure and stage four kidney failure. JOHN DOE TWO receives health insurance through his husband's former employer and the pharmacy benefit for his health plan is administered by CVS Caremark. JOHN DOE TWO currently takes three HIV/AIDS Medications (Epivir, Selzentry, and Tivicay) that are subject to the Program.

33.     For approximately four years prior to the implementation of the Program, CVS Caremark administered JOHN DOE TWO's pharmacy benefits. Throughout this period, JOHN DOE TWO was able to obtain his HIV/AIDS Medications from a retail specialty pharmacy that specializes in serving HIV/AIDS patients. In October 2015, JOHN DOE TWO's husband received a letter from CVS Caremark that stated that he was required to enroll in the Program beginning January 1, 2016. The letter provided that "effective January 1 [2016]," members "taking a long-term maintenance medication … must choose to receive [their] 90-day supply by mail or pick them up at a retail CVS/pharmacy." The letter also stated that the plan "will allow two 30-day fills of a long-term medication" at a local pharmacy. JOHN DOE TWO did not receive the same communication from CVS Caremark. The following month, in November 2015, JOHN DOE TWO received a letter from CVS Caremark, which stated that he had "reached [his] plan limit for filling 30-day supplies at a retail pharmacy" and would have to pay the full cost of his medications

if he did not receive 90-day supplies of his medications through the Program.

34.    Beginning in January 2016, JOHN DOE TWO had to obtain his HIV/AIDS Medications under the Program but does not want to pick up his medications from a CVS pharmacy due to significant privacy concerns. At his local specialty pharmacy, JOHN DOE TWO can enter a private screened section of the pharmacy to receive a consultation and ask questions. In comparison, nearby CVS pharmacies do not have a private area for picking up medications and consultations. JOHN DOE TWO explains: "At my retail specialty pharmacy, they have a little alcove for privacy. I can take my medications out and match it with a list I have of all my drugs. I can meet with my pharmacist and explain any changes I have felt and ask any questions I have. At CVS, I am within hearing distance of everyone waiting in line, including many people who do not have HIV/AIDS. I can hear other patients' questions and the pharmacists' answer. I am concerned with other people finding out about my HIV-positive status."

35.    As a result, JOHN DOE TWO has had no choice but to pick up his prescriptions from the closest CVS retail pharmacy that offers a private consultation room, which is 50 miles from his home round-trip. As JOHN DOE TWO cannot drive himself, his husband has been required to drive him to the pharmacy as well as to assist in carrying out JOHN DOE TWO's 21–24 prescriptions. Each time JOHN DOE TWO has attempted to pick up his prescriptions from the retail CVS location, JOHN DOE TWO has encountered problems that require a return to the store, including missing and inadequate amounts of medication (*e.g.,* only 60 days' worth of HIV/AIDS Medication for a 90-day prescription). In fact, JOHN DOE TWO was informed by the retail pharmacist that he does not even open the specialty medication shipments when they come in, let alone verify that the shipment is correct or whether there is any new information that should be passed along to JOHN DOE TWO. According to JOHN DOE TWO, "every refill involves a new surprise in trying to learn their system."

36.    JOHN DOE TWO requested to have a specific representative appointed as a contact at the beginning of his experience, but the "patient advocate" system employed by CVS Caremark has only added another layer of bureaucracy that has resulted in more confusion and issues. On multiple occasions, JOHN DOE TWO's patient advocate has either been too busy or unavailable

to assist him.

37.     JOHN DOE TWO takes many medications every day and wants to obtain all those medications from his local community pharmacy so that his local pharmacist can help coordinate his medications and monitor for adverse drug interactions and possible side effects. JOHN DOE TWO has come to rely on the watchful eye of his specialty pharmacist. For example, following a hospital stay relating to JOHN DOE TWO's kidney problems, the discharging physician prescribed Bactrim DS. Because JOHN DOE TWO's specialty pharmacist is familiar with JOHN DOE TWO's medical history, including his kidney failure, the pharmacist advised JOHN DOE TWO that the dosage strength of the prescribed Bactrim DS was incorrect. JOHN DOE TWO called his nephrologist, who agreed with the pharmacist's conclusion.

38.     JOHN DOE TWO was previously required to obtain his medications by mail-order when his prescription drug benefit was administered by Express Scripts, Inc. The experience was disastrous. After multiple delivery and privacy problems, JOHN DOE TWO was allowed to opt out of the mail-order program and return to his local specialty pharmacy.

39.     JOHN DOE TWO has built a very close relationship with his local specialty pharmacy. JOHN DOE TWO explains: "My pharmacist knows me, my medical conditions and history, and is immediately available for consultation. He coordinates my monthly refills so that all my prescriptions, some of which require refrigeration, are available for pick-up at one time."

40.     In comparison, the CVS Caremark representatives JOHN DOE TWO has dealt with appear to have no specialized knowledge about HIV/AIDS Medications or the concerns of HIV patients, resulting in the reduction or effective elimination of such benefits. The individuals who work in the CVS Caremark mail-order call centers and interact with members who need these medications have no specialized training as to HIV/AIDS Medications, and it is clear from JOHN DOE's interactions with staff members that both the specialty pharmacies and retail pharmacies are woefully understaffed, overworked, and inexperienced. The retail pharmacist JOHN DOE TWO has been forced to receive his medications from has said, "I studied HIV medicine in school but I don't have any current experience."

41.     JOHN DOE TWO has expended substantial resources attempting to resolve the

SECOND AMENDED CLASS ACTION COMPLAINT

issues raised herein, spending hours on the phone with CVS Caremark representatives. JOHN DOE TWO has, on several occasions, expressly requested to opt out of the Program with CVS Caremark and his husband's former employer. Between October 2015 (when his husband received the first letter referenced above) and March 2016, JOHN DOE TWO called CVS Caremark more than 20 times in an attempt to opt out of the Program. A CVS Caremark representative named Lisa informed him that she would try to appeal on his behalf. However, her supervisor denied the appeal. In addition, on January 11, 2016 and February 28, 2016, JOHN DOE TWO submitted letters to CVS Caremark requesting to opt out of the Program. Those requests were either ignored or denied. Prior to filing this action, he contacted his employer benefits representative and CVS Caremark once again to opt out of the Program and was subjected to a 40-minute call. The employer representative informed JOHN DOE TWO that only CVS Caremark could decide whether to grant such requests. The CVS Caremark representative he then spoke with stated there was no provision in JOHN DOE TWO's health plan allowing him to opt out of the Program, nor would there be for 2018, and confirmed this policy applied to specialty HIV/AIDS Medications. Furthermore, the CVS Caremark representative stated that since JOHN DOE TWO obtained HIV/AIDS Medications under the Program, all of his medications—including non-HIV specialty medications and non-specialty medications not otherwise subject to the Program—must also be obtained through the Program. After JOHN DOE TWO detailed his experience of obtaining his prescriptions through the Program, the CVS Caremark representative stated she genuinely wished that she could do something to help, but said there was nothing she could do. JOHN DOE TWO sums up the conversation this way: "I have had so many conversations with CVS Caremark personnel who recognize the limitations of the Program and are supportive about my desire to go to the pharmacist who knows me and my medications. [The CVS representative] actually said other employees ask her after nine years in her position, 'how do you stand it?'"

42.    On April 1, 2016, JOHN DOE TWO submitted, via certified mail, a letter to both his husband's former employer and CVS Caremark requesting, once again, that he be allowed to opt out of the Program. JOHN DOE TWO received a letter dated April 4, 2016 from CVS Caremark denying his request and directing him to file a second level appeal. On May 11, 2016,

JOHN DOE TWO filed the second level appeal as directed. In a letter from CVS Caremark dated May 16, 2016, CVS Caremark informed JOHN DOE ONE that it had made a "final determination" denying his opt out request. JOHN DOE TWO followed the appeal process as set forth in his plan documents. Ultimately, CVS Caremark has denied all of his opt out requests and informed him that all HIV/AIDS Medications must be obtained under the Program.

43.     JOHN DOE TWO's present and ongoing experience with CVS Caremark's Program has dramatically increased his stress. Stress plays a part in undermining the human immune system and is detrimental to people with chronic illnesses. JOHN DOE TWO's physician has told him to do everything he can to reduce stress in his life, especially as JOHN DOE TWO has had multiple heart attacks, strokes, open heart surgery, and has had numerous cardiac stents placed to keep him alive. As a result of the stress from the Program, JOHN DOE TWO has received a prescription for Wellbutrin, an antidepressant medication.

*JOHN DOE THREE*

44.     On personal knowledge, JOHN DOE THREE has been taking HIV/AIDS Medications for 15 years. JOHN DOE THREE is insured through his former employer's health insurance carrier, Anthem Blue Cross and Blue Shield, and the pharmacy benefit for his health plan is administered by CVS Caremark, which has been the pharmacy benefit provider for his former employer since at least 2013. He had previously been able to obtain his three HIV/AIDS Medications (Intelence, Isentress, and Reyataz) from his neighborhood specialty pharmacy. In December 2015, JOHN DOE THREE received a communication from CVS Caremark that he would have to enroll in the Program in 2016, but that he could receive an initial order and two refills at any pharmacy—an amount of medication equal to a three-month supply. However, when he went to his local pharmacy in Los Angeles, California on January 8, 2016 to refill a prescription for his HIV/AIDS Medications, a CVS Caremark representative informed JOHN DOES THREE's neighborhood specialty pharmacy that CVS Caremark would not process payment, and that JOHN DOE THREE would have to immediately enroll in the Program in order to obtain his medications. JOHN DOE THREE called both his former employer and CVS Caremark. After numerous calls, CVS Caremark gave him a one-time exception and allowed his pharmacy to fill his HIV/AIDS

Medications, but only for January 2016. CVS Caremark insists that prescriptions for all specialty medications must be filled through the Program and that it no longer permits the three-month grace period it had allowed in the past.

45.     JOHN DOE THREE was also informed that CVS Caremark's Program now requires JOHN DOE THREE to order a single month of medication at a time, requiring JOHN DOE THREE to incur additional out-of-pocket costs on a monthly basis and increasing the financial burden imposed by the Program.

46.     JOHN DOE THREE has, on several occasions, expressly requested to opt out of the Program. His requests and appeal were denied on the basis that there has been a change to his former employer's benefit plan. On March 24, 2016, JOHN DOE THREE submitted, via certified mail, a letter to both his former employer and CVS Caremark to formally request that he be allowed to opt out of the Program; he received no response from either. JOHN DOE THREE followed the appeal process as set forth in his plan documents, to no avail. Before this lawsuit was filed, JOHN DOE THREE contacted his former employer once again and asked to opt out of the Program so that he can obtain his HIV/AIDS Medications at a community pharmacy of his choice. The benefits manager referred him to CVS Caremark. The person he spoke to at CVS Caremark said there is no such option. As JOHN DOE THREE says, "I persisted and asked her if there was any change during the past year so I could get up to date information on my plan, and she said there was none and directed me to my employer's benefits 'welcome package' I was supposed to receive in the mail."

47.     JOHN DOE THREE describes his experience with CVS Caremark's Program as an "odious burden" and states that the entire process is "unreliable and clumsy." For example, on one occasion when JOHN DOE THREE used CVS Caremark's Program to obtain his medication, the package he received only contained part of his prescription. When JOHN DOE THREE called CVS Caremark to inform them of the mistake, the CVS Caremark customer service representative insisted that the order was complete and told JOHN DOE THREE that he would have to file a police report so the police could determine whether the medications had been stolen. The next day, the remainder of the incomplete order arrived. The lengthy phone calls and additional stress to

JOHN DOE THREE would have been avoided entirely had he not been subject to the Program. JOHN DOE THREE also believes that the Program does not have adequate systems in place to communicate with his doctor with regard to the timing of prescription refills, resulting in additional calls to the doctor and stress and concern to JOHN DOE THREE regarding whether he will receive his prescriptions in a timely manner. Furthermore, because the neighborhood in which JOHN DOE THREE resides has in fact recently seen theft of mail parcels, JOHN DOE THREE must remain at home for the entire day on which a delivery of his medication is to occur in order to guard against theft, resulting in missed doctor appointments that are critical to the maintenance of JOHN DOE THREE's condition.

48.     JOHN DOE THREE has built a very close relationship with his local pharmacist, who is knowledgeable and understands the subtle nuances of HIV/AIDS Medications. He has used his local neighborhood pharmacy since 1990. His local pharmacy is very highly regarded in the community and was the first pharmacy in Los Angeles to specialize in HIV patient care. On more than one occasion, when JOHN DOE THREE was particularly ill, he has called his local pharmacist, who has in turn called JOHN DOE THREE's doctor to obtain the necessary prescription from the doctor. JOHN DOE THREE and others depend on these types of longstanding relationships with local pharmacists to maximize the benefits of HIV/AIDS Medications and to treat the complex and ever-changing needs of HIV/AIDS patients.

49.     In comparison, the CVS Caremark representatives JOHN DOE THREE has dealt with appear to have no specialized knowledge about HIV/AIDS Medications or the concerns of HIV patients, resulting in the reduction or effective elimination of such benefits. CVS Caremark is also unwilling to work to provide him the manufacturer rebates he would obtain by continuing to work with his local pharmacist, thus increasing his payments by an estimated $400 per month, which on his fixed income he cannot afford for an extended period. JOHN DOE THREE has also been forced to take the additional step of enrolling in Medicare Part D as a "back-up" to ensure that he will have timely and necessary access to his HIV/AIDS Medications. This additional coverage, which should not be necessary, will cost JOHN DOE THREE thousands of dollars in premiums and other costs throughout the year. Further, JOHN DOE THREE shares the same

financial concerns as JOHN DOE ONE and JOHN DOE TWO in terms of the impact of the Program on the affordability of his medications.

50.     JOHN DOE THREE's present and ongoing experience with CVS Caremark's Program has dramatically increased his stress. Stress plays a part in undermining the human immune system and is detrimental to people with chronic illness. Because he is being forced into the mail order Program, JOHN DOE THREE has sought to renew his prescription for anxiety medication, at additional personal cost.

### *JOHN DOE FOUR*

51.     On personal knowledge, JOHN DOE FOUR has been taking HIV/AIDS Medications for more than 10 years. JOHN DOE FOUR was insured through the health plan of his spouse, JOHN DOE THREE. The pharmacy benefit for that health plan is administered by CVS Caremark, which has been the pharmacy benefit provider for the plan since at least 2013. He had previously been able to obtain his various approved HIV/AIDS Medications from his neighborhood specialty pharmacy. In December 2015, JOHN DOE FOUR received a communication from CVS Caremark that he would have to enroll in the Program in 2016.

52.     JOHN DOE FOUR has had numerous issues with CVS Caremark's Program. On several occasions, deliveries of critical medications have not arrived on time and/or have not arrived by the date specified by CVS Caremark for delivery. Because a signature is required for delivery of the medications he receives, he must take off work for the entire day in order to receive these deliveries. As a result, even deliveries that arrive on time require him to forgo a day's wages—approximately $200. When deliveries of his medications do not arrive on the date projected by CVS Caremark, as often occurs, he is forced to forgo multiple days' wages simply to obtain medications that are critical to his health. Of course, late delivery of his medications also jeopardizes his health, which deteriorates quickly without his medications, and subjects him to the risk of developing increased drug resistance as a result of missed doses. Accompanying these injuries to his economic and physical well-being comes a feeling of despondence and lack of control over his own health, which is detrimental to his psychological well-being. The unnecessary challenges and sacrifices that CVS Caremark's Program imposes on JOHN DOE FOUR result in

SECOND AMENDED CLASS ACTION COMPLAINT

stress and obstacles to medication compliance.

53.     Further, JOHN DOE FOUR has received and been billed for, without his consent, deliveries of medications that were not set for automatic refill, including medications that he, in consultation with his physician, had discontinued. In such instances, his credit card has been charged for delivery of these medications without his consent. With his limited income, such unanticipated and unauthorized charges cause him significant financial stress.

54.     JOHN DOE FOUR was also informed that CVS Caremark's Program now requires JOHN DOE FOUR to order a single month of medication at a time, requiring JOHN DOE FOUR to incur additional out-of-pocket costs on a monthly basis and increasing the financial burden imposed by the Program.

55.     JOHN DOE FOUR has built a very close relationship with his local pharmacist, who is knowledgeable and understands the subtle nuances of HIV/AIDS Medications. He has used his local neighborhood pharmacy since 2010. His local pharmacy is very highly regarded in the community and was the first pharmacy in Los Angeles to specialize in HIV patient care. On more than one occasion, he has called his local pharmacist who has in turn called JOHN DOE FOUR's doctor to obtain the necessary prescription from the doctor. JOHN DOE FOUR and others depend on these types of longstanding relationships with local pharmacists to maximize the benefits of HIV/AIDS Medications and to treat the complex and ever-changing needs of HIV/AIDS patients.

56.     In comparison, the CVS Caremark representatives JOHN DOE FOUR has dealt with appear to have no specialized knowledge about HIV/AIDS Medications or the concerns of HIV patients, resulting in the reduction or effective elimination of such benefits. CVS Caremark is also unwilling to work to provide him the manufacturer rebates he would obtain by continuing to work with his local pharmacist, thus increasing his payments by an estimated $200 per month, which, at his income level, he cannot afford for an extended period. Further, JOHN DOE FOUR shares the same financial concerns as the other Plaintiffs in terms of the impact of the Program on the affordability of his specialty medications. Specifically, CVS Caremark routinely delays delivery of JOHN DOE FOUR's medications on the basis that he has not satisfied his cost-share obligation. Each time, JOHN DOE FOUR is required to contact CVS Caremark, often requiring a

substantial investment of time spent on the phone, in order to remind them of his participation in ADAP and provide them the information related to that program yet again. The failure of CVS Caremark's Program to retain and apply this information from one prescription fill to the next results in increased stress and delayed treatment for JOHN DOE FOUR. In comparison, JOHN DOE FOUR's neighborhood specialty pharmacy coordinated ADAP coverage for his prescription medications without intervention, insistence, or reminder on the part of JOHN DOE FOUR.

57.     Furthermore, because the neighborhood in which JOHN DOE FOUR resides has in fact recently seen theft of mail parcels, JOHN DOE FOUR must remain at home for the entire day on which a delivery of his medication is to occur in order to guard against theft, resulting in missed doctor appointments that are critical to the maintenance of JOHN DOE FOUR's condition.

58.     JOHN DOE FOUR's present and ongoing experience with CVS Caremark's Program has dramatically increased his stress. Stress plays a part in undermining the human immune system and is detrimental to people with chronic illness. Because he was forced into using the Program, JOHN DOE FOUR has sought to renew his prescription for anxiety medication, at additional personal cost.

### *JOHN DOE FIVE*

59.     On personal knowledge, JOHN DOE FIVE has been taking the HIV/AIDS Medications Descovy and Prezcobix, having previously taken Truvada, Norvir, and Prezista. JOHN DOE FIVE is insured through his spouse's employer health plan. The pharmacy benefit for that health plan is administered by CVS Caremark, which has been the pharmacy benefit provider for the plan since at least 2013. He had previously been able to obtain his various approved HIV/AIDS Medications from his neighborhood specialty pharmacy. In late 2014, JOHN DOE FIVE received a communication from CVS Caremark that he would have to enroll in the Program in early 2015.

60.     JOHN DOE FIVE has had numerous issues with CVS Caremark's Program. On several occasions, deliveries of critical medications have not arrived on time and/or have not arrived by the date specified by CVS Caremark for delivery.

61.     In one instance in which JOHN DOE FIVE did not receive his medication as

SECOND AMENDED CLASS ACTION COMPLAINT

ordered through the CVS Specialty website, he had to speak to several CVS Caremark customer service representatives. After several hours of being transferred from one representative to another, he was told that there was no record of his order, despite his having received an email confirmation of that same order. To resolve this matter, JOHN DOE FIVE had to escalate his grievance to the CVS Office of the President. Although that particular circumstance was resolved by CVS Caremark sending a same-day courier with his HIV/AIDS medications from Dallas, Texas, that same issue has occurred on several more occasions without a similar resolution, and has required him to expend resources and not be available to work so that he can be available on the schedule of a courier. Many of the resources he needs to access on daily basis are only available during traditional business hours, which are also the only hours CVS Specialty seems to keep in terms of being able to answer his specific inquiries.

62.     On another occasion, due to another failure by CVS Caremark to deliver medications as originally ordered combined with inclement weather, JOHN DOE FIVE requested to fill his prescriptions at a local CVS pharmacy. Despite the fact this shipment had come about because his original order had again been lost by CVS Caremark, and despite his having email confirmation of that lost order from CVS Caremark, he was told that the weather was considered an Act of God, and as a result the lost shipment was not CVS Caremark's fault, so he could not pick up his medications from any CVS pharmacy. He was told his best option would be to contact United Parcel Service ("UPS") to arrange a pickup. In contacting UPS, he was forced to reveal very sensitive personal health information to third-party UPS customer service representatives, local UPS office management, and the UPS delivery driver to explain why he desperately needed the medications and could not access them at a CVS pharmacy, and then had to arrange to meet the driver at another location when the driver could not make it to his residence, again requiring JOHN DOE FIVE to expend resources and not be available to work in order to be available on the schedule of that driver.

63.     On yet another occasion, after JOHN DOE FIVE had used the CVS Specialty iOS application to separately order two HIV/AIDS Medications that had become eligible for refill on different dates, a CVS specialty pharmacy technician unilaterally made the decision to bundle and

ship both medications in one package. Despite clear information provided by JOHN DOE FIVE to CVS Caremark at the time he placed his first refill request that stated exactly how many doses of the first ordered medication he had on hand and when his last dose would be taken, the technician's decision resulted in yet another missed confirmed shipment date and a missed dose of a necessary medication. Even when Program representatives discovered the technician's error, they refused JOHN DOE FIVE's requests to be allowed to fill the prescription at a local pharmacy or to send a courier with the medication from a more geographically distant pharmacy. This incident also required him to expend resources trying to sort out CVS Caremark's own error, spending hours on the phone and not being available to work.

64.     In the instances in which the failure of CVS Caremark to deliver his medications in a timely manner resulted in missed doses of his medications, JOHN DOE FIVE has been told on at least three separate occasions by Program representatives that a CVS specialty pharmacist had stated that there would be no detrimental effects from missing a dose of his medications for 24 hours. This is in direct contradiction to the advice of his prescribing physician to keep taking the medications at the same time every day. In fact, these errors have also resulted in further expenditures of resources, since with missed doses of these medications his physician orders a new battery of blood tests, requiring JOHN DOE FIVE to incur additional out-of-pocket costs for such tests and increasing the financial burden imposed on him by the Program.

65.     JOHN DOE FIVE had built a very close relationship with his local pharmacist, who is knowledgeable and understands the subtle nuances of HIV/AIDS Medications. He had used his local neighborhood pharmacy since 2013, which has always been in-network under his employer health plan. His local pharmacy is very highly regarded in the community. On more than one occasion, he has called his local pharmacist who has in turn called JOHN DOE FIVE's physician to obtain the necessary prescription from the physician. JOHN DOE FIVE and others depend on these types of longstanding relationships with local pharmacists to maximize the benefits of HIV/AIDS Medications and to treat the ever-changing needs of HIV/AIDS patients. Such education and monitoring can most effectively be provided by a retail pharmacy rather than a faceless bureaucratic process.

SECOND AMENDED CLASS ACTION COMPLAINT

66.     In comparison, the CVS Caremark representatives JOHN DOE FIVE has dealt with appear to have no specialized knowledge about HIV/AIDS Medications or the concerns of HIV patients, resulting in the reduction or effective elimination of such benefits. Further, JOHN DOE FIVE shares the same financial concerns as the other Plaintiffs in terms of the impact of the Program on the affordability of his specialty medications.

67.     The unnecessary challenges and sacrifices that CVS Caremark's Program has imposed and continues to impose on JOHN DOE FIVE results in stress and obstacles to medication compliance. Of course, untimely delivery of these medications jeopardizes his health, which can deteriorate quickly without timely taking such medications, and subjects him to the risk of developing increased drug resistance as a result of missed doses. Accompanying these injuries to his economic and physical well-being also comes a feeling of despondence and lack of control over his own health, which is detrimental to his psychological well-being. The failure of CVS Caremark's Program to retain and apply basic information from one prescription fill to the next also results in increased stress and delayed treatment for JOHN DOE FIVE. JOHN DOE FIVE's present and ongoing experience with CVS Caremark's Program has dramatically increased his stress, which plays a part in undermining the human immune system and is detrimental to people with chronic illness.

68.     On or about March 30, 2018, JOHN DOE FIVE, pursuant to the terms of his employer plan, submitted a written request to be exempted from the Program. After receiving several form letters from CVS Caremark that had nothing to do with his request but asked for additional personal information from him, CVS Caremark denied his request for an exemption. On or about May 30, 2018, he filed a written appeal of this denial, which was further denied by CVS Caremark on or about June 5, 2018.

### **STATEMENT OF FACTS**

69.     The Program results in a reduction in or elimination of health plans' drug benefits, effectuated by transforming drug purchases at community pharmacies from an "in-network" covered benefit to an "out-of-network" payment. Under the Program, patients using a non-CVS community pharmacy will be considered going "out-of-network" and will be subject to increased

"out-of-network" charges or may not have these medications covered at all. Class Members also face a potential or actual increase in out-of-pocket expenses, as co-pays, discounts, or rebates that were otherwise covered or recognized may not be consistently covered by or recognized under the Program at the discretion of CVS Caremark to elect whether to do so, resulting in an overall increased cost for the same benefits. As part of the prescription drug plans it offers, one of CVS Caremark's roles as a prescription drug benefit administrator for any plan sponsor or health plan it contracts with is to establish and contractually control which, if any, non-CVS pharmacies are "in-network," thereby determining where Class Members may purchase their prescription drugs with full insurance coverage.

70.     As a result of Defendants' discriminatory behavior, HIV/AIDS patients face a potentially life-threatening decision that also threatens their privacy and reduces their current health plan's drug benefits. They must either: (i) forego essential counseling from an expert pharmacist at a community pharmacy and face risks to their privacy that are inherent in the Program, since even where CSP permits deliveries to CVS pharmacies, they are only for drop shipment as compared to being filled there and subject to active consultation by a pharmacist; or (ii) pay hundreds or thousands of dollars out-of-pocket monthly for their medications at their non-CVS community pharmacy.

71.     The community specialty pharmacist knows patients' medical histories and, working directly with patients in face-to-face interactions and with specific training in HIV/AIDS Medications, is best positioned to: (i) detect potentially life-threatening adverse drug interactions and dangerous side effects, some of which may only be detected visually; (ii) immediately provide new drug regimens as their disease progresses; and (iii) provide essential advice and counseling that help HIV/AIDS patients and families navigate the challenges of living with a chronic and sometimes debilitating condition. Defendants' Program is further flawed because it does not allow some subscribers to transfer all of their medications to a single provider. Instead, CVS Caremark's Program is in fact two distinct programs for many subscribers—one for regular medications, and a separate program for specialty medications. This means that many patients, including JOHN DOE ONE, JOHN DOE THREE, JOHN DOE FOUR, and JOHN DOE FIVE must manage

prescriptions between community pharmacies and the Program. This "separate and unequal" splitting of prescription providers also makes it difficult, if not impossible, for CVS Caremark to track potentially life-threatening drug interactions, as discussed below.

72. To the extent applicable to them, Plaintiffs have exhausted available administrative remedies with regard to opting out of the Program. In response, CVS Caremark or the plan sponsors either did not formally respond to these opt out requests or refused to permit Plaintiffs to opt out of the Program. Plaintiffs therefore bring this action on behalf of themselves and on behalf of a class (defined herein) of residents in the United States who: (i) are or were enrolled in a health care plan that includes a prescription drug benefit that is administered by CVS Caremark; and (ii) have been prescribed specialty HIV/AIDS Medications subject to the Program.

73. For all but the wealthiest HIV/AIDS patients, the dramatic cost increases and/or reductions in or elimination of benefits of coverage associated with the Program are untenable, and thus many Class Members are left with no choice but to risk their health and privacy by obtaining their life-sustaining medications through the Program.

74. This limitation is a material change to and reduction or elimination of benefits in Class Members' pharmacy benefits and violates both federal and state law as described herein. One harmful impact of this policy is that the Program does not allow for early refills; patients cannot refill their HIV/AIDS Medication until the very end of their current prescription. As a result, enrollees will be forced to call or fax CSP to re-order drugs during a very narrow period of time each month, often requiring them to coordinate with their physicians as further described below. If there are: (i) circumstances that make it difficult for the patient to re-order drugs at the designated time—such as with JOHN DOE ONE, for example, who works out of town for days at a time, or other workload and travel commitments or illness; or (ii) billing, processing, or mail complications or delays (such as happened with JOHN DOES TWO, THREE, FOUR, and FIVE), HIV/AIDS patients will likely miss doses and potentially experience serious health problems as a result.

75. In addition to the potentially life-threatening health consequences of the Program as discussed below, Class Members' fundamental and inalienable right to privacy is also

- 23 -
SECOND AMENDED CLASS ACTION COMPLAINT

threatened. An improper disclosure of a person's HIV or AIDS status can often result in the denial of proper health care, poor treatment in educational and work settings, and many other collateral consequences. *See Activities Combating HIV Stigma and Discrimination*, HIV.gov, https://www.hiv.gov/federal-response/federal-activities-agencies/activities-combating-hiv-stigma-and-discrimination (last visited March 28, 2021). Ninety percent of Americans recognize that people living with HIV and AIDS face prejudice and discrimination, and roughly one in eight people living with HIV is denied health services because of such stigma and discrimination associated with the disease. *See* Henry J. Kaiser Family Foundation, The Washington Post/ Henry J. Kaiser Family Foundation 2012 Survey of Americans on HIV/AIDS (July 2012); *see also HIV Stigma and Discrimination,* AVERT, https://www.avert.org/professionals/hiv-social-issues/stigma-discrimination (last visited March 28, 2021). For the roughly one million Americans living with HIV/AIDS, the "painful stigma and discrimination continue to permeate their daily lives."[2] *Eradicating Discrimination Against People Living With HIV/AIDS*, U.S. Dep't of Justice Archives, https://www.justice.gov/archives/opa/blog/eradicating-discrimination-against-people-living-hivaids (last visited March 28, 2021). Class Members who live in apartment buildings or will be required to have medications delivered to their workplace have expressed alarm that neighbors and co-workers, who do not know that the recipient has HIV/AIDS, will come to suspect that they are ill. Mail-order shipments also present the risk of lost or stolen medications, as each shipment of medications may be worth thousands of dollars. CVS Caremark claims Class Members bear the financial risk of lost shipments left at their door or in their mailbox.

---

[2] "HIV stigma and discrimination can pose complex barriers to prevention, testing, treatment, and support for people living with or at risk for HIV. Some examples of stigma include being shunned by family, peers, and the wider community; receiving poor treatment in health care and education settings; and experiencing judgmental attitudes, insults, or harassment. Some individuals with HIV have been denied or lost employment, housing, and other services; prevented from receiving health care; denied access to educational and training programs; and have been victims of violence and hate crimes. HIV-related stigma and discrimination prevents individuals from learning about their HIV status, disclosing their status even to family members and sexual partners, and/or accessing medical care and treatment, weakening their ability to protect themselves from getting or transmitting HIV, and to stay healthy." *Activities Combating HIV Stigma and Discrimination*, HIV.gov, https://www.hiv.gov/federal-response/federal-activities-agencies/activities-combating-hiv-stigma-and-discrimination (last visited March 28, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT

Alternatively, the recipient may need to be present when the package is delivered, thus forcing the patient to obtain needed medications on the schedule of the delivery person, which raises further privacy and personal liberty concerns or requires them to miss hours or days of work waiting for deliveries. Furthermore, if a Class Member obtains his or her HIV/AIDS Medications from a CVS pharmacy, he or she must discuss those medications with pharmacy personnel with whom he or she does not know and is likely not aware of his or her disability or medical condition, in violation of his or her right to privacy. All Class Members must discuss their HIV/AIDS status with CSP personnel over the phone.

76.     Even if they elect to not use mail order but rather a regular CVS pharmacy for pick-up of their HIV/AIDS Medications under the Program, Class Members still face serious health and privacy issues. The pharmacists at a CVS pharmacy do not fill the HIV/AIDS Medication prescriptions. Such pharmacists are generally unable to provide any counseling services related to the HIV/AIDS Medications. Class Members may be forced to fill their HIV/AIDS Medication prescriptions at full cost at their local pharmacies just so they can receive the personalized services they need from their established community pharmacists. Class Members in such a situation run the risk of having to manage their prescriptions between their local pharmacy and CVS Caremark by themselves. CVS Caremark also may not have a full and accurate record of all of the medications Class Members are taking and cannot anticipate or warn against potential adverse drug interactions, which are common with HIV/AIDS Medications. Additionally, similar to mail-order, Class Members must wait for their HIV/AIDS Medications to ship to a CVS pharmacy and face delays and lost shipments.

77.     Furthermore, CVS pharmacy personnel do not have the same level of sensitivity as Class Members' local pharmacy staff. For example, Class Members have reported that CVS Caremark personnel shouted the name of their HIV/AIDS Medications across the room in front of other customers, raising severe privacy concerns and making it untenable to pick up their medications at a CVS pharmacy in the future.

78.     Drop shipment to a CVS pharmacy is simply not the same benefit as having access to a local pharmacy where pharmacists are aware of Class Members' drug histories and regimens.

- 25 -

SECOND AMENDED CLASS ACTION COMPLAINT

Even though Class Members are given a choice to have their HIV/AIDS Medications delivered to their homes, CVS Caremark does not provide them a window of time when the delivery will take place. As a result, Class Members are forced to wait at home all day to sign for their medications. If Class Members do not have a signature required for their HIV/AIDS Medications, then they face the risk of having their drugs stolen because their HIV/AIDS Medications are left sitting in front of their doors, as stated above. How such medications are delivered, the limited options provided to Plaintiffs and Class Members, the mix-ups and delays occasioned by CVS Caremark's flawed delivery process, the decision not to constantly apply rebates or discounts, and/or the decisions to offer opt out and non-opt out options to plan sponsors and/or recognize opt out requests are all matters within CVS Caremark's discretion and control.

79. The Program constitutes a material and discriminatory change in Class Members' coverage, a significant reduction in or elimination of prescription drug benefits, and a violation of the standards of good health care and clinically appropriate care for HIV/AIDS patients. By implementing such practices, CVS Caremark effectively reduces the quality of prescription drug care provided to Class Members, and thus a reduction or elimination of benefits, by forcing enrollees to only obtain such medications through their sister co-conspirator and wholly-owned subsidiary CSP—allowing CVS Caremark to profit through this conduct by keeping hundreds of thousands, if not millions, of dollars in prescription fill fees, possible rebates, and other monies to themselves. As a result, many Class Members have already expended resources in response to the Program and presently are threatened with substantial, imminent, and irreparable harm. This harm includes a grave threat to their health and safety, as well as their right to privacy.

80. The decision to force Class Members to accept CSP as their exclusive provider under the Program, not advise enrollees of opt out rights in a meaningful way, not timely deliver medications, not consistently apply or accept rebates or discounts offered by manufacturers and provided to enrollees, and/or provide financial incentives to employers to enroll in the Program are acts and decisions exclusively in the control and discretion of CVS Caremark. Such decisions are ultimately motivated by profit, as shown by CVS Caremark providing financial incentives to self-funded plans and other plan sponsors to select the Program over a prescription drug benefit

plan that allows enrollees to use the pharmacy of their choice. CVS Caremark profits if plan sponsors select a prescription benefit plan that is subject to the Program. As a result of the Program, CVS Caremark and CSP will likely continue to see a substantial increase in revenues and even greater increases in profits as a result of the forced transition of its enrollees.

### *The Role of the Clinical Pharmacist and the Importance of Face-to-Face Interactions*

81.     Many physicians specializing in HIV/AIDS treatment are unable to spend very long with each patient. In fact, physician consultations are often limited to just 15 minutes in the era of managed care. As a result, there is very limited time for the physician to elicit extensive information about the patient's complete medical history, including which non-HIV/AIDS Medications the patient is taking, and impart critical information about prescription drug regimens and warnings about the high number of known adverse side effects and adverse drug interactions associated with HIV/AIDS Medications that need to be monitored. For this reason and the reasons that follow, it is vitally important for HIV/AIDS patients, even as compared to patients taking other "specialty" medications, to have access to in-person consultations, where they can address any and all of the numerous issues and concerns surrounding drug interactions, side effects, and other problems that can arise while living with and managing HIV/AIDS.

82.     HIV/AIDS patients are often prescribed both specialty and non-specialty medications, including over-the-counter medications that do not require a prescription and therefore are not tracked in the same manner as prescription medications. Many HIV/AIDS patients have a history of cardiovascular disease, hypertension, anemia, diabetes, or psychiatric issues, among other conditions. Medications that manage mental health issues, for example, such as antidepressants, anti-psychotics, and sleep agents, among others, are often not prescribed by the physician managing the patient's HIV/AIDS conditions. Since for many patients only specialty medications are to be filled by CVS Caremark's wholly-owned subsidiary CSP, and non-specialty medications may be filled at the patient's community pharmacy, CSP may not always have a full and accurate record of all the medications the patient is taking and therefore cannot anticipate or warn against potential adverse drug interactions, which are common with HIV/AIDS Medications. Even worse, CVS Caremark uses its discretion to require some enrollees to fulfill both specialty

SECOND AMENDED CLASS ACTION COMPLAINT

and non-specialty medications using the Program, thereby denying them the benefit of any direct pharmacist consultation.

83.     But for the Program, a patient's community pharmacist would be aware of the patient's entire medical history, have a comprehensive view of the patient's complete medication regimen (as compared to only certain specialty medications), and engage in ongoing communications with physicians and patients regarding potential issues that may arise concerning drug side effects, adverse drug interactions, and adherence to specialty medications.

84.     The ability of community pharmacists to closely monitor HIV/AIDS patients in face-to-face encounters is life-saving in many instances. In the case of a patient with a history of depression, for example, a community pharmacist can work with the patient through regular "check-ins" as changes in mood, attitudes, or day-to-day function would occur if an HIV/AIDS Medication such as Atripla (with documented central nervous system side effects) were prescribed. Other side effects provide visual cues—changes in skin color, for example—that cannot be detected over the phone. Additionally, community pharmacists, who serve patients prescribed medications by numerous doctors, may have more up-to-date experience and information about potential adverse drug interactions and changes in drug regimens than physicians themselves.

85.     HIV/AIDS patients, therefore, rely on their specialty community pharmacists to remind them how and when drugs must be taken, to review potential side effects with many other medications and develop strategies to avoid those side effects, and to provide other counseling, including what to expect if a patient's drug regimen changes.

86.     Conversely, the CSP personnel with whom Class Members typically directly interact with, particularly over the phone, are not pharmacists, nor do they have specific knowledge about HIV/AIDS, but rather are general customer service representatives with little to no specialized training around HIV/AIDS Medications. Thus, taking the local pharmacist, and the community pharmacy where they provide their services, out of the treatment equation for HIV/AIDS patients results in a loss and injury to Class Members, as it lessens the quality of care and benefits they receive and are entitled to receive under their plans.

87.     This harm is not conjectural or speculative, but real, imminent and severe. "Putting a label on the bottle—that's the least of what we do," Marva Brannum, a clinical specialty pharmacist at Edwin's Prescription Pharmacy in North Hollywood, California, explains. Ms. Brannum, who has worked with HIV and AIDS patients for 30 years, said working with patients also includes knowing the psychological and social issues involved with their disease states and providing a critical informed link between doctor and patient. Importantly, working with patients directly allows pharmacists to monitor potential adverse drug interactions. "We are an extension of the patient's clinical team," Brannum says.

88.     The Program thus reduces the overall quality of care Class Members receive and reduces or effectively eliminates their health plans' pharmacy benefits, since providing an effective pharmacy benefit for HIV/AIDS patients is not just a question of knowing the drugs the patient uses, but also knowing the patient and all of their medical needs. "The most intricate part that leads to quality outcomes and leads to decreased costs for us is knowing the patient in total," Brannum says.

89.     Patients who need specialty medicines and suffer from complex diseases require complex treatment. Community pharmacists that provide HIV/AIDS Medications build strong personal and clinical relationships with their patients, making sure that they receive the drugs they need when they need them and even providing them discounts for these expensive medications. The community pharmacist is an essential member of the treatment team.

90.     Furthermore, because there is presently no cure for HIV/AIDS, the virus continually mutates around the medications prescribed to treat it, requiring constant monitoring and immediate provision of new medication regimens to address changes in treatment. Periods of medication changes are particularly sensitive times for HIV/AIDS patients. Doctors and pharmacists must review the panoply of the patient's medications for potential new adverse drug interactions, and patients must be concerned about addressing new drug side effects in the short term.

91.     The limited options available to obtain HIV/AIDS Medications under the Program also creates the very real risk of delayed, lost, or stolen shipments, resulting in dire consequences

for many patients who must strictly adhere to their medication regimens or face serious illness or death, as well as potentially serious personal financial liability according to CVS Caremark, which in its discretion claims these losses are the patient's responsibility even though they are occasioned by the mandated use of the Program. Yet, as detailed below, Defendants appear to have no realistic fail-safe procedure in place to allow subscribers to purchase medications at local community pharmacies (or as shown by the experiences of Plaintiffs, even at CVS pharmacies) in the event that such shipments are delayed, lost, or stolen. Unfortunately, theft of HIV/AIDS Medications appears to be more than an isolated event due to the high cost of some of the medications.

92.     CVS Caremark has replaced the present, ongoing, close relationship between community pharmacist and patient with a toll-free telephone number that does not and cannot provide the same or similar level of service and benefits as detailed above. Class Members are not provided regular access to a pharmacist with similar qualification levels, if at all. Furthermore, the Program's requirement that Class Members must routinely call in during a limited time period to renew their prescriptions as explained below—and work their way through automated robocalls, messages, and multiple call center staff—increases stress and fatigue for patients, exacerbating their conditions.

***Defendants' Discriminatory Business Practices Specifically Target HIV/AIDS Patients***

93.     Due to the complex nature of their disease and medications, HIV/AIDS patients are particularly hard hit and discriminated against by requirements that they obtain their specialty medications exclusively under the Program. For the reasons stated herein, patients with HIV and AIDS are disproportionately impacted by the Program compared to other patients, even compared to patients prescribed non-HIV/AIDS specialty medications.

94.     Further, as the Program applies to HIV/AIDS Medications and other disabilities but permits Plaintiffs and Class Members to continue to use their pharmacists of choice as an in-network benefit for other medications, including other medications prescribed to the same individuals, the Program specifically targets and discriminates against individuals on the basis of their disability. The Program denies HIV/AIDS patients full and equal access to utilize the in-network pharmacies and method of delivery of their choice specifically because of the medications

attributable to their illness, while at the same time permitting other enrollees to enjoy full access to the pharmacies of their choice. This is an arbitrary and harmful distinction, since the pharmacist's role is even more important in caring for HIV/AIDS patients. While the Program may be appropriate for some patients or some medications, it is not appropriate for all patients with complex, chronic conditions, especially illnesses subject to social stigma where privacy is a significant concern like HIV/AIDS, for which the pharmacist does much more than merely dispense specialty medications. The decision to enroll in the Program should be a matter of informed enrollee choice, not a mandate. CVS Caremark's change in policy and corresponding reduction in or elimination of benefits creates a particular health risk for HIV/AIDS patients that require time-sensitive treatments. Even worse, CVS Caremark uses its discretion to require some enrollees to fulfill both specialty and non-specialty medications using the Program, so that they are directly discriminated against by being required to go to the lowest common denominator to obtain all of their medications.

95.    According to CSP, "[a] specialty medication[] is used to treat complex and chronic conditions . . . . [They] tend to be high cost and those who take specialty medications may need extra monitoring or support."[3] According to CSP's Specialty Pharmacy Distribution Drug List for April 2018,[4] the following is a list of medications classified as "specialty" by CSP. Critically, all of the HIV/AIDS Medications taken by Plaintiffs are classified as "specialty" by CSP, and are thus subject to the Program. In fact, CSP's "Value Formulary" categorically lists "HIV Medications" as "specialty medications," all subject to the mandatory requirements of the Program.[5] The specialty medications are listed below corresponding to the medical conditions they treat, including HIV/AIDS. Only the specialty medications are subject to the Program, and these

---

[3] CVS Specialty Pharmacy, What is a specialty medication?,
https://www.cvsspecialty.com/faq.html#acc_link_content_section_box_copy_boxpar_accordion
_copy_1 (last visited March 28, 2021).
[4] CVS Specialty Pharmacy Distribution Drug List, April 2018,
https://www.cvsspecialty.com/wps/wcm/connect/d5405d7b-685e-4377-b998-
2e4c4daf0b13/SpecialtyDrugs.pdf?MOD=AJPERES&CACHEID=d5405d7b-685e-4377-b998-
2e4c4daf0b13 (last visited June 12, 2018.).
[5] CVS Caremark Value Formulary, Effective as of 04/01/2018,
https://www.caremark.com/portal/asset/Value_Formulary.pdf (last visited June 12, 2018.)

drugs may only be obtained through the Program. The specialty medications listed below are used to treat illnesses that meet the definition of "disability."[6] (*see* 29 C.F.R. § 1630.2):

- **HIV/AIDS**: as set forth below, HIV and AIDS are disabilities. CVS Caremark requires modern, commonly prescribed drugs for HIV/AIDS and its related conditions to be obtained only through the Program:

  o Aptivus; Atripla; Biktarvy; Combivir; Complera; Crixivan; Descovy; Edura; Egrifta; Emtriva; Epivir; Epzicom; Evotaz; Fuzeon; Genvoya; Intelence; Invirase; Isentress; Julua; Kaletra; Lexiva; Norvir; Odefsey; Prezcobix; Prezista; Rescriptor; Retrovir; Retrovir, Injectable; Reyataz; Selzentry; Stribild; Sustiva; Symfi Lo; Tivicay; Triumeq; Trizivir; Truvada; Tybost; Videx; Videx Ec; Videx Solution; Viracept; Viramune; Viramune Xr; Viread; Zerit; Ziagen; Ziagen Solution; Abacavir Tab; Abacavir/Lamivudine; Abacavir/Lamivudine/Zidovudine Tab; Atazanavir Sulfate; Didanosine; Efavirenz; Fosamprenavir; Lamivudine; Lamivudine/Zidovudine; Lopinavir/Ritonavir Soln; Nevirapine; Ritonavir; Stavudine; Tenofovir Disoproxil Fumarate; Zarxui; and Zidovudine.

- **Active Psoriatic Arthritis**: "is a form of arthritis that affects some people who have psoriasis — a [skin] condition ... Joint pain, stiffness and swelling are the main symptoms of psoriatic arthritis. They can affect any part of [the] body, including … fingertips and spine, and can range from relatively mild to severe…. Without treatment, psoriatic arthritis may be disabling."[7] Thus, Active Psoriatic Arthritis is a disability: a physical impairment that substantially limits the major life activities of, *inter alia*, performing manual tasks, walking, standing, sitting, reaching, lifting, bending, and the operation of special sense organs and skin and the

---

[6] Arguably, there are two drugs on CVS's specialty formulary that may not treat a disability: Makena, designed to lower the risk of pre-term birth in women who have experienced pre-term birth in the past, and Synagis, designed to treat respiratory syncytial virus. However, the inclusion of one or even a handful of medications used to treat non-disabilities on the specialty pharmacy list does not allow CVS to avoid an Affordable Care Act violation. As alleged herein, the Program demonstrates discriminatory intent on behalf of CVS against HIV and AIDS patients. CVS Carmark's Program is designed to discourage HIV and AIDS patients, as well as individuals with other disabilities, from enrolling in or remaining enrolled in a CVS Caremark health plan.

[7] Mayoclinic.org, Diseases and Conditions, Psoriatic Arthritis Definition, http://www.mayoclinic.org/diseases-conditions/psoriatic-arthritis/basics/definition/con-20015006 (last visited June 7, 2018).

musculoskeletal function, making it a disability. *See* 29 C.F.R. §1630.2(j)(iii); *see also Carmona v. Southwest Airlines Co.*, 604 F. 3d 848, 859 (5th Cir. 2010) (holding that an individual who suffered from psoriatic arthritis was considered to have an impairment that substantially limits a major life activity because psoriatic arthritis limits one's ability to walk). CVS Caremark requires drugs for Active Psoriatic Arthritis to be obtained only through the Program:

> o   Cosentyx; Enbrel; Humira; Inflectra; Otezla; Otrexup; Rasuvo; Remicade; Renflexis; Siliq; Stelara; Taltz; and Tremfya.

•   **Atrial fibrillation**: "is an irregular and often rapid heart rate that can increase [one's] risk of stroke, heart failure and other heart-related complications."[8] At times, atrial fibrillation only occurs on occasion, but it can also persist permanently, subjecting those who suffer from atrial fibrillation to endure fatigue, dizziness, shortness of breath, chest pain, and reduced physical mobility.[9] Thus, atrial fibrillation is a physical impairment that substantially limit the major life activities of, *inter alia*, breathing and regular mobility, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires atrial fibrillation drugs to be obtained only through the Program:

> o   Tikosyn; Dofetilide; and Ceprotin.

•   **Allergic Rhinitis**: "is a reaction that happens in the eyes, nose, and throat when allergens in the air trigger the release of histamine in the body. Histamine causes itching, swelling, and fluid to build up in the fragile linings of nasal passages, sinuses, and eyelids."[10] Thus, allergic rhinitis is a physical or mental impairment that substantially limits the major life activity of, *inter alia*, properly functioning respiratory process, making it a disability. *See* 29 C.F.R. § 1630.2(j) (iii); *see also Homeyer v. Stanley Tulchin Assoc., Inc.,* 91 F. 3d 959, 963 (7th Cir. 1996) (finding that, with adequate evidence, it is plausible a jury would conclude that allergic rhinitis substantially limits

---

[8] Mayoclinic.org, Diseases and Conditions, Atrial Fibrillation, https://www.mayoclinic.org/diseases-conditions/atrial-fibrillation/symptoms-causes/syc-20350624 (last visited June 7, 2018).
[9] *Id.*
[10] Hopkinsmedicine.org, John Hopkins Medical, Allergic Rhinitis in Children, https://www.hopkinsmedicine.org/healthlibrary/conditions/pediatrics/allergic_rhinitis_in_children_90,P01704 (last visited June 8, 2018.)

SECOND AMENDED CLASS ACTION COMPLAINT

one's respiratory function thus rending it a disability). CVS Caremark requires drugs for allergic rhinitis and its related conditions to be obtained only through the Program:

  o Oralair.

- **Alpha-1 Antitrypsin Deficiency (AAT)**: "is a condition that raises [one's] risk for lung disease ... and other diseases."[11] AAT causes several symptoms, including lowering one's physical activity levels, tiredness, lung infection, vision problems, and weight loss. Thus, AAT is a physical or mental impairment that substantially limits the major life activity of, *inter alia*, everyday tasks involving physical mobility, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for AAT and its related conditions to be obtained only through the Program:

  o Aralast Np; Glassia; and Zemaira.

- **Anemia**: is a condition in which a person does not have the needed amount of healthy red blood cells to adequately carry oxygen to the body's tissues.[12] If left untreated, anemia can cause severe fatigue, pregnancy complications, heart problems, and death. Thus, anemia is a physical or mental impairment that substantially limits the major life activity of, *inter alia*, everyday tasks, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for anemia and its related conditions to be obtained only through the Program:

  o Aranesp; Epogen; and Procrit.

- **Asthma**: "is a chronic lung disease that inflames and narrows the airways. The airways are tubes that carry air into and out of [one's] lungs." [13] With ongoing care and proper treatment, most individuals with asthma experience few symptoms, but specific triggers, such as air quality, certain medications, increased physical activity, or dust can cause one's asthma to worsen, which can result in lowered physical activity levels. Thus, asthma is a physical or mental impairment that

---

[11] Nhlbi.nih.gov, U.S. Department of Health and Human Services, National Heart, Lung, and Blood Institute, Alpha-1 Antitrypsin, https://www.nhlbi.nih.gov/health-topics/alpha-1-antitrypsin-deficiency (last visited June 7, 2018).

[12] Mayoclinic.org, Diseases and Conditions, Anemia Overview, https://www.mayoclinic.org/diseases-conditions/anemia/symptoms-causes/syc-20351360 (last visited June 7, 2018).

[13] Nhlbi.nih.gov, U.S. Department of Health and Human Services, National Heart, Lung, and Blood Institute, Asthma, https://www.nhlbi.nih.gov/health-topics/asthma (last visited June 7, 2018).

substantially limits the major life activity of, *inter alia*, everyday tasks, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for asthma and its related conditions to be obtained only through the Program:

> o   Cinqair; Fasenra; Nucala; Levoleucovorin Calcium; and Xolair.

•   **Blood Clotting Disorders (Hypercoagulable States or Thrombophilia**): are conditions that are usually genetic or acquired in which a person has tendency to form clots when the blood is simply moving through the body.[14] People with these disorders have an increased risk for blood clots developing in the arteries and veins and, therefore, and increased risk for stroke, heart attack, severe leg pain, difficulty walking, or even the loss of a limb. Thus, blood clotting disorders are physical or mental impairments that substantially limit the major life activities of, *inter alia*, hemic and circulatory functions, organ functions, limbs, and walking, making them disabilities. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for blood clotting disorders and related conditions to be obtained only through the Program:

> o   Bebulin; Benefix; Mononine; Rixubis; and Stimate.

•   **Cancer**: is "a collection of related diseases [in which] some of the body's cells begin to divide without stopping and spread into surrounding tissues."[15] Thus, all cancers are a physical or mental impairment that substantially limits the major life activity of, *inter alia*, the operation of normal cell growth, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for cancer and its related conditions to be obtained only through the Program:

> o   Afinitor; Alecensa; Alunbrig; Benlysta; Bosulif; Cabometyx; Cotellic; Erivedge; Erleada; Farydak; Gleevec; Hycamtin; Ibrance; Inlyta; Iressa; Jakafi; Kisqali; Kisqali Femara Co-Pack Lonsurf; Mekinist; Mozobil; Mitoxantrone[16]; Mugardnerlynx; Neumega: Nexavar; Ninlaro; Odomzo; Pomalyst; Purixan; Procrit; Revlimid; Rubraca; Soliris; Sprycel; Stivarga; Sutent; Sylatron; Stelara; Tafinlar; Tagrisso; Tarceva; Targretin; Tasigna; Temodar; Temozolomide;

---

[14] My.clevelandclinic.org, Disease and Conditions, Blood Clotting Disorders (Hypercoagulable States) Overview, https://my.clevelandclinic.org/health/diseases/16788-blood-clotting-disorders-hypercoagulable-states (last visited June 7, 2018).

[15] Cancer.gov, What is Cancer?, http://www.cancer.gov/about-cancer/what-is-cancer (last visited June 7, 2018).

[16] Cancer medication are also used to treat other disabilities such as Crohn's Disease.

Thalomid; Tykerb; Verzenio; Votrient; Xalkori; Xeloda; Xtandi; Zelboraf; Zolinza; Zortress; Zykadia; Zytiga; Neulasta; Neupogen; Lonsurf; Leuprolideacetate; Ibrance; Capecitabine; Bexarotene; Promacta; Granix; Leukine; Neulasta; Neupogen; Eligard; Firmagon; Supprelin La; Trelstar; Vantas; Zoladex Adcetris; Avastin; Bavencio; Beleodaq; Bendeka; Cyramza; Dacogen; Darzalex; Empliciti; Erbitux; Evomela; Folotyn; Fusilev; Gazyva; Halaven; Herceptin; Imfinzi; Istodax; Ixempra; Jevtana; Kadcya; Keytruda; Kyprolis; Levoleucovorin Calcium; Opdivo; Perjeta; Portrazza; Proleukin; Rituxan; Rituxan; Hycela; Romidepsin; Sylatron; Sylvant; Tecentriq; Temodar; Tepadina; Thyrogen; Torisel; Treanda; Valstar; Vectibix; Velcade; Vidaza; Xgeva; Yervoy; Yondelis; Zaltrap; Zometa; Azacitidine; Decitabine; Mitoxantrone; and Zoledronic Acid.

- **Cervical Dystonia**: "is a painful condition in which [one's] neck muscles contract involuntarily, causing their head to twist or turn to one side. Cervical dystonia can also cause [one's] head to uncontrollably tilt forward or backward."[17] Cervical dystonia Can cause severe neck pain and headaches, and in some cases, the pain can be "exhausting and disabling."[18] Thus, cervical dystonia is a physical impairment that substantially limits a major life activity of, *inter alia*, physical mobility, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires cervical dystonia drugs to be obtained only through the Program:

  o Botox; Dysport; Myobloc; and Xeomin.

- **Chronic Kidney Disease or Chronic Renal Failure**: is the gradual loss of kidney function. "Chronic kidney disease can progress to end-stage kidney failure, which is fatal without artificial filtering (dialysis) or a kidney transplant."[19] Thus, chronic kidney disease is a physical or mental impairment that substantially limits the major life activity of, *inter alia*, the operation of kidneys, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for chronic kidney disease and its related conditions to be obtained only through the Program:

---

[17] Mayoclinic.org, Diseases and Conditions, Cervical Dystonia, https://www.mayoclinic.org/diseases-conditions/cervical-dystonia/symptoms-causes/syc-20354123 (last visited June 7, 2018).

[18] *Id.*

[19] Mayoclinic.org, Diseases and Conditions, Chronic Kidney Disease Overview, https://www.mayoclinic.org/diseases-conditions/chronic-kidney-disease/symptoms-causes/syc-20354521 (last visited June 7, 2018).

o   Norditropin; Parsabiv; and Sensipar.

• **Crohn's Disease**: "is an inflammatory bowel disease (IBD). It causes inflammation of the lining of [the] digestive tract, which can lead to abdominal pain, severe diarrhea, fatigue, weight loss and malnutrition."[20] Thus, Crohn's disease is a physical impairment that substantially limits the major life activities of, *inter alia*, the operation of digestive and bowel functions, making it a disability. *See, e.g., Crevier v. Town of Spencer*, D.Mass.2008, 600 F.Supp.2d 242 (employee's Crohn's disease, a chronic illness that causes inflammation and ulceration in the digestive tract, interfered with employee's major life activity of working, and thus was a disability). CVS Caremark requires drugs for Crohn's disease to be obtained only through the Program:

o   Cimzia; Entyvio; and Humira.

• **Cryopyrin-associated autoinflammatory syndromes (CAPS)**: "consist of three diseases[21] related to a defect in the same gene [but] differ in the organs involved…. [Symptoms of these diseases include, *inter alia*:] fever with inflammation in multiple organs … chronic meningitis (inflammation of the membranes surrounding the brain) resulting in headache, blindness, hearing loss or other neurologic problems … joint pain and swelling of the bones surrounding the large joints, especially the knees … growth delay … episodic fever, chills, rash, red eyes, joint pain and severe headaches with vomiting.… Deafness or partial hearing loss … a hive-like rash."[22] Thus, CAPS is a physical impairment that substantially limits the major life activities of, *inter alia*, seeing, hearing, and the operation of the brain, neurological, and musculoskeletal functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for CAPS and related conditions to be obtained only through the Program:

o   Arcalyst and Ilaris.

---

[20] Mayoclinic.org, Diseases and Conditions, Crohn's Disease, Definition, http://www.mayoclinic.org/diseases-conditions/crohns-disease/basics/definition/con-20032061 (last visited June 7, 2018).

[21] These three diseases are called: Neonatal Onset Multisystem Inflammatory Disease (NOMID), Muckle-Wells syndrome, and Familial cold auto inflammatory syndrome.

[22] Rheumatology.org, Cryopyrin Associated Autoinflammatory Syndromes, http://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Cryopyrin-Associated-Autoinflammatory-Syndrome-CAPS-Juvenile#sthash.H5tmcP6g.dpuf (last visited June 7, 2018).

SECOND AMENDED CLASS ACTION COMPLAINT

- **Cystic fibrosis**: "is an inherited disorder that causes severe damage to the lungs and digestive system. [It] affects the cells that produce mucus, sweat and digestive juices. … a defective gene causes the[se] secretions to become thick and sticky. Instead of acting as a lubricant, the secretions plug up tubes, ducts and passageways, especially in the lungs and pancreas."[23] Thus, cystic fibrosis is a physical impairment that substantially limits the major life activities of, *inter alia*, breathing and operation of the respiratory and digestive functions, making it a disability. *See, e.g.*, *Save Our Summers v. Washington State Dept. of Ecology*, E.D.Wash.1999, 132 F.Supp.2d 896 (children suffering from severe respiratory problems as result of their severe asthma and allergies and cystic fibrosis had disabilities). CVS Caremark requires drugs for cystic fibrosis and its related conditions to be obtained only through the Program:

   o Bethkis; Kitabis; Pak; Pulmozyme; Tobi; Tobi Podhaler; Obramycin; and Nebulizer.

- **Cystinosis, Homocystinuria, Phenylketonuria (PKU), and Tyrosinemia:** are rare genetic diseases where the body cannot metabolize certain amino acids, causing the amino acids to accumulate in various organs of the body. These diseases "lead[] to widespread tissue and organ damage[,]"[24] affect the "kidneys, eyes, liver, muscles, pancreas, brain,"[25] "connective tissue, muscles, central nervous system (CNS), and cardiovascular system"[26] and cause "intellectual disability, delayed development, behavioral, emotional, and social problems, psychiatric disorders, and neurological problems that may include seizures."[27] Thus, cystinosis, homocystinuria, PKU, and tyrosinemia are physical or mental impairments that substantially limit the major life activities of, *inter alia*, seeing and operation of the brain, neurological, and

---

[23] Mayoclinic.org, Diseases and Conditions, Cystic Fibrosis, Definition, http://www.mayoclinic.org/diseases-conditions/cystic-fibrosis/basics/definition/con-20013731 (last June 7, 2018).

[24] Medscape.com, Cystinosis, Practice Essentials, http://emedicine.medscape.com/article/981650-overview (last visited June 7, 2018).

[25] Cystinosis.org, Symptoms and Treatment, https://cystinosis.org/what-is-cystinosis/symptoms-treatment (last visited June 7, 2018).

[26] Wikipedia.org, Homocystinuria, https://en.wikipedia.org/wiki/Homocystinuria (last visited June 7, 2018).

[27] Mayoclinic.org, Diseases and Conditions, Phenylketonuria, Symptoms, http://www.mayoclinic.org/diseases-conditions/phenylketonuria/basics/symptoms/con-20026275 (last visited June 7, 2018).

musculoskeletal functions, making them disabilities. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires cystinosis homocystinuria, PKU, and tyrosinemia drugs to be obtained only through the Program:

> o   Cystagon and Kuvan.

•   **Endometriosis:** is a painful disorder in which the tissue that lines in the inside of the uterus grows outside the uterus, commonly involving the ovaries, fallopian tubes and the tissues lining the pelvis. The displaced tissue thickens, breaks down and bleeds with each menstrual cycle but is trapped because it is unable to exit the body, which can lead to the formation of cysts, scar tissue, and adhesions.[28] Complications and symptoms of endometriosis are infertility, ovarian cancer, excessive bleeding, and painful menstruation, bowel movements and urination. Thus, endometriosis is a physical or mental impairment that substantially limits the major life activities of, *inter alia*, women's reproductive functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires endometriosis drugs to be obtained only through the Program:

> o   Lupaneta Pack; Lupron; and Lupron Depot.

•   **Epilepsy (includes all "seizure disorders"):** is a "neurological disorder … characterized by unpredictable seizures and can cause other health problems… Epilepsy is a spectrum condition with a wide range of seizure types."[29] Thus, epilepsy is a physical impairment that substantially limits the major life activities of, *inter alia*, the operation of the musculoskeletal and neurological functions, making it a disability. *See, e.g., Smith v. Strayer Univ. Corp.*, 79 F.Supp.3d 591 (E.D. Va. 2015) (university employee who suffered from seizure disorder was an individual with a disability since seizures were physical or mental impairment that substantiality limited one or more of employee's major life activities). CVS Caremark requires drugs for epileptic seizure disorders to be obtained only through the Program:

---

[28] Mayoclinic.org, Diseases and Conditions, Endometriosis Overview, https://www.mayoclinic.org/diseases-conditions/endometriosis/symptoms-causes/syc-20354656 (last visited June 7, 2018).
[29] Epilepsy.com, Epilepsy Foundation, What is Epilepsy?, http://www.epilepsy.com/learn/epilepsy-101/what-epilepsy (last visited June 7, 2018).

SECOND AMENDED CLASS ACTION COMPLAINT

o   H. P. Acthar;[30] Sabril Pwd; and Sabril Tabs.

•   **Familial hypercholesterolemia:** is a rare genetic disorder that "causes LDL ("bad") cholesterol level to be very high. The condition begins at birth and can cause heart attacks at an early age."[31] Thus, familial hypercholesterolemia is a physical impairment that substantially limits the major life activity of, *inter alia,* the operation of the circulatory function, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for familial hypercholesterolemia to be obtained only through the Program:

o   Kynamro.

•   **Gout**: is a complex form of arthritis that affects one's joints.[32] Gout is characterized by sudden sensations, which, at times, can limit one's range of motion.[33] Thus, gout is a physical impairment that substantially limits the major life activities of, *inter alia*, physical mobility, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires gout drugs to be obtained only through the Program:

o   Krystexxa.

•   **Growth hormone deficiency:** "means the pituitary gland does not make enough growth hormone…. The pituitary gland is located at the base of the brain [and] controls the body's balance of hormones [and] makes growth hormone."[34] Thus, a growth hormone deficiency is a physical impairment that substantially limits the major life activity of, *inter alia,* the operation of the endocrine function, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs that treat growth hormone deficiencies and related conditions to be obtained only through the Program:

---

[30] Epilepsy medications are also used to treat other disabilities such as Lupas.

[31] Nlm.nih.gov, U.S. National Library of Medicine, Medline Plus, Medical Encyclopedia, Familial hypercholesterolemia, https://www.nlm.nih.gov/medlineplus/ency/article/000392.htm (last visited June 7, 2018).

[32] Mayoclinic.org, Diseases and Conditions, Gout, https://www.mayoclinic.org/diseases-conditions/gout/symptoms-causes/syc-20372897 (last visited June 7, 2018).

[33] *Id.*

[34] Nlm.nih.gov, U.S. National Library of Medicine, Medline Plus, Medical Encyclopedia, Growth hormone deficiency, https://www.nlm.nih.gov/medlineplus/ency/article/001176.htm (last visited June 7, 2018).

SECOND AMENDED CLASS ACTION COMPLAINT

o  Increlex; Genotropin; Humatrope; Norditropin; Omnitrope; Octreotide Acetate; Saizen; Sandostatin; Sandostatin Lar; Serostim; Somavert; Zomacton; and Zorbtive.

- **Heart failure:** "is a condition in which the heart [cannot] pump enough blood to meet the body's needs. In some cases, the heart cannot fill with enough blood. In other cases, the heart cannot pump blood to the rest of the body with enough force. Some people have both problems . . . heart failure is a serious condition that requires medical care."[35] Thus, heart failure is a physical impairment that substantially limits the major life activity of the operation of, *inter alia,* the circulatory function, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for heart failure and its related conditions to be only obtained through the Program:

o  Samsca.

- **Hepatitis:** Hepatitis B is "a serious liver infection caused by the hepatitis B virus (HBV). For some people, hepatitis B infection becomes chronic, meaning it lasts more than six months. Having chronic hepatitis B increases [the] risk of developing liver failure, liver cancer or cirrhosis — a condition that causes permanent scarring of the liver."[36] Similarly, Hepatitis C is a serious liver infection caused by a virus, which, "[u]nless successfully treated with medication … can cause other serious health problems, such as cirrhosis, liver cancer and liver failure."[37] Thus, hepatitis (B and C) is a physical impairment that substantially limits the major life activities of, *inter alia*, the operation of the digestive, hemic and circulatory functions and an individual organ within a body system (liver), making it a disability. *See, e.g., Carter v. Pathfinder Energy Services, Inc.,* C.A.10 (Wyo.) 2011, 662 F.3d 1134 (employee who had diabetes and hepatitis C had physical impairment, as required to be considered disabled, since these diseases affected his digestive and circulatory systems); *Teeter v. Lofthouse Foods,* 691 F.Supp.2d 1314 (D. Utah 2010) (hepatitis C was a "physical impairment," as it was a virus that infected the blood and affected the hemic

---

[35] Nhlbi.nih.gov, U.S. Department of Health and Human Services, National Heart, Lung, and Blood Institute, What is Heart Failure?, \(last visited June 7, 2018).

[36] Mayoclinic.org, Diseases and Conditions, Hepatitis B, Definition, http://www.mayoclinic.org/diseases-conditions/hepatitis-b/basics/definition/con-20022210 (last visited June 7, 2018).

[37] Hepc.liverfoundation.org, What is Hepatitis C?, Complications of Chronic Hepatitis C, http://hepc.liverfoundation.org/what-is-hepatitis-c/what-can-happen-complications-of-hep-c/ (last visited June 7, 2018).

SECOND AMENDED CLASS ACTION COMPLAINT

system). CVS Caremark requires drugs for hepatitis B and C and related conditions to be obtained only through the Program:

     o    Baraclude; Daklinza Epclusa; Epivir Hbv; Epivir Hbv Solution; Gamastan S/D; Harvoni; Hepsera; Intron-A; Mavyret; Moderiba; Olysio; Pegasys Peg; Intron; Rebetol; Rebetol Solution; Ribasphere; Ribatab: Sovaldi: Technivie; Vemlidy; Viekira Pak; Viread; Vosevi; Zepatier Nabi-Hb; Hyperhep B; and Hepagam B.

• **Hemophilia A:** is a condition in which "blood does [not] clot normally. That means [the] body has problems stopping bleeding, both outside and inside [the] body."[38] Thus, Hemophilia A is a physical impairment that substantially limits the major life activity of, *inter alia*, the operation of the hemic and circulatory functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for Hemophilia A and its related conditions to be obtained through the Program:

     o    Advate; Alphanate; Adynovate; Afstyla; Eloctate; Hemlibra; Kovaltry; Novoeight; Nuwiq; Obizur; Riastap; Tretten; Vonvendi; Fibryga; Feiba Nf; Helixate Fs; Hemofil M; Humate-P; Koate-Dvi; Kogenate Fs; Monoclate-P; Novoseven Rt; Recombinate; Stimate; Wilate; and Xyntha.

• **Hemophilia B:** is a bleeding condition is which people bleed longer than normal. "Bleeds can occur internally, into joints and muscles, or [] from minor cuts, dental procedures or trauma."[39] Thus, Hemophilia B is a physical impairment that substantially limits the major life activities of, *inter alia*, the operation of the hemic and circulatory functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for Hemophilia B and its related conditions to be obtained only through the Program:

     o    Alphanine Sd; Alprolix; Bebulin; Benefix; Idelvion; Ixinity; Mononine; Profilnine Sd; Rebinyn; and Rixubis.

---

[38] Webmd.com, A to Z Guides, Hemophilia A, http://www.webmd.com/a-to-z-guides/hemophilia-a (last visited June 7, 2018).

[39] Hemophilia.org, Types of Bleeding Disorders, Hemophilia B, https://www.hemophilia.org/Bleeding-Disorders/Types-of-Bleeding-Disorders/Hemophilia-B (last visited June 7, 2018).

SECOND AMENDED CLASS ACTION COMPLAINT

- **Hereditary angioedema (HAE):** "is a rare, autosomal dominantly inherited blood disorder that causes episodic attacks of swelling that may affect the face, extremities, genitals, gastrointestinal tract and upper airways."[40] Thus, HAE is a physical impairment that substantially limits the major life activities of, *inter alia*, the operation of the hemic, genitourinary, reproductive, digestive, and respiratory functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for HAE and related conditions to be obtained only through the Program:

  o Berinert; Cinryze; Firazyr; Haegarda; Kalbitor; and Ruconest.

- **Hereditary Factor XIII Deficiency Disease:** "is a rare, genetic bleeding disorder characterized by deficiency of clotting factor XIII… resulting in prolonged, uncontrolled bleeding episodes."[41] Thus, hereditary factor XIII deficiency disease is a physical impairment that substantially limits the major life activities of, *inter alia*, the operation of the hemic and circulatory functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for hereditary factor XIII deficiency disease and its related conditions to be obtained only through mail-order:

  o Corifact.

- **Severe Cholesterol:** is a condition that causes fatty deposits in the blood vessels that make it difficult for blood to flow through the arteries and can increase the risk of heart disease.[42] Thus, high cholesterol is a physical impairment that substantially limits the major life activity of, *inter alia*, the operation of the circulatory function, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for high cholesterol and its related conditions to be obtained only through the Program:

  o Praluent and Repatha.

- **Huntington's disease:** is "an inherited disease that causes the [degeneration] of nerve cells in the brain… [and] has a broad impact on a person's functional abilities and usually results in

---

[40] Wikipedia.org, Hereditary angioedema, https://en.wikipedia.org/wiki/Hereditary_angioedema (last visited June 7, 2018).
[41] Rarediseases.org, Rare Disease Information, Factor XIII Deficiency (last visited June 7, 2018).
[42] Mayoclinic.org, Diseases and Conditions, High Cholesterol, https://www.mayoclinic.org/diseases-conditions/high-blood-cholesterol/symptoms-causes/syc-20350800 (last visited June 7, 2018).

SECOND AMENDED CLASS ACTION COMPLAINT

movement, thinking (cognitive) and psychiatric disorders."[43] Thus, Huntington's disease is a physical or mental impairment that substantially limits the major life activities of, *inter alia*, performing manual tasks, walking, standing, sitting, reaching, lifting, bending, speaking, learning, reading, concentrating, thinking, communicating, interacting with others, and working, and operating neurological, brain, and musculoskeletal functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for Huntington's disease to be obtained only through the Program:

- o Tetrabenazine and Xenazine.

• **Hyperparathyroidism:** "is an excess of parathyroid hormone in the bloodstream due to overactivity to one of more of the body's four parathyroid glands."[44] If left untreated, complications include osteoporosis, kidney stones, cardiovascular disease, and neonatal hypoparathyroidism. Thus, hyperparathyroidism is a physical impairment that substantially limits the major life activity of, *inter alia*, the operation of the parathyroid glands, bone health, and circulatory function, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for hyperparathyroidism and its related conditions to be obtained only through the Program:

- o Parsabiv and Sensipar.

• **Hypoparathyroidism:** is a condition in which the body secretes abnormally low levels of parathyroid hormone, which is necessary to regulate and maintain a balance of calcium and phosphorus in the body.[45] If left untreated, complications include prolonged and painful spasms in the hands and fingers; tingling sensations in the lips, tongue, fingers and toes; seizures; malformed teeth; kidney damage; heart failure; stunted growth; slow mental development in children; and cataracts. Thus, hypoparathyroidism is a physical impairment that substantially

---

[43] Mayoclinic.org, Diseases and Conditions, Huntington's disease, Definition, http://www.mayoclinic.org/diseases-conditions/huntingtons-disease/basics/definition/con-20030685 (last visited June 7, 2018).

[44] Mayoclinic.org, Diseases and Conditions, Hyperparathyroidism Overview https://www.mayoclinic.org/diseases-conditions/hyperparathyroidism/symptoms-causes/syc-20356194 (last visited June 7, 2018).

[45] Mayoclinic.org, Diseases and Conditions, Hypoparathyroidism Overview https://www.mayoclinic.org/diseases-conditions/hypoparathyroidism/symptoms-causes/syc-20355375 (last visited June 7, 2018).

limits the major life activity of, *inter alia*, the operation of the parathyroid glands and nerve, limb, digit, and circulatory functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for hypoparathyroidism and its related conditions to be obtained only through the Program:

> o   Natpara.

• **Idiopathic Pulmonary Fibrosis:** "is a disease in which tissue deep in [the] lungs becomes thick and stiff, or scarred, over time."[46] As a result, the lungs are unable to move oxygen into the bloodstream. Once diagnosed, life expectancy is three to five years. Thus, idiopathic pulmonary fibrosis is a physical impairment that substantially limits the major life activity of, *inter alia*, the respiratory and circulatory functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for idiopathic pulmonary fibrosis and its related conditions to be obtained only through the Program:

> o   Esbriet and Ofev.

• **Immune (Idiopathic) Thrombocytopenic Purpura (ITP)**: is disorder that does not allow the body to produce adequate blood cell fragments called platelets.[47] "Without enough platelets, bleeding can occur inside the body (internal bleeding) or underneath or from the skin (external bleeding)."[48] Thus, ITP is a physical impairment that substantially limits the major life activities of, *inter alia*, the body's normal function of clotting blood, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires ITP drugs to be obtained only through the Program:

> o   Bivigam; Carimune Nf; Flebogamma Dif; Gamastan S/D; Gammagard Liquid Gammagard S/D; Gammaplex; Hyperrho S/D; Micrhogam; Octagam; Privigen; Rhogam; Rhophylac; Varizig; Nplate; and Promacta.

• **Increased Calcium in Blood (Hypercalcemia):** "is a condition in which the calcium level in [the] blood is above normal… [which] can weaken [the] bones, create kidney stones, and

---

[46] Nhlbi.nih.gov, Health Topics, Idiopathic Pulmonary Fibrosis, https://www.nhlbi.nih.gov/health-topics/idiopathic-pulmonary-fibrosis (last visited June 7, 2018).

[47] Nhlbi.nih.gov, U.S. Department of Health and Human Services, National Heart, Lung, and Blood Institute, Health Topics, Immune Thrombocytopenia, https://www.nhlbi.nih.gov/health-topics/immune-thrombocytopenia (last visited June 7, 2018)

[48] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT

interfere with how [the] heart and brain work."[49] Thus, increased calcium in the blood is a physical impairment that substantially limits the major life activity of, *inter alia*, bone health, kidney function and the operation of the circulatory function, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for increased calcium in the blood and its related conditions to be obtained only through the Program:

> o Sensipar.

• **Iron Overload:** is an excess of iron in the body resulting from either a genetic disease or repeated blood transfusions to treat other debilitating conditions. Excess iron can poison organs, leading to cancer, cirrhosis, heart attack or heart failure, diabetes mellitus, osteoarthritis, osteoporosis, metabolic syndrome, hypothyroidism, hypogonadism, premature death, and can accelerate neurodegenerative diseases like Alzheimer's, early-onset Parkinson's, Huntington's, epilepsy and multiple sclerosis."[50] Thus, iron overload is a physical or mental impairment that substantially limits the major life activities of, *inter alia*, the operation of the brain, neurological, normal cell growth, endocrine, circulatory, and musculoskeletal functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for iron overload and related conditions to be obtained only through the Program:

> o Desferal; Deferoxamine; Exjade; and Jadenu.

• **Leukemia:** "is cancer of the body's blood-forming tissues, including the bone marrow and the lymphatic system[,]" which causes the bone marrow to produce white blood cells that do not function properly.[51] Thus, leukemia is a physical or mental impairment that substantially limits the major life activities of, *inter alia*, the operation of the immune and lymphatic functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for leukemia and related conditions to be obtained only through the Program:

---

[49] Mayoclinic.org, Diseases and Conditions, Hypercalcemia Overview, https://www.mayoclinic.org/diseases-conditions/hypercalcemia/symptoms-causes/syc-20355523 (last visited June 7, 2018).

[50] Irondisorders.org, Iron Overload, http://www.irondisorders.org/iron-overload (last visited June 7, 2018).

[51] Mayoclinic.org, Diseases and Conditions, Leukemia Overview, https://www.mayoclinic.org/diseases-conditions/leukemia/symptoms-causes/syc-20374373 (last visited June 7, 2018).

1

        o   Imatinib Mesylate; Idhifa; Intron- A; Oncaspar; and Rydapt.

2 • **Medical Infertility**: "is when [one] cannot get pregnant after having unprotected, regular

3 sex for six months to one year."[52] Studies show that "infertility in most cultures remains associated

4 with social stigma and taboo just like the social model of disability."[53] Thus, medical infertility is

5 a physical and mental impairment that substantially limits the major life activity of, *inter alia*,

6 reproduction and subjecting one to the social stigma associated with infertility, making it a

7 disability. *See* 29 C.F.R. § 1630.2(j)(iii). *See e.g., Erickson v. Board of Gov. of State Colleges* N.D.

8 Illl. 1995, 911 F. Supp. 316, 321 (holding that infertility is a physical impairment that substantially

9 limits a major life activity). CVS Caremark requires drugs for medical infertility and its related

10 conditions to be obtained only through the Program:

11         o   Bravelle; Cetrotide; Follistim Aq; Gonal-F; Menopur; Novarel; Ovidrel; Pregnyl;

12 Chorionic; Gonadotropin; and Ganirelix Acetate.

13 • **Menorrhagia**: "menstrual periods with abnormally heavy or prolonged bleeding."[54] An

14 individual who suffers from Menorrhagia cannot continue with usual activities while on their

15 period because the abnormal blood loss results in surmounting cramping. Thus, Menorrhagia is a

16 physical or mental impairment that substantially limit the major life activities of, *inter alia*,

17 continuing normal physical activities, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS

18 Caremark requires drugs that treat Menorrhagia to be obtained only through the Program:

19         o   Kyleena; Liletta; Mirena; Nexplanon; and Skyla.

20 • **Multiple Sclerosis (MS):** is "an unpredictable, often disabling disease of the central

21 nervous system that disrupts the flow of information within the brain, and between the brain and

22 body."[55] Thus, MS is a physical impairment that substantially limits the major life activity of, *inter*

23 ---

[52] Webmd.com, Infertility and Reproduction, Understanding Infertility- Symptoms,

24 https://www.webmd.com/infertility-and-reproduction/guide/understanding-infertility-symptoms#1 (last visited June 7, 2018).

25 [53] Ncbi.gov, US National Library of Medicine National Institution of Health, Infertility: Why Can't we Classify this Inability as disability?,

26 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3395292/ (last visited June 7, 2018).

27 [54] Mayclinic.org, Patient Care and Health Information, Diseases and Conditions, Menorrhagia, https://www.mayoclinic.org/diseases-conditions/menorrhagia/symptoms-causes/syc-20352829

28 (last visited June 7, 2018).

[55] Nationalmssociety.org, National Multiple Sclerosis Society, What is MS?,

*alia*, the operation of the neurological function, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii); *see, e.g., Gaylor v. Greenbriar of Dahlonega Shopping Center, Inc.*, 975 F. Supp. 2d 1374 (N.D. Ga. 2013) (customer suffering from MS was disabled since MS is a condition that, at a minimum, substantially limited the individual's neurological functions, and as a result of his condition, he lived in pain which made it difficult, although not impossible, for him to walk); *Feldman v. Law Enforcement Associates Corp.*, 955 F.Supp.2d 528 (E.D.N.C. 2013) (employee who suffered from MS was disabled). CVS Caremark requires drugs for MS and its related conditions to be obtained only through the Program:

         o    Ampyra; Aubagio; Avonex; Betaseron; Copaxone; Extavia; Gilenya; Glatopa; H.P. Acthar; Lemtrada; Ocrevus; Plegridy; Rebif; Tecfidera; and Tysabri.

•    **Opioid Dependency**: "is a primary, chronic disease of brain reward, motivation, memory and related circuitry."[56] Opioid dependency is a chronic disease, and without treatment or participation in rehabilitation, addiction is debilitating "and can result in disability or premature death."[57] Thus, opioid dependency is a physical or mental impairment that substantially limits the major life activity of, *inter alia*, consistently abstaining from opioids, control of one's behavior, and non-impaired decision execution,[58] making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for opioid dependency and its related conditions to be obtained only through the Program:

         o    Vivitrol.

•    **Osteoarthritis** "is when the protective cartilage on the ends of [one's] bones wears down over time." Osteoarthritis often limits one's ability to walk, bend, lift objects, or climb. Thus, Osteoarthritis are physical impairments that substantially limit the major life activities of, *inter alia* a, physical mobility, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). *See Cody v. County of Nassau*, 577 F. Supp. 2d 623, 639 (E.D.N.Y. 2008) (claiming that osteoarthritis limited one's major life activities). CVS Caremark requires Osteoarthritis drugs to be obtained only through the

---

http://www.nationalmssociety.org/What-is-MS (last visited June 7, 2018).

[56] Asam.org, American Society of Addiction Medicine, Resources, Definition of Addiction, https://www.asam.org/resources/definition-of-addiction (last visited June 7, 2018).
[57] *Id.*
[58] *Id.*

Program:

        o  Durolane; Euflexxa; Gel-One; Gelsyn-3; Genvisc 850; Hyalgan; Hymovis; Monovisc; Orthovisc; Supartz; Synvisc; Synvisc One; and Visco-3.

- **Osteoporosis:** "causes bones to become weak and brittle — so brittle that a fall or even mild stresses like bending over or coughing can cause a fracture."[59] Thus, osteoporosis is a physical impairment that substantially limits the major life activity of *inter alia*, the operation of the musculoskeletal function, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for osteoporosis to be obtained only through the Program:

        o  Actimmune; Prolia; Tymlos; Reclast; Zoledronic Acid; and Forteo.

- **Parkinson's disease:** Parkinson's disease is "a progressive disorder of the nervous system that affects movement."[60] Thus, Parkinson's disease is a physical or mental impairment that substantially limits the major life activities of, *inter alia*, performing manual tasks, walking, standing, sitting, reaching, lifting, bending, speaking, learning, reading, concentrating, thinking, communicating, interacting with others, and working, and operation of the neurological, brain, and musculoskeletal functions, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for Parkinson's disease and its related conditions to be obtained only through the Program:

        o  Apokyn; Northera; and Nuplazid.

- **Primary immunodeficiency diseases (PI):** "are a group of more than 250 rare, chronic disorders in which part of the body's immune system is missing or functions improperly. While not contagious, these diseases are caused by hereditary or genetic defects, and, although some disorders present at birth or in early childhood, the disorders can affect anyone, regardless of age or gender. Some affect a single part of the immune system; others may affect one or more components of the system. And while the diseases may differ, they all share one common feature:

---

[59] Mayoclinic.org, Diseases and Conditions, Osteoporosis, Definition, http://www.mayoclinic.org/diseases-conditions/osteoporosis/basics/definition/con-20019924 (last visited June 7, 2018).

[60] Mayoclinic.org, Diseases and Conditions, Parkinson's disease, Definition, http://www.mayoclinic.org/diseases-conditions/parkinsons-disease/basics/definition/con-20028488 (last visited June 7, 2018).

SECOND AMENDED CLASS ACTION COMPLAINT

each results from a defect in one of the functions of the body's normal immune system."[61] Thus, PIs are physical impairments that substantially limit the major life activity of, *inter alia*, operating immune function, making them disabilities. CVS Caremark requires drugs for PIs and related conditions to be obtained only through the Program:

    o  Bivigam; Carimune Nf; Cuvitru; Flebogamma Dif; Gamastan S/D; Gammaked; Gamunex C Hizentra; and Hyqvia.

• **Retinal Diseases**: "vary widely, but most can affect any part of your retina, a thin layer of tissue on the inside back wall of your eye. [One's] retina organizes visual information and sends it to their brain through their optic nerve, allowing them to see."[62] Symptoms associated with Retinal diseases include blurred or distorted vision, defective vision, or lost vision.[63] Thus, Retinal Diseases are physical and mental impairments that substantially limit the major life activities of, *inter alia*, enjoying clear vision, making them disabilities. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires Retinal Diseases drugs to be obtained only through the Program:

    o  Eylea; Iluvien; Lucentis; Macugen; Ozurdex; Retisert; and Visudyne.

• **Rheumatoid Arthritis (RA):** "is a chronic inflammatory disorder that can affect more than just joints. In some people, the condition also can damage a wide variety of body systems, including the skin, eyes, lungs, heart and blood vessels. An autoimmune disorder, [RA] occurs when your immune system mistakenly attacks your own body's tissues. [RA] affects the lining of your joints, causing a painful swelling that can eventually result in bone erosion and joint deformity. The inflammation associated with [RA] is what can damage other parts of the body as well. … [S]evere [RA] can still cause physical disabilities."[64] Thus, RA is a physical impairment that substantially limits the major life activities of, *inter alia*, performing manual tasks and

---

[61] Primaryimmune.org, Immune Deficiency Foundation, About Primary Immunodeficiencies, http://primaryimmune.org/about-primary-immunodeficiencies/ (last visited June 7, 2018).

[62] Mayoclinic.org, Patient Cares and Health Information, Diseases and Conditions, Retinal Diseases, https://www.mayoclinic.org/diseases-conditions/retinal-diseases/symptoms-causes/syc-20355825 (last visited June 7, 2018).

[63] *Id.*

[64] Mayoclinic.org, Diseases and Conditions, Rheumatoid arthritis, Overview, http://www.mayoclinic.org/diseases-conditions/rheumatoid-arthritis/home/ovc-20197388 (last visited June 7, 2018).

operation of the musculoskeletal functions, making it a disability. *See, e.g., Moore v. J.B. Hunt Transp., Inc*., 221 F.3d 944, 951 (7th Cir. 2000) (court "believe[s] [RA] falls within the definition of impairment in the regulations"). CVS Caremark requires RA drugs to be obtained only through the Program:

> o   Acthar H.P.; Actemra; Cimzia; Enbrel; Humira; Inflectra; Kevzara; Orencia; Otrexup; Rasuvo; Remicade; Renflexis; Rituxan; Simponi; Simponi Aria; Xeljanz; and Neoral.

- •   **Severe Forms of Hypertension – Malignant Hypertension, Pulmonary Arterial Hypertension (PAH), Pulmonary Hypertension (PH):** Malignant hypertension is "extremely high blood pressure that develops rapidly and causes some type of organ damage."[65] PAH or PH is "[h]igh blood pressure in the lungs … [It] is a chronic and life- changing disease that can lead to right heart failure if left untreated."[66] Thus, malignant hypertension and PAH/PH are physical impairments that substantially limit the major life activities of, *inter alia*, breathing and operating organs and the respiratory and circulatory functions, making them disabilities. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires malignant hypertension and PAH/PH drugs to be obtained only through the Program:

> o   Adcirca; Adempas; Flolan; Letairis; Opsumit; Orenitram; Remodulin; Revatio; Tracleer; Tyvaso; Uptravi; Veletri; Ventavis; Epoprostenol Sodium; and Sildenafil Citrate.

- •   **Short Bowel Syndrome:** "is a group of problems related to poor absorption of nutrients. [It] typically occurs in people who have had at least half of their small intestine removed and sometimes all or part of their large intestine removed; significant damage of the small intestine; poor motility, or movement, inside the intestines…. People with short bowel syndrome cannot absorb enough water, vitamins, minerals, protein, fat, calories, and other nutrients from food."[67] Thus, short bowel syndrome is a physical impairment that substantially limits the major life

---

[65] Webmd.com, Hypertension/High Blood Pressure Health Center, Malignant Hypertension, http://www.webmd.com/hypertension-high-blood-pressure/guide/what-is-malignant-hypertension (last visited June 7, 2018).

[66] Phassociation.org, Pulmonary Hypertension Association, About Pulmonary Hypertension, http://www.phassociation.org/AboutPH (last visited June 7, 2018).

[67] Niddk.nih.gov, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Health, Short Bowel Syndrome, http://www.niddk.nih.gov/health-information/health-topics/digestive-diseases/short-bowel-syndrome/Pages/facts.aspx (last visited June 7, 2018).

SECOND AMENDED CLASS ACTION COMPLAINT

activity of, *inter alia*, operation of the digestive function, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs that treat short bowel syndrome to be obtained only through the Program:

> o   Gattex; Solesta; and Norditropin.

- **Transplant rejection:** "is a process in which a transplant recipient's immune system attacks the transplanted organ or tissue."[68] Thus, transplant rejection is a physical condition that substantially limits the major life activities of *inter alia*, the operation of an individual organ within a body system, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for forms of transplant rejection and its related conditions to be obtained only through the Program:

> o   Astagraf Xl; Cellcept; Cellcept Injectable; Cellcept Suspension; Envarsus Xr; Gengraf; Myfortic; Neoral; Nulojix; Prograf; Prograf Injectable; Rapamune; Rapamune Solution; Sandimmune; Zortress; Cyclosporine; Mycophenolate Mofetil; Mycophenolate Sodium Dr Sirolimus Tab; and Tacrolimus.

- **Type 1 Gaucher disease:** is a condition that causes "enlargement of the liver and spleen (hepatosplenomegaly), a low number of red blood cells (anemia), easy bruising caused by a decrease in blood platelets (thrombocytopenia), lung disease, and bone abnormalities such as bone pain, fractures, and arthritis."[69] Thus, Type 1 Gaucher disease is a physical impairment that substantially limits the major life activities of, *inter alia*, the operation of the hemic, respiratory, and musculoskeletal functions and the operation of an individual organ (liver and spleen) within a body system, making it a disability. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs for Type 1 Gaucher disease and related conditions to be obtained only through the Program:

> o   Aldurazyme; Cerdelga; Cerezyme; Elaprase; Elelyso; Fabrazyme; Kanuma; Lumizyme; Naglazyme; Vimizim; and Vpriv.

---

[68] Nlm.nih.gov, U.S. National Library of Medicine, Medline Plus, Medical Encyclopedia, Transplant rejection, https://www.nlm.nih.gov/medlineplus/ency/article/000815.htm (last visited June 7, 2018).

[69] Ghr.nlm.nih.gov, Genetics Home Reference, U.S. National Library of Medicine, National Institute of Health, Gaucher Disease, https://ghr.nlm.nih.gov/condition/gaucher-disease (last visited June 7, 2018).

- **Urea cycle disorders (UCDs):** are rare genetic disorders "caused by a mutation that results in a deficiency of one of the six enzymes in the urea cycle … responsible for removing ammonia from the blood stream. … In [UCDs], … ammonia, a highly toxic substance, [accumulates in the blood] resulting in hyperammonemia (elevated blood ammonia). Ammonia then reaches the brain through the blood, where it can cause irreversible brain damage, coma and/or death."[70] Thus, UCDs are physical or mental impairments that substantially limit the major life activities of, *inter alia*, operation of the hemic and brain functions, making them disabilities. *See* 29 C.F.R. § 1630.2(j)(iii). CVS Caremark requires drugs that treat UCDs and their related conditions to be obtained only through the Program:

  o Buphenyl; Ravicti; and Sodium-Phenylbutyrate.

96.     These formulary classifications demonstrate the hypocrisy engaged in by CSP and CVS Caremark with regard to the specialty medications at issue here. On the one hand, CSP claims that because people "who take specialty medications may need extra monitoring or support" these medications should be listed on the highest tier of medications in its formulary. On the other hand, CSP and CVS Caremark requires delivery of such medications at the lowest level of service and interaction with persons who are not specifically trained in the handling of such medications.

97.     When Class Members inform CVS Caremark representatives they do not want to participate in the Program, they are typically told they have no choice, satisfying any requirement to exhaust administrative remedies.

98.     The Affordable Care Act ("ACA") and state laws outlaw deceptive acts or practices and/or discrimination based on disability, medical condition, and other categories. HIV/AIDS is a "disability" under the ACA.

99.     CVS Caremark's Program improperly reduces or eliminates benefits, breaching CVS Caremark's fiduciary duties to Class Members. CVS Caremark's conduct is also unlawful and unfair, and therefore violates California Business & Professions Code section 17200, *et seq.*, as well as privacy rights provided by the California and U.S. Constitutions.

---

[70] Nucdf.org, National Urea Cycle Disorders Foundation, What is a Urea Cycle Disorder?, http://www.nucdf.org/ucd.htm (last visited June 7, 2018).

SECOND AMENDED CLASS ACTION COMPLAINT

100.     CVS Caremark exercises discretion over claims for prescription drug benefits for those health benefit plans for which it administers prescription drug benefits. Among other things, CSP and CVS Caremark exercises discretion in establishing drug formularies, which determine whether a given drug is classified as a specialty drug, and, therefore, whether that drug is accessible to Plaintiffs and class members at community retail pharmacies. As a document on CVS Caremark's own website states, "Development and management of drug formularies is an integral component in the pharmacy benefit management (PBM) services CVS Caremark provides to health plans and plan sponsors."[71]

101.     CVS Caremark is specifically identified in the Summary Plan Descriptions of certain employers' health benefit plans as a fiduciary with respect to prescription drug benefits.

## **DEFENDANTS' CONDUCT VIOLATES FEDERAL AND STATE LAW**

102.     A central tenet of the ACA is to end discrimination against patients based on their health status, health history, or disability. For example, the "guaranteed issue" provision of the ACA bars discrimination on the basis of health condition, barring companies from "impos[ing] any preexisting condition exclusion." 42 U.S.C. § 300gg-3. Those with HIV/AIDS and other chronic illness stood the most to gain from the elimination of discrimination on the basis of medical condition.

103.     Section 1557 of the ACA provides that "an individual shall not … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

104.     As noted below, CVS Health Corporation, the parent company of the CVS Caremark defendants, is a health care entity that receives Federal financial assistance and is subject to Section 1557.

105.     Similarly, CVS Caremark's Pharmacy Services Segment and Retail/LTC Segment—which include all Defendants and all Defendants participate in the running of—are both

---

[71] CVS Caremark, Formulary Development and Management at CVS Caremark, www.caremark.com/portal/asset/FormDevMgmt.pdf. (last visited March 28, 20121.)

"health program[s] or activit[ies] … receiv[ing] Federal financial assistance" that are subject to Section 1557, as they include retail and mail-order pharmacies, as well as PBMs, and are directly responsible for the discriminatory conduct at issue in this Complaint. Under CVS Caremark's Pharmacy Services Segment and its Retail/LTC Segment, various aspects of pharmaceutical care critical to Class Members' health have been eliminated, including medically appropriate dispensing of their medications and access to necessary counseling.

106.    Section 1557 specifically delineates the design of plan benefits as a potentially discriminatory practice. Section 1557 also provides that an individual shall not be subjected to discrimination on grounds prohibited under section 504 of the Rehabilitation Act of 1973. The Supreme Court has specified that the relevant inquiry under the Rehabilitation Act for determining if discrimination has occurred is whether "meaningful access" has been provided to individuals with disabilities. *Alexander v. Choate*, 469 U.S. 287 (1985). The meaningful access inquiry asks "whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2003). As detailed herein, the Program does not provide meaningful access to HIV/AIDS medications.

107.    The Department of Health and Human Services ("HHS"), Office for Civil Rights ("OCR") made clear in its comments on regulations implementing the ACA that Section 1557 is "not intended to apply lesser standards for the protection of individuals from discrimination than the standards under Title VI, Title IX, Section 504, the Age Act, or the regulations issued pursuant to those laws, all of which are incorporated into Section 1557 by reference." 81 Fed. Reg. 31381 (2016) (discussing 45 C.F.R. § 92.3 as adopted). Section 504 of the Rehabilitation Act, expressly incorporated into Section 1557, recognizes private rights of action for discrimination based on disparate impact, which does not require a discriminatory motive. *See Alexander*, 469 U.S. at 299 and *International Broth. of Teamsters v. U.S.,* 431 U.S. 335, n.15 (1977). This was made explicit by the Department of Health and Human Services: "OCR interprets Section 1557 as authorizing a private right of action for claims of disparate impact discrimination on the basis of any of the criteria enumerated in the legislation." 81 Fed. Reg. 31440 (2016).

108.    As discussed more fully below, CSP and CVS Caremark's implementation of a

limited network of specialty pharmacies is only applicable to those enrollees who require specialty medications. Enrollees with HIV/AIDS, who must always be conscious of privacy and other concerns that accompany the condition, are significantly, adversely, and disproportionately impacted by the Program.

109.   The U.S. Supreme Court has recognized HIV/AIDS as a "disability." *Bragdon v. Abbott*, 118 524 U.S. 624, 655 (1998).

110.   Defendants' intentionally discriminatory actions have denied Plaintiffs and members of the Class full and equal enjoyment of the benefits, services, facilities, privileges, advantages, and accommodations under their health plans' prescription drug benefit. These changes to Class Members' health plans' prescription drug benefit put Class Members' health and privacy at risk and reduce or effectively eliminate their drug benefit for subscribers prescribed HIV/AIDS Medications forced to obtain those medications solely using the limited options available to Class Members under the Program without an option to opt out and use the pharmacy and pharmacist of their choice, or not being properly informed that they do not need to use the Program to obtain such medications. These changes have made, or will make, HIV/AIDS Medications unaffordable at in-network community pharmacies where expert pharmacists provide life-saving advice and counseling on which Plaintiffs and Class Members have come to rely. Therefore, based on their disability Plaintiffs and Class Members are subject to discriminatory treatment that threatens their health and their privacy.

111.   Defendants are engaging in a series of illegal transactions that violate the ACA and the state law claims asserted herein.

112.   Article I, section 1 of the California Constitution guarantees "all people" the right to privacy:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

The U.S. Constitution impliedly also recognizes a fundamental right to privacy. As detailed above, the Program violates Class Members' inalienable right to privacy by eliminating their choice to keep their medical condition private, by requiring public delivery of their medications by someone

they do not know and from CSP personnel who may not be sensitive to or have extensive knowledge of their condition.

113.    The Program targets individuals with specific disease states. Here, Defendants specifically target certain "specialty medicines" that are used to treat serious and chronic health conditions. In fact, due to the specialized nature of these targeted medications, this policy change predominantly impacts subscribers with serious medical conditions, and specifically for purposes of this Complaint, persons with HIV/AIDS. The Program denies equal use of and access to community pharmacists and denies prescription drug benefits due for only these people.

114.    The California Legislature has declared that the State of California has an interest in ensuring that all people have ready and reasonably available access to HIV/AIDS Medications:

> (a)    State-of-art knowledge regarding treatment of people infected with the human immunodeficiency virus (HIV) indicates that active HIV infection (AIDS) can be a manageable, though chronic, condition with the use of drugs such as zidovudine (AZT), aerosolized pentamidine, and ganciclovir. AIDS experts across the nation agree that early intervention with these drugs can prolong life, minimize the related occurrences of more serious illnesses, reduce more costly treatments, and maximize the HIV-infected person's vitality and productivity.
>
> (b)    For reasons of compassion and cost effectiveness, *the State of California has a compelling interest in ensuring that its citizens infected with the HIV virus have access to these drugs.*

California Health & Safety Code § 120950 (emphasis added).

115.    In controlling and administering the plans, Defendants owe a duty to act solely for the benefit of Plaintiffs, their plan members, and/or the Class, as applicable. However, Defendants have put their own interests above their subscribers through their conduct of discrimination and self-dealing by mandating the use of CSP and not providing an opt out right or notice thereof, restricting choice of pharmacy to fulfill these specialty medications, refusing to consistently accept manufacturer rebates or discounts, forcing consumers to accept the financial responsibility of lost or stolen shipments, and/or keeping fees or rebates that would be paid to community specialty pharmacies or consumers, all the time profiting as a result thereof. Defendants have also put their own interests before subscribers' interests by seeking to increase their own profits at the expense of their subscribers' health, as set forth above.

116.    Defendants have failed to provide a reasonable procedure for subscribers who wish

SECOND AMENDED CLASS ACTION COMPLAINT

to opt out of the Program and any information regarding appeal of any determinations to deny opt out requests.

117.    Forcing affected enrollees to participate in the Program will cause severe detriment and irreparable harm to Class Members, as well as the potential for financial loss, as actually suffered by Plaintiffs. Such conduct is continuing. Class Members either have switched against their will to the Program or are being threatened with the requirement to purchase their specialty drugs through CSP in accordance with the Program. CSP must either agree not to continue to implement the Program in its current form or, at a minimum, provide Class Members the right to opt out of the Program.

## **FEDERAL FINANCIAL ASSISTANCE**

### ***CVS Health Corporation***

118.    CVS Health Corporation, the parent company of the CVS Caremark defendants, is an entity principally engaged in the business of providing healthcare that receives Federal financial assistance. As noted in its 2020 Form 10-K filing with the U.S. Securities and Exchange Commission ("SEC"),[72] CVS Health Corporation is an entity principally engaged in the business of providing healthcare:

> CVS Health Corporation ("CVS Health"), together with its subsidiaries (collectively, the "Company," "we," "our" or "us"), *is a diversified health services company united around a common purpose of helping people on their path to better health*. In an increasingly connected and digital world, we are meeting people wherever they are and changing health care to meet their needs.  The Company has more than 9,900 retail locations, approximately 1,100 walk-in medical clinics, a leading pharmacy benefits manager with approximately 105 million plan members, a dedicated senior pharmacy care business serving more than one million patients per year and expanding specialty pharmacy services. We also serve an estimated 34 million people through traditional, voluntary and consumer-directed health insurance products and related services, including expanding Medicare Advantage offerings and a leading standalone Medicare Part D prescription drug plan ("PDP").

(emphasis added.)

119.    CVS Health Corporation is, and holds itself and its network of subsidiaries out to

---

[72] SEC.gov, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, For the Fiscal Year Ended December 31, 2020, https://www.sec.gov/Archives/edgar/data/0000064803/000006480321000011/cvs-20201231.htm (last visited March 28, 2021).

the public as, an integrated health care company that provides a wide range of healthcare services. According to CVS Health Corporation's fourth quarter 2020 Earnings Release: [73]

**About CVS Health**

CVS Health is a different kind of health care company. We are a diversified health services company with nearly 300,000 employees united around a common purpose of helping people on their path to better health. In an increasingly connected and digital world, we are meeting people wherever they are and changing health care to meet their needs. Built on a foundation of unmatched community presence, our diversified model engages one in three Americans each year. From our innovative new services at HealthHUB® locations, to transformative programs that help manage chronic conditions, we are making health care more accessible, more affordable and simply better.

120.    According to CVS Health Corporation's website:

**About CVS Health**

At CVS Health, we share a clear purpose: helping people on their path to better health. Through our health services, plans and community pharmacists, we're pioneering a bold new approach to total health. Making quality care more affordable, accessible, simple and seamless, to not only help people get well, but help them stay well in body, mind and spirit.

. . .

**The path to better health**

Every one of us at CVS Health shares a single, clear purpose: helping people on their path to better health.

Whether in our pharmacies or through our health services and plans, we are pioneering a bold new approach to total health. Making quality care more affordable, accessible, simple and seamless. Creating innovations that not only help people get well, but help them stay well in body, mind and spirit.

…

**Our services**

Across CVS Health, from face-to-face, to at-home and virtual care, we offer a wide range of services to meet you as a patient, customer or member at every step of your health care journey.

---

[73] CVS Health Reports Fourth Quarter and Full-Year 2020 Results and Provides 2021 Full Year Guidance, https://s2.q4cdn.com/447711729/files/doc_financials/2020/q4/Q4-2020-Earnings-Release.pdf (last visited March 28, 20121).

…

**Our suite of services**

CVS Health is a one-of-a-kind health care company that helps you get the care you need through the channel that works best for you.

…

**Improving health care**

By looking at the whole picture of care, we're working to make health care more accessible, affordable and simply better

. . .

**Care when and where you need it most**

No matter what your care needs may be, our goal is to make that care easily accessible, through our many retail or clinical locations, through one of our digital tools or through virtual care that puts care in the palm of your hand

. . .

**A spectrum of health support**

We support you across the entire health ecosystem, from prevention to personalized solutions. Our thousands of medical and behavioral professionals, as well as digital tools and advanced data analytics that enable early intervention and treatment, help us give you the best care possible.

. . .

**Access to care**

One of our top priorities is to ensure that whatever your health needs may be, that you can easily access the kind of care that keeps you on your path to better health.

. . .

**Expertise and technology to support you**

Thousands of medical and behavioral professionals and more than 30,000 retail pharmacists take care of our members, patients and customers daily. It's that expertise combined with our technology-enabled solutions and network of more than 7,900 health care organizations nationwide that allows us to put you at the center of your health care and to support a sustainable health system for all.

. . .

SECOND AMENDED CLASS ACTION COMPLAINT

**Health with Heart**

We're working to improve the health care experience for all, through innovative products and services and in communities nationwide.

. . .

We have assembled the most comprehensive suite of assets in the industry. Our unique integrated model increases access to quality care, delivers better health outcomes, and lowers overall health care costs. We have one mission: to actively support your efforts in offering the best care possible for your members.

. . .

**Our vision: Human centered health care**

It's the focus of everything we do as a health services company. But what, or more accurately who, we put at the center is what truly matters most. It's you. With health care revolving around each person and their individual needs, we can be there during every meaningful moment of health in your lifetime.

121.   As an integrated health care company that provides a wide range of healthcare services, CVS Health Corporation receives significant Federal financial assistance under the Medicare Part D[74] program and other government programs. CVS Health Corporation is an intended recipient of that Federal financial assistance for purposes of providing Part D benefits and other government-funded health benefits to eligible enrollees. For example, as noted in the CVS Health Corporation's 2020 10-K filing with the SEC:

> ***The Company is a national provider of drug benefits under the Medicare Part D prescription drug program.*** All Medicare eligible individuals are eligible to participate in this voluntary prescription drug plan.

(emphasis added.)

…

> ***Programs funded in whole or in part by the U.S. federal government account for a significant portion of our revenues, and we expect that percentage to increase.***

(emphasis added.)

…

---

[74] Medicare Part D is the prescription drug component of Medicare. https://www.medicare.gov/drug-coverage-part-d.

SECOND AMENDED CLASS ACTION COMPLAINT

The Health Care Benefits segment is one of the nation's leading diversified health care benefits providers, serving an estimated 34 million people as of December 31, 2020. The Health Care Benefits segment has the information and resources to help members, in consultation with their health care professionals, make more informed decisions about their health care. The Health Care Benefits segment offers a broad range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental and behavioral health plans, medical management capabilities, Medicare Advantage and Medicare Supplement plans, PDPs, Medicaid health care management services and health information technology ("HIT") products and services.

…

Government Medical: In select geographies, the Health Care Benefits segment offers Medicare Advantage plans, Medicare Supplement plans and prescription drug coverage for Medicare beneficiaries; participates in Medicaid and subsidized Children's Health Insurance Programs ("CHIP"); and participates in demonstration projects for members who are eligible for both Medicare and Medicaid ("Duals"). *These Government Medical products are further described below*:

- Medicare Advantage: Through annual contracts with CMS, the Company offers HMO and PPO products for eligible individuals in certain geographic areas through the Medicare Advantage program.

  . . .

- Medicare PDP: The Company is a national provider of drug benefits under the Medicare Part D prescription drug program. All Medicare eligible individuals are eligible to participate in this voluntary prescription drug plan.

- . . . The Company offered a wide selection of Medicare Supplement products in 49 states and Washington, D.C. in 2020.

- Medicaid and CHIP: The Company offers health care management services to individuals eligible for Medicaid and CHIP under multi-year contracts with government agencies in various states that are subject to annual appropriations. CHIP are state-subsidized insurance programs that provide benefits for families with uninsured children.

  . . .

- Duals: The Company provides health coverage to beneficiaries who are dually eligible for both Medicare and Medicaid coverage

(emphasis added.)

. . .

SECOND AMENDED CLASS ACTION COMPLAINT

In both 2020 and 2019, Health Care Benefits segment revenues from the federal government accounted for 13% of the Company's consolidated total revenues. Contracts with CMS for coverage of Medicare-eligible individuals . . . accounted for approximately 92% of the Company's revenues from the federal government in both 2020 and 2019.

. . .

Compared to Commercial Medical products, Medicare contracts generate higher per member per month revenues and higher health care and other benefit costs.

. . .

***The Company has expanded its Medicare service area and products in 2021 and is seeking to substantially grow its Medicare membership, revenue and operating results over the next several years,*** including through growth in Medicare Supplement products. The anticipated organic expansion of the Medicare service area and Medicare products offered and the Medicare-related provisions of the ACA significantly increase the Company's exposure to funding and regulation of, and changes in government policy with respect to and/or funding or regulation of, the various Medicare programs in which the Company participates, including changes in the amounts payable to us under those programs and/or new reforms or surcharges on existing programs.

(emphasis added.)

. . .

***Programs funded in whole or in part by the U.S. federal government account for a significant portion of our revenues, and we expect that percentage to increase***.

(emphasis added.)

. . .

Our revenues from government funded programs, including in Health Care Benefits' Medicare, Medicaid, dual eligible and dual eligible special needs plan businesses and from government customers in its Commercial business, are dependent on annual funding by the federal government and/or applicable state or local governments.

122.    Whether measuring by the (i) total number of individuals linked to certain services, (ii) total revenues of CVS Health Corporation's segments, or (iii) adjusted operating income of those segments, it is clear that more than half of CVS Health Corporation's business constitutes the provision of health care.

123.    According to CVS Health Corporation's fourth quarter 2020 Earnings Release,[75] three segments make up the majority of its business: "Pharmacy Services Segment," "Retail/LTC Segment," and "Health Care Benefits Segment."

124.    CVS Health Corporation's 2020 Earnings Release describes each segment as follows:

- Pharmacy Services Segment – "provides a full range of pharmacy benefit management solutions to employers, health plans, government employee groups and government sponsored programs."

- Retail/LTC Segment – "fulfills prescriptions for medications, provides patient care programs, sells a wide assortment of health and wellness products and general merchandise, provides health care services through walk-in medical clinics, provides medical diagnostic testing and provides services to long-term care facilities."

- Health Care Benefits Segment – "offers a full range of insured and self-insured ("ASC") medical, pharmacy, dental and behavioral health products and services."

125.    According to CVS Health Corporation,[76] it has approximately 102 million PBM members, 62 million ExtraCare members, and 23 million medical benefit members.

126.    The 102 million PBM members are served under the Pharmacy Services Segment; the 62 million ExtraCare members are served under the Retail/LTC Segment; and the 23 million medical benefit members are served under the Health Care Benefits Segment.

127.    Additionally, CVS Health Corporation has over 9,900 retail pharmacy locations, 1,100 MinuteClinic locations, and 26 retail specialty pharmacies. CVS Health Corporation advertises that it has 50 million visits to the MinuteClinics, manages or fills 2.5 billion prescriptions, serves 4.5 million people daily in its retail pharmacy locations, and serves 5 million people annually with long-term care services through Omnicare.

128.    According to CVS Health Corporation's fourth quarter 2020 Earnings Report, CVS Health Corporation's four segments—Pharmacy Services, Retail/LTC, Health Care Benefits, and Corporate/Other—reported the following results (chart on next page):

---

[75] *Supra* n.73.
[76] CVSHealth.com, Our company at a glance, https://cvshealth.com/about-cvs-health/our-company-at-a-glance (last visited March 28, 2021.)

SECOND AMENDED CLASS ACTION COMPLAINT

Company's underlying business performance as further described in endnote (1). The Company uses adjusted operating income as its principal measure of segment performance as it enhances the Company's ability to compare past financial performance with current performance and analyze underlying business performance and trends.

The following is a reconciliation of financial measures of the Company's segments to the consolidated totals:

| *In millions* | Pharmacy Services [(a)] | Retail/ LTC | Health Care Benefits | Corporate/ Other | Intersegment Eliminations [(b)] | Consolidated Totals |
|---|---|---|---|---|---|---|
| **Three Months Ended** | | | | | | |
| December 31, 2020 | | | | | | |
| Total revenues | $ 36,355 | $ 24,062 | $ 19,103 | $ 134 | $ (10,100) | $ 69,554 |
| Operating income (loss) | 1,505 | 1,644 | 56 | (512) | (169) | 2,524 |
| Adjusted operating income (loss) [(1)] | 1,561 | 1,775 | 153 | (375) | (169) | 2,945 |
| December 31, 2019 | | | | | | |
| Total revenues | 37,073 | 22,580 | 17,150 | 89 | (10,003) | 66,889 |
| Operating income (loss) | 1,348 | 1,909 | 386 | (430) | (176) | 3,037 |
| Adjusted operating income (loss) [(1)] | 1,447 | 2,031 | 779 | (315) | (176) | 3,766 |
| **Year Ended** | | | | | | |
| December 31, 2020 | | | | | | |
| Total revenues | $ 141,938 | $ 91,198 | $ 75,467 | $ 426 | $ (40,323) | $ 268,706 |
| Operating income (loss) | 5,454 | 5,640 | 5,166 | (1,641) | (708) | 13,911 |
| Adjusted operating income (loss) [(1)] | 5,688 | 6,146 | 6,188 | (1,306) | (708) | 16,008 |
| December 31, 2019 | | | | | | |
| Total revenues | 141,491 | 86,608 | 69,604 | 512 | (41,439) | 256,776 |
| Operating income (loss) | 4,735 | 5,793 | 3,639 | (1,483) | (697) | 11,987 |
| Adjusted operating income (loss) [(1)] | 5,129 | 6,705 | 5,202 | (1,000) | (697) | 15,339 |

(a)   Total revenues of the Pharmacy Services segment include approximately $2.4 billion and $2.6 billion of retail co-payments for the three months ended December 31, 2020 and 2019, respectively, and $10.9 billion and $11.5 billion of retail co-payments for the years ended December 31, 2020 and 2019, respectively.

129.    In 2020, the total revenue (in millions) from selling products was $190,688, compared to a total revenue of $69,364 from insurance premiums.[77] Additionally, within the retail pharmacy segment, out of a total revenue (in millions) of $91,198, $70,176 of that amount came from "pharmacy" sales, as opposed to $19,655 that came from "front store."[78]

### CVS Caremark's Pharmacy Services and Retail/LTC Segments

130.    CVS Caremark's Pharmacy Services Segment and Retail/LTC Segment are "health program or activit[ies] … receiv[ing] Federal financial assistance" subject to the requirements of 42 U.S.C. section 18116. CVS Caremark's Pharmacy Services Segment and Retail/LTC Segment, which are components of CVS Health Corporation's vertically integrated pharmacy-PBM model, include retail and mail-order pharmacies and PBM services. Under CVS Caremark's Pharmacy Services Segment and Retail/LTC Segment various aspects of pharmaceutical care critical to Class

[77] ICRM.indigotool.com, Interactive Analysis Center, https://icrm.indigotools.com/IR/IAC/?Ticker=CVS2&Exchange=NYSE ("Annual – Income Statement" tab) (last visited March 28, 2021).

[78] *Id*. (*See* "Annual – Retail Pharmacy Segment" tab.)

SECOND AMENDED CLASS ACTION COMPLAINT

Members' health have been eliminated, including medically appropriate dispensing of their medications and access to necessary counseling.

131.    CVS Caremark's Pharmacy Services Segment and Retail/LTC Segment are directly responsible for the discriminatory conduct at issue in the Complaint.

132.    As noted in its 2020 10-K filing with the SEC:

The Pharmacy Services segment provides a full range of pharmacy benefit management ("PBM") solutions, including plan design offerings and administration, formulary management, retail pharmacy network management services, mail order pharmacy, specialty pharmacy and infusion services, clinical services, disease management services and medical spend management. The Pharmacy Services segment's clients are primarily employers, insurance companies, unions, government employee groups, health plans, PDPs, Medicaid managed care ("Managed Medicaid") plans, plans offered on public health insurance exchanges ("Public Exchanges") and private health insurance exchanges.

…

The Retail/LTC segment sells prescription drugs and a wide assortment of health and wellness products and general merchandise, provides health care services through its MinuteClinic® walk-in medical clinics, provides medical diagnostic testing, administers vaccinations for illnesses such as influenza, COVID-19 and shingles and conducts long-term care pharmacy ("LTC") operations, which distribute prescription drugs and provide related pharmacy consulting and other ancillary services to chronic care facilities and other care settings. As of December 31, 2020, the Retail/LTC segment operated more than 9,900 retail locations, approximately 1,100 MinuteClinic locations as well as online retail pharmacy websites, LTC pharmacies and on-site pharmacies. During the year ended December 31, 2020, the Retail/LTC segment filled 1.5 billion prescriptions on a 30-day equivalent basis. For the year ended December 31, 2020, the Company dispensed approximately 27.1% of the total retail pharmacy prescriptions in the United States.

133.    CVS Caremark's Pharmacy Services Segment and Retail/LTC Segment are, and hold themselves out to the public as, "health program[s] or activit[ies]." For example, according to its website:

**Pharmacy services**

We strive to understand the unique needs of individuals and help them get the care they need conveniently. With over 9,900 retail stores, along with our easy-to-access mail pharmacy, and our chronic care specialty pharmacy services, we are partners in your health care needs at every step.

. . .

**We support people on the path to better health**

Taking a new prescription, either for a new diagnosis or an existing condition, often comes with many questions. At CVS Caremark, we don't just manage insurance claims. Our professionals — adhering to decisions made by your healthcare provider — offer personalized support to each patient so that they can successfully start and stay on their medications, leading to better health care outcomes and lower costs.

…

**Mail pharmacy**

Our members depend on their medications to keep them healthy. We work to ensure that prescriptions are affordable at the lowest possible cost, and we also make it easy for them to access their medicines in whatever way is most convenient.

…

**Specialty pharmacy**

People with rare or chronic conditions often require complex treatments and specialty medications that can be more costly for both payors and patients. Making sure those medications are available at the lowest possible cost – and without a long wait – is a top priority for us.

. . .

CVS Health continues to play a leading role in the national response to COVID-19 through testing solutions and vaccine administration across the country.

134.     In addition to the information provided above, as noted in the CVS Health Corporation's 2020 10-K filing with the SEC, CVS Caremark's Pharmacy Services Segment and Retail/LTC Segment receive Federal financial assistance:

> ***Pharmacy revenues represented approximately three-fourths of Retail/LTC segment[79] revenues*** in each of 2020, 2019 and 2018. The Company believes that retail pharmacy operations will continue to represent a critical part of the Company's business due to industry demographics, e.g., an aging American population consuming a greater number of prescription drugs, prescription drugs being used more often as the first line of defense for managing illness, the

---

[79] "LTC" is a reference to CVS Caremark's "long-term care pharmacy services" programs. CVSHealth, Long-term care, https://cvshealth.com/our-services/health-and-wellness-services/long-term-care.

introduction of new pharmaceutical products, the need for vaccinations **and Medicare Part D growth**.

(emphasis added.)

…

The Company's Pharmacy Services clients are primarily employers, insurance companies, unions, government employee groups, health plans, **Medicare Part D plans**, Managed Medicaid plans and plans offered on Insurance Exchanges and other sponsors of health benefit plans and individuals located throughout the United States.

(emphasis added.)

…

Substantially all of the Retail/LTC segment's pharmacy revenues are derived from pharmacy benefit managers, managed care organizations ("MCOs"), **government funded health care programs**, commercial employers and other third party payors.

(emphasis added.)

135.    Defendant CVS Pharmacy, Inc., which is part of CVS Caremark's Pharmacy Services Segment and/or Retail/LTC Segment, also constitutes a "health program or activity … receiv[ing] Federal financial assistance" subject to the requirements of 42 U.S.C. section 18116. CVS Pharmacy, Inc. receives "Federal financial assistance" as part of its participation in the Medicare Part D program. CVS Pharmacy, Inc. is the intended beneficiary of those funds. Defendant Caremark Rx, L.L.C. is a direct subsidiary of Defendant CVS Pharmacy, Inc., and Defendant CaremarkPCS, L.L.C. is a direct subsidiary of Defendant Caremark Rx, L.L.C.

136.    The Garfield Beach CVS, L.L.C. defendant owns and operates CVS retail pharmacies in California and is a participant in the Medicaid 340B program, which subsidizes the cost of pharmaceuticals for low-income individuals.

## CLASS ALLEGATIONS

137.    This action is brought by Plaintiffs on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure Rule 23. Plaintiffs seek to represent the following class (the "Class"):

All persons currently or previously enrolled in or covered by a health plan since January 1, 2015 in which the prescription drug benefit is or was administered by CVS Caremark, and who: (i) obtained or may obtain HIV/AIDS Medications; and (ii) have been or may in the future be required to participate in the Program with no right to opt out or notice thereof, but not including individual claims for personal injury or bodily harm.

138.    The precise number and identity of Class Members are unknown to Plaintiffs but can be obtained from Defendants' records. Based on CVS Caremark's presence nationwide, the Class numbers in thousands of persons.

139.    Common questions of law and fact predominate over any questions affecting individual members of the Class. Such common legal and factual questions include the following:

(a)    Whether Defendants' implementation of the Program as described above violates federal and state law detailed throughout this Complaint;

(b)    Whether Defendants engaged in an unlawful, unfair, misleading or deceptive business act or practice in connection with the implementation of and statements relating to the Program;

(c)    Whether Plaintiffs and Class Members are entitled to damages, equitable monetary relief, disgorgement of profits and/or restitution; and,

(e)    Whether Plaintiffs and Class Members are entitled to an Order enjoining Defendants from engaging in the conduct here at issue.

140.    For the reasons set forth above, Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs have been subjected to the practices at issue. Additionally, as set forth above, Plaintiffs have already expended personal resources or incurred out-of-pocket expenses as a result of the acts and practices of Defendants in connection with the implementation and operation of the Program.

141.    Plaintiffs are willing and prepared to serve the Court and the proposed Class in a representative capacity. Based on the facts detailed above, the interests of Plaintiffs are reasonably co-extensive with and not antagonistic to those of absent Class Members. Plaintiffs will fairly and

adequately represent and protect the interests of the Class and have no interests adverse to or which materially and irreconcilably conflict with the interests of the other members of the Class.

142.    Plaintiffs have engaged the services of counsel who are experienced in complex class litigation and the issues raised in this Complaint who will vigorously prosecute this action and will assert and protect the rights of and otherwise adequately represent Plaintiffs and absent Class Members.

143.    To the extent applicable to certification of a class under these circumstances, a class action is superior to other available means for the fair and efficient group-wide adjudication of this controversy. To Plaintiffs' knowledge, no other litigation is pending addressing the issues raised here as against Defendants. The injuries suffered by individual Class Members are, while important to them, relatively small compared to the burden and expense of individual prosecution of the complex issues and extensive litigation needed to address Defendants' conduct.

144.    Individualized litigation presents a potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

145.    Defendants have acted or refused to act on grounds generally applicable to the Class with regard to implementation and terms of the Program, thereby making appropriate provisional and final declaratory and injunctive relief with respect to Class Members as a whole.

## FIRST CAUSE OF ACTION

### Claim for Violation of Anti-Discrimination Provisions of
### Affordable Care Act (42 U.S.C. § 18116)

146.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein. This claim is brought against CVS Caremark.

147.    Section 1557 of the ACA prohibits discrimination in "any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." (42 U.S.C. § 18116.)

148.    CVS Health Corporation, the parent company of the CVS Caremark defendants, is

a health care entity that receives Federal financial assistance in the form of, *inter alia*, Medicare and Medicaid funding. Similarly, CVS Caremark's Pharmacy Services Segment and Retail/LTC Segment—which include retail and mail-order pharmacies and are directly responsible for the discriminatory conduct at issue in the Complaint—are "health program[s] or activit[ies] … receiv[ing] Federal financial assistance" subject to the requirements of 42 U.S.C. section 18116.

149.  CVS Caremark's Pharmacy Services Segment Retail/LTC Segment receive Federal financial assistance in the form of, *inter alia*, Medicare Part D payments. The Garfield Beach CVS, L.L.C. Defendant owns and operates CVS retail pharmacies in California and receives Federal financial assistance under the Medicaid 340B program.

150.  CVS Health Corporation, CVS Caremark's Pharmacy Segment, Retail/LTC Segment, and Garfield Beach CVS, L.L.C. are the intended recipients of that government funding for purposes of providing health care services on behalf of government agencies to qualified individuals.

151.  CVS Caremark's Pharmacy Services Segment and Retail/LTC Segment are also "health program[s] or activit[ies] … receiv[ing] Federal financial assistance" subject to the requirements of 42 U.S.C. section 18116. As one example of CVS Caremark's federal funding, CVS's specialty and retail pharmacies participate in and receive reimbursement from Medicare Part D.

152.  CVS Health Corporation explicitly acknowledges that Defendant CVS Pharmacy, Inc. is subject to section 1557 of the ACA:

**Nondiscrimination and Accessibility Notice (ACA § 1557)**

CVS Pharmacy, Inc. complies with applicable Federal Civil rights laws and does not discriminate on the basis of race, color, national origin, age, *disability*, or sex. CVS Pharmacy, Inc. does not exclude people or treat them differently because of race, color, national origin, age, *disability* or sex.

*See*   https://www.cvs.com/bizcontent/general/CVS_Pharmacy_Nondiscrimination_Policy.pdf, emphasis added.

153.  HIV/AIDS has been deemed a "disability" under both federal and state laws. Solely on the basis of their disability, Class Members have been excluded from participation in, have

been denied the full benefits of, or are being subjected to discrimination by being required to participate in the Program and subject to the limitations and discriminatory conduct set forth above. The discrimination includes is but not limited to being required to obtain specialty medications solely from CSP that they could otherwise obtain at the in-network pharmacy of their choice; being forced to use separate but unequal methods to obtain life-sustaining medications and inadequate facilities to do so; being forced to pay more for such medications due to the refusal of CVS to recognize manufacturer discounts and rebates for such medications; being forced to be financially responsible for lost or stolen shipments, which is only an issue due to forced participation in the Program; and/or having their privacy violated and social stigma exacerbated. Class Members have not been provided meaningful access to their life-sustaining medications, and are significantly, adversely, and disproportionately impacted by the Program. Participation in the Program threatens their health and privacy.

154.    As described in more detail herein, CSP and CVS Caremark's actions of requiring subscribers to choose between risking their health and privacy by enrolling in the Program or paying full price for their medications at a community pharmacy where they may receive the consultations they need and that protect their privacy: (i) tend to exclude HIV/AIDS patients from full participation in health care plans where the prescription benefit is administered by CVS Caremark; (ii) denies HIV/AIDS patients the full benefits of their health care plans' drug benefit; and (iii) subjects patients with HIV/AIDS to unjust discrimination based solely on the nature of their health condition, all in violation of the ACA and in contradiction of Defendants' representation that they comply with the ACA.

155.    Defendants' actions have denied Plaintiffs and Class Members full and/or equal enjoyment of the benefits, services, facilities, privileges, advantages, and accommodations available under their health care plans' prescription drug benefit. The Program:

(a)    Excludes HIV and AIDS patients from coverage. CVS Caremark has avoided or is continuing to threaten to avoid providing patients appropriate coverage based on their health status or medical condition requiring treatment with HIV/AIDS Medications, leaving them to either bear the costs of insurance co-pays, treatment disruption, and loss of privacy, or pay

thousands of dollars out-of-pocket each month to purchase such medications at their in-network community pharmacy of choice. By requiring such patients to access their life-sustaining medications through the Program that threatens their health and privacy, the Program operates as a constructive eviction from coverage and erodes Plaintiffs' ongoing ability to receive medications from the pharmacist of their choice and with no right to opt out of the Program or clear notice thereof. Therefore, enrollees with HIV/AIDS are impermissibly discouraged from enrolling in health care plans for which pharmacy benefits are administered by CVS Caremark.

(b)      Denies these patients the full benefit of their health care plans' drug benefit. Patients who are forced into the Program bear additional costs in time spent navigating websites or phone menus and long hold times, coordinating with multiple pharmacies and pharmacists for specialty and non-specialty drugs, and experiencing disruptions in their treatment, even in situations where prompt access to their medication is medically necessary. These patients also suffer from the loss of privacy because their medications are either shipped to their workplace or home, where they receive regular, conspicuous deliveries, or drop shipped to a CVS pharmacy, which raises additional privacy problems as set forth above. Defendants' changes to Class Members' health plans' drug benefit put Class Members' health and privacy at risk and reduce or effectively eliminate their drug benefit by requiring subscribers prescribed HIV/AIDS Medications to obtain those medications solely under the Program, without the option to opt out or receiving clear (or any) notice of the ability to do so. This reduction or elimination of the drug benefit is effectuated by way of CSP's and CVS Caremark's control over the Program, CVS Caremark's control over whether community pharmacies are designated as "out-of-network," and CVS Caremark's control over cost-sharing issues and control over CVS pharmacies that allow Defendants to establish CVS pharmacies as drop shipment locations and limit or effectively bar in-person consultations, advice, and monitoring by pharmacists knowledgeable about HIV/AIDS Medications.

(c)      Discriminates against these patients. Programs that do not provide meaningful access to coverage for patients with HIV/AIDS from pharmacists of their choice are prohibited as discriminatory. The need for this prohibition is clear. Allowing providers to provide

SECOND AMENDED CLASS ACTION COMPLAINT

ineffective benefits for patients with a pre-existing condition through inconvenient and ineffective requirements such as the Program that puts patients' health and privacy at risk undermines one of the central tenets of the ACA: guaranteeing access to care for those with pre-existing conditions. CVS Caremark's requirement that such patients receive their HIV/AIDS Medications under the Program, rather than the in-network community pharmacy and specialty pharmacist of their choice, is a coverage rule based on the patients' health status and/or medical condition.

156. Plaintiffs fall within the zone of protected persons under the ACA and thus have standing to seek all appropriate relief available from Defendants under this statute.

157. Plaintiffs request equitable and monetary relief to the fullest extent permissible under the ACA, attorneys' fees, costs, and such other and further appropriate relief against the CVS Caremark defendants as may be available under this claim.

## SECOND CAUSE OF ACTION

### Violation of California Business & Professions Code Section 17200, *et seq.*

158. Plaintiffs incorporate by reference paragraphs 1–145 as though fully set forth herein. This claim is brought on behalf of members of the Class who reside in California or received shipments under the Program in California, as well as separately for the benefit of the general public.

159. California Business & Professions Code section 17200, *et seq.*, prohibits acts of "unfair competition," which is defined by California Business & Professions Code section 17200 as including "any unlawful, unfair or fraudulent business act or practice."

160. The acts and practices as described above violate California Business & Professions Code section 17200's prohibition against engaging in "unlawful" business acts or practices, by violating the above-stated provisions of the ACA. To the extent such claims apply the same standards as the above-cited federal laws, these claims are properly asserted by all Class Members who can assert such claims.

161. CVS Caremark's conduct does not benefit consumers or competition. Indeed, the harm to consumers and competition is substantial for the reasons set forth above.

162. Plaintiffs and Class Members could not have reasonably avoided the injury each of

them suffered based on implementation of the Program, which injury is substantial, even though Plaintiffs have attempted to do so.

163.    The gravity of the consequences of the CVS Caremark's conduct as described above outweighs any justification, motive, or reason therefor, and is immoral, unethical, and unscrupulous, offends established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, or is substantially injurious to Plaintiffs and other members of the Class.

164.    To the extent Class Members have a right to opt out of the Program but have not been adequately informed of that right, and/or been told it does not exist when under the law it must, CVS Caremark's conduct of not advising them of this right would have a tendency or likelihood to mislead consumers to reasonably believe such an option does not exist when in reality it does.

165.    Plaintiffs have been injured in fact and suffered a loss of money or property as a result of the CVS Caremark's unlawful business acts and practices by, *inter alia*, (i) spending hours dealing with these issues; (ii) having benefits in which they have or had a vested interest materially reduced or eliminated; (iii) paying or being told they will need to pay increased amounts for such specialty medications, even if covered, if they continue to obtain such medications from the in-network community pharmacy of their choice; and (iv) obtaining these medications through the Program and thereby losing discounts, rebates, loyalty programs or other monies or programs that if accepted by CVS Caremark would otherwise reduce their out-of-pocket costs.

166.    As a result of Defendants' violations of the UCL, Plaintiffs and Class Members are, to the extent permitted by law, and if such relief does not conflict with the other causes of action set forth herein, entitled to equitable relief in the form of full restitution and disgorgement of the unjust enrichment Defendants derived from these illegal business acts and practices.

167.    Pursuant to Business & Professions Code §§ 17203 and 17204, the Court may enjoin such conduct both now and in the future on behalf of the Class and for the benefit of the general public in the form of public injunctive relief for those who may be impacted by these illegal practices. Plaintiffs thus also seek an order enjoining Defendants from continuing these

illegal business practices and from engaging in such conduct. Plaintiffs also seek payment of attorneys' fees and costs pursuant to, *inter alia*, California Civil Code section 1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class and for the benefit of the general public, as applicable, pray for relief as follows as applicable for the particular cause of action:

1.     An Order certifying this action to proceed on behalf of the Class, including any appropriate sub-class, and appointing Plaintiffs and the counsel listed below to represent the Class;

2.     An Order awarding Plaintiffs and the Class Members entitled to such relief such equitable monetary relief as the Court deems proper;

3.     An Order enjoining Defendants from implementing or continuing the Program in its current form, or such other appropriate injunctive relief;

4.     An Order awarding Plaintiffs and the Class Members who might be entitled to such relief actual, compensatory, and/or statutory damages to the extent permitted by the above claims;

6.     An Order awarding Plaintiffs' attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to, *inter alia*, California Civil Code section 1021.5 and the federal and state statutory causes of action set forth above that permit such an award;

7.     An Order awarding pre-judgment and post-judgment interest on the above amounts; and

8.     An Order awarding such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues and causes of action so triable.

DATED: March 30, 2021                                      **CONSUMER WATCHDOG**

                                                                      */s/ Jerry Flanagan*
                                                                      Jerry Flanagan (SBN: 271272)
                                                                      jerry@consumerwatchdog.org
                                                                      Benjamin Powell (SBN: 311624)
                                                                      ben@consumerwatchdog.org
                                                                      Daniel L. Sternberg (SBN: 329799)
                                                                      danny@consumerwatchdog.org
                                                                      6330 San Vicente Blvd., Suite 250

SECOND AMENDED CLASS ACTION COMPLAINT

Los Angeles, CA 90048
Tel: (310) 392-0522

**WHATLEY KALLAS, LLP**

Alan M. Mansfield (Bar No. 125998)
(Of Counsel)
amansfield@whatleykallas.com
16970 W. Bernardo Dr., Suite 400
San Diego, CA 92127
Tel.: (858) 674-6641
Fax: (855) 274-1888

Joe R. Whatley, Jr. (admitted *pro hac vice*)
jwhatley@whatleykallas.com
Edith M. Kallas (admitted *pro hac vice*)
ekallas@whatleykallas.com
C. Nicholas Dorman (admitted *pro hac vice*)
ndorman@wahtleykallas.com
152 West 57th Street, 41st Floor
New York, NY 10019
Tel: (212) 447-7060
Fax: (800) 922-4851

*Attorneys for Plaintiffs*

SECOND AMENDED CLASS ACTION COMPLAINT

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on March 31, 2021, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

4

to the email addresses denoted on the attached Electronic Mail Notice List.

5

I certify under penalty of perjury under the laws of the United States of America that the

6

foregoing is true and correct. Executed on March 31, 2021.

7

8
*/s/ Jerry Flanagan*
Jerry Flanagan (Bar No. 271272)

9
jerry@consumerwatchdog.org
6330 San Vicente Blvd., Suite 250

10
Los Angeles, CA 90048
Tel.: (310) 392-0522

11
Fax: (855) 392-8874

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT