UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE ONE, et al.,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>CVS PHARMACY, INC., et al.,<br><br>　　　　　　　Defendants. | Case No.  18-cv-01031-EMC<br><br>**ORDER DENYING DEFENDANTS'<br>MOTION TO DISMISS**<br><br>Docket No. 184 |

　　　　Plaintiffs bring this putative class action alleging that five CVS entities—Caremark, L.L.C., Caremark PCS Health, L.L.C, CVS Pharmacy, Inc., Garfield Beach CVS, L.L.C., and Caremark California Specialty Pharmacy, L.L.C. (collectively, "Defendants")—have discriminatorily denied them benefits under their employer-offered prescription drug benefit plans. Plaintiffs allege that their benefit plans allow them to obtain their HIV/AIDS medications at favorable "in-network" prices only via mail or a CVS pharmacy.  Compared to the non-CVS "community pharmacies" from which Plaintiffs were previously able to obtain their medications, the mail order and CVS Pharmacy pickup options do not offer the same level of privacy, convenience, reliability, and service.

　　　　The Ninth Circuit found that Plaintiffs adequately alleged that they were denied meaningful access to their prescription drug benefits, as required to state a claim for disability discrimination under Section 1557 of the Affordable Care Act (ACA), but remanded the case so that this Court could determine whether Defendants received the requisite "Federal financial assistance" necessary to the application of Section 1557.  *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1212 & n.2 (9th Cir. 2020).  Defendants have moved to dismiss the Second Amended

1   Complaint for failure to state a claim on the basis that no single Defendant CVS entity receives the

2   requisite federal funding and is responsible for the allegedly discriminatory health benefits

3   program.

4        For the reasons discussed below, the Court **DENIES** Defendants' motion to dismiss.  At

5   this early stage in the proceedings, and drawing all reasonable inferences in Plaintiffs' favor,

6   Plaintiffs have alleged that the Defendant entities have collectively designed and implemented the

7   allegedly discriminatory program at issue, and that all Defendants are directly or indirectly

8   federally funded through one or more related arms of the enterprise.  To permit the CVS entities to

9   escape responsibility as a result of the establishment of corporate structures which cabin their

10   functions would exalt form over substance, and would be antithetical to the overarching purpose

11   of the anti-discrimination provision of the ACA.  Additionally, even under the more narrowly

12   worded earlier civil rights statutes referenced in the ACA, the Defendant CVS entities would be

13   considered direct or indirect recipients of federal funding.  The Court finds that Plaintiffs have

14   plausibly pleaded that Defendants engage in a "health program or activity, any part of which is

15   receiving Federal financial assistance" under the ACA.

16   ## I.     FACTUAL BACKGROUND

17        Plaintiffs[1] are five individuals, proceeding anonymously, who take medicines that treat

18   HIV/AIDS.  Docket No. 162 (Second Amended Complaint, or "SAC") ¶¶ 9–13.  Plaintiffs

19   received prescription drug coverage through health plans sponsored by their employers, who once

20   were, but no longer are, defendants in this case.  *See* Docket No. 143 (December 12, 2018 Order).

21   Plaintiffs have brought a claim under Section 1557 of the ACA based on Defendants' allegedly

22   discriminatory benefits plans.

23   A.     CVS's Prescription Drug Benefits Plans

24        The SAC alleges the following regarding CVS's prescription drug benefits plans (the

25   "Program").  Under the terms of the Program, HIV/AIDS medications are classified as "specialty

26

27   [1] All Plaintiffs are proceeding under pseudonyms due to the sensitive nature of this action.  SAC at
   1 n.1.  Two of the Plaintiffs have passed away and the executors of their estates have substituted

28   as plaintiffs.  Docket No. 178 (Notice of Filing Suggestions of Death) at 2; Docket No. 184
   (Motion to Dismiss) at 3 n.4.

United States District Court
Northern District of California

medications" and are subject to specific restrictions.  SAC ¶¶ 1, 95, 108.  In order to qualify for lower "in-network" drug prices, Plaintiffs must obtain their HIV/AIDS medications from Caremark California Specialty Pharmacy ("CSP"), which delivers medications in one of two ways: by mailing the medications to Plaintiffs directly, or by mailing them to a CVS pharmacy for pickup.  *Id.* ¶¶ 1, 15, 16.  Otherwise, Plaintiffs "must either pay more out-of-pocket or pay full-price" to procure their HIV/AIDS medication from an "out-of-network" community pharmacy.  *Id.* ¶¶ 1, 69.  All drugs designated in the benefit plans as "specialty medications" are subject to the Program's restrictions, not just drugs that treat HIV/AIDS.  *Id.* ¶¶ 44, 82.  Plaintiffs allege that HIV/AIDS patients are "disproportionately impacted by the Program," due to the "complex nature of their disease and medications."  *Id.* ¶¶ 93–95.

Before their employers enrolled Plaintiffs in the Program, each of the Plaintiffs was able to purchase their HIV/AIDS medications through their benefit plan from any in-network pharmacy, including non-CVS pharmacies, with full insurance benefits.  *See id.* ¶¶ 9–13.  Many of them had long obtained their medications from their local "community pharmacies" and had developed relationships with their pharmacists.  *Id.*  These in-person appointments with expert pharmacists who were familiar with Plaintiffs and their medical histories serve a critical function because the pharmacists can "detect potentially life-threatening adverse drug interactions and dangerous side effects, some of which may only be detected visually"; immediately prescribe new drug regimens as Plaintiffs' conditions progress and evolve; and provide essential counseling to help Plaintiffs and their families navigate the challenges of living with a chronic condition.  *Id.* ¶¶ 71, 81–85, 90.

Since being enrolled in the Program, however, Plaintiffs have faced numerous difficulties and indignities in their efforts to obtain their HIV/AIDS medications.  Those who opted to have the medication mailed to their homes have experienced delivery problems.  *Id.* ¶¶ 25, 47, 52.  For example, in some instances the packages containing their medications were left "baking in the afternoon sun," which could "quickly degrade the potency and stability" of the medication.  *Id.* ¶ 25.  Out of concerns about parcel theft, some Plaintiffs have had to wait at home on the days their medications are scheduled for delivery, resulting in missed doctor appointments and missed days of work.  *Id.* ¶¶ 47, 52.  Those who have opted to pick up their prescriptions from CVS

3

Pharmacies have also encountered problems.  For some, the closest CVS Pharmacy is many miles away.  *Id.* ¶ 35.  Some have had to make multiple trips to and from a pharmacy to deal with incorrectly filled prescriptions.  *Id.*  Others have experienced "CVS personnel shout[ing] the name of their HIV/AIDS Medications across the room in front of other customers, raising severe privacy concerns."  *Id.* ¶ 77.  Many Plaintiffs have reached out to CVS in an attempt to resolve their problems, only to encounter bureaucracy and long wait-times.  *See id.* ¶¶ 28, 36, 41–42, 46.  Reportedly, CVS representatives also "appear to have no specialized knowledge about HIV/AIDS Medications or the concerns of HIV patients."  *Id.* ¶¶ 40, 49, 86.

B.    Defendants' Organizational Structure

The Second Amended Complaint names both pharmacies and pharmacy benefit managers as defendants: CVS Pharmacy, Inc., CSP, and Garfield Beach CVS, L.L.C. are pharmacies (collectively, the "Pharmacy Defendants"), and Caremark, L.L.C. and Caremark PCS Health, L.L.C. are pharmacy benefit managers, or PBMs (collectively, the "PBM Defendants").  Docket No. 184 (Motion to Dismiss, or "MTD") at 1.  According to the SAC, Defendants "act as agents of one another and operate as a single entity for purposes of administering pharmacy benefits and providing prescription drugs to health plans and health plan members."  SAC ¶ 18.

CVS Health Corporation, which is a parent company to all Defendants, was originally a defendant but was voluntarily dismissed by Plaintiffs in May 2018.  *See* Docket No. 63 (Stipulation of Voluntary Dismissal) at 1.  According to information found in CVS Health Corporation's 2020 Form 10-K filing with the United States Securities Commission, Defendant CVS Pharmacy, Inc. is a direct subsidiary of CVS Health Corporation.[2]  CVS Pharmacy, Inc. in turn, is a parent company of the other Pharmacy Defendants and the PBM Defendants.  *See* SAC ¶ 135 (establishing that CVS Pharmacy, Inc. is a parent company of Defendant CaremarkPCS

_____

[2] The authenticity of the information contained within CVS Health Corporation's 10-K is not in dispute, and the SAC relies on this information.  *See, e.g.*, SAC ¶¶ 118 & n.72, 121, 132, 134 (quoting the 10-K).  As a result, the Court may consider the information found in the 10-K without converting this motion to a motion for summary judgment.  *Parrino v. FHP, Inc.*, 146 F.3d 699 706 (9th Cir. 1998) ("[A] district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies.").

United States District Court
Northern District of California

Health, L.L.C.); MTD at 5 & n.8 (explaining that CVS Pharmacy, Inc. is the indirect parent company of the two PBM Defendants and Garfield Beach CVS, and that CVS Pharmacy operates CVS retail pharmacy locations, directly and through subsidiaries, throughout the country); *see also* Docket No. 184-3 ("Form 10-K") at 192–201 (listing the subsidiaries of CVS Pharmacy, Inc.). In addition to the four named Defendants, Defendant CVS Pharmacy, Inc. appears to have hundreds of other subsidiaries. *See* Form 10-K at 192–201.

CVS Health Corporation "holds itself and its network of subsidiaries out to the public as . . . an integrated health care company that provides a wide range of healthcare services." SAC ¶ 119. Under CVS Health Corporation's "vertically integrated pharmacy-PBM model," some of these healthcare services are provided by CVS pharmacies, while others are provided by CVS PBMs. *Id.* ¶¶ 124, 126, 130, 132. PBMs contract with health plans sponsored by employers, insurers, and government agencies to administer the prescription benefit offered under the client's health plan. Form 10-K at 2–3. Services that typically fall within the PBM segment include "plan design offerings and administration, formulary management, [and] retail pharmacy network management services," among other things. SAC ¶ 132. CVS pharmacies, on the other hand, "sell[] prescription drugs and a wide assortment of health and wellness products and general merchandise, provide[] health care services . . . [and] provide[] medical diagnostic testing," among other things. *Id.*

C.     Defendants' Roles in the Program

The SAC alleges that the Pharmacy Defendants and the PBM Defendants are both "directly responsible for the discriminatory conduct at issue in the Complaint." SAC ¶ 131. CSP, one of the Pharmacy Defendants, is responsible for filling Plaintiffs' prescriptions and shipping out medications. *Id.* ¶ 15. Garfield Beach CVS, L.L.C. operates CVS retail pharmacies in California. *Id.* ¶ 17. Caremark, L.L.C., a PBM Defendant, administers the prescription drug benefits under Plaintiffs' plans. *Id.* ¶¶ 15, 16. Caremark, L.L.C. "owns and exercises control over CSP." *Id.* ¶ 15. "[A]s a prescription drug benefit administrator," one of Caremark, L.L.C.'s roles is to "establish and contractually control which, if any, non-CVS pharmacies are 'in network,' thereby determining where Class Members may purchase their prescription drugs with full

insurance coverage." *Id.* ¶ 69.  Caremark, L.L.C. established the "Specialty Pharmacy Distribution Drug List" that imposed the relevant restrictions on Plaintiffs' HIV/AIDS medications.  *Id.* ¶¶ 16, 95.

The SAC alleges that Defendants collectively worked together to control and execute the Program.  The Program's restrictions with regard to the HIV/AIDS medications are described as "acts and decisions exclusively in the control and discretion of" Defendants.  *Id.* ¶ 80.  Defendants "conspired" to secure "agreements as to each Plaintiff's and Class Member's health plan requiring Class Members to use the wholly-owned [CSP] under the Program."  *Id.* ¶ 20.  "[B]y forcing enrollees to only obtain such medications through their sister co-conspirator and wholly-owned subsidiary CSP," Defendants keep "hundreds of thousands, if not millions, of dollars in prescription fill fees, possible rebates, and other monies to themselves."  *Id.* ¶ 79.  Defendants are collectively alleged to have "control over the Program," "control over whether community pharmacies are designated as "out-of-network," "control over cost-sharing issues and control over CVS pharmacies."  *Id.* ¶ 155(b).  Defendants are collectively alleged to offer "financial inducements" to health plan sponsors—Plaintiffs' employers—to enroll Plaintiffs in benefit plans subject to the Program.  *Id.* ¶ 2.

D.     Defendants' Receipt of Federal Funding

The SAC alleges that CVS Pharmacy, Inc. receives "Federal financial assistance" as part of its participation in the Medicare Part D. program.  *Id.* ¶ 135.  Garfield Beach CVS, L.L.C. owns and operates CVS retail pharmacies in California and receives Federal financial assistance under the Medicaid 340B program, which subsidizes the cost of pharmaceuticals for low-income individuals.  *Id.* ¶¶ 136, 149.  The Pharmacy Defendants and PBM Defendants (as part of the Pharmacy Segment and Retail/LTC Segment of CVS Health Corporation) are "the intended recipients of that government funding for purposes of providing health care services on behalf of government agencies to qualified individuals."  *Id.* ¶ 150.

## II.     PROCEDURAL BACKGROUND

Plaintiffs filed their original class action complaint on February 16, 2018.  *See* Docket No. 1.  On May 12, 2018, Plaintiffs voluntarily dismissed CVS Healthcare Corporation and

1    CaremarkRx, L.L.C. and subsequently filed an amended complaint.  Docket Nos. 63, 75.  On July

2    20, 2018, the original three CVS Defendants (CVS Pharmacy, Inc., CSP, and Caremark, L.L.C.)

3    moved to dismiss the amended complaint.  Docket No. 87.  On December 12, 2018, the Court

4    dismissed the amended complaint in its entirety and entered judgment for Defendants.  Docket

5    Nos. 142, 143.  On January 11, 2019, Plaintiffs appealed.  Docket No. 146.

6         On December 9, 2020, the Ninth Circuit vacated the dismissal of (1) the ACA claim and

7    (2) the UCL claim to the extent it is predicated on a violation of the ACA, but affirmed dismissal

8    of all other claims.  *Doe*, 982 F.3d at 1215.  The Ninth Circuit remanded with instructions that this

9    Court address in the first instance whether Plaintiffs had adequately alleged Defendants' receipt of

10   "Federal financial assistance."  *Id.* at 1212 n.2.  On March 21, 2021, Defendants filed a petition for

11   a writ of certiorari, which was granted on July 2, 2021.  *See* Docket Nos. 168, 170.  On November

12   12, 2021, the U.S. Supreme Court dismissed the petition for a writ of certiorari after the parties

13   jointly stipulated to dismissal.  Docket No. 176.

14        After remand, Plaintiffs filed the operative Second Amended Class Action Complaint on

15   March 31, 2021.  Docket No. 162.  The SAC added two additional CVS entities: Caremark PCS

16   Health, L.L.C., and Garfield Beach CVS, L.L.C.  *Id.*  On March 2, 2022, CVS moved to dismiss

17   the SAC.  Docket No. 186.

18                          **III.     LEGAL STANDARD**

19        Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

20   statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

21   complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R.

22   Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's

23   decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550

24   U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the

25   claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th

26   Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the

27   pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire &*

28   *Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not

1     simply recite the elements of a cause of action [and] must contain sufficient allegations of

2     underlying facts to give fair notice and to enable the opposing party to defend itself effectively."

3     *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d

4     990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual

5     content that allows the court to draw the reasonable inference that the Defendant is liable for the

6     misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a

7     'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

8     unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

9          If it grants a motion to dismiss, a court is generally required to allow the plaintiff leave to

10    amend, even if no request to amend the pleading was made, unless amendment would be futile.

11    *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246–47 (9th Cir. 1990).

12    In determining whether amendment would be futile, the court examines whether the complaint

13    could be amended to cure the defect requiring dismissal "without contradicting any of the

14    allegations of [the] original complaint."  *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir.

15    1990).

16                              **IV.**    **DISCUSSION**

17         Section 1557 provides in pertinent part that "[a]n individual shall not, on the ground

18    prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq*.), title IX of the

19    Education Amendments of 1972 (20 U.S.C. 1681 *et seq*.), the Age Discrimination Act of 1975 (42

20    U.S.C. 6101 *et seq*.), or section 794 of title 29, be excluded from participation in, be denied the

21    benefits of, or be subjected to discrimination under, any health program or activity, any part of

22    which is receiving Federal financial assistance."  42 U.S.C. § 18116(a).  For an entity to be liable

23    under Section 1557, it must be both administering a "program or activity" as defined under 42

24    C.F.R. § 92.3(b), and a recipient of "Federal financial assistance."  *See* 42 U.S.C. § 18116(a).  The

25    definition of "program or activity" under Section 1557 is broad, and encompasses "all of the

26    operations of entities principally engaged in the business of providing healthcare that receive

27    Federal financial assistance;" for any entity "not principally engaged in the business of providing

28    healthcare," the requirements applicable to a health program or activity "shall apply to such

United States District Court
Northern District of California

United States District Court
Northern District of California

1    entity's operations only to the extent that any such operation receives Federal financial

2    assistance." 42 C.F.R. § 92.3(b).

3          Defendants move to dismiss on the basis that Plaintiffs have not stated a plausible claim

4    against any single Defendant.  In particular, Defendants argue that Plaintiffs have not adequately

5    alleged that: (1) the PBM Defendants receive Federal financial assistance, and (2) the Pharmacy

6    Defendants are responsible for the allegedly discriminatory conduct in the Program.  MTD at 6.  In

7    short, under Defendants' theory, no Defendant meets both criteria even though within the CVS

8    family federal funds are received and a program is structured which allegedly discriminates.

9    A.      Defendants Have Not Waived Their Arguments Under Rule 12(g)(2)

10          As a threshold matter, Plaintiffs charge that because Defendants failed to challenge

11   whether "Plaintiffs sufficiently alleged a 'health program or activity' within the meaning of the

12   ACA" in their first motion to dismiss, they have foreclosed their ability to do so now.  Docket No.

13   186 ("MTD Opp.") at 10.  Plaintiffs contend, under Rule 12(g)(2), Defendants have waived any

14   argument that the Pharmacy Defendants are not engaging in "a health program or activity" under

15   the ACA.

16          Rule 12(g)(2) prohibits a party from "raising a defense or objection that was available to

17   the party but omitted from its earlier motion," except in certain circumstances that are not

18   applicable here.  Fed. R. Civ. P. 12(g)(2).  Plaintiffs are correct that, other than one section header

19   in Defendants' initial motion to dismiss, Defendants did not raise this argument in their initial

20   motion to dismiss.  In their first motion, Defendants asserted that "[t]he Amended Complaint does

21   not properly allege a health program or activity that receives Federal financial assistance."  *See*

22   Docket No. 87 (First Motion to Dismiss) (capitalization altered for clarity) at 12.  But the problem

23   for Defendants is that this section of their motion focused specifically on whether Plaintiffs had

24   shown that the CVS entities received the requisite federal funding—Defendants did not address

25   whether any CVS entity was engaged in a "health program or activity" within the meaning of the

26   ACA.  *Id.* at 13.  In other words, Defendants did not initially argue that dispensing prescription

27   medications and providing pharmaceutical services did not constitute a "health program or

28   activity" under Section 1557.

In their reply brief, Defendants counter that the question of whether the Defendant-entities are engaged in "a health program or activity" is "inextricably intertwined" with whether they received "Federal financial assistance."  Docket No. 188 (Reply) at 2.  This appears accurate: the basic question was raised even if the precise issues were not identified.

And in any event, two of the five Defendants were only named in the Second Amended Complaint and have not filed any motion under Rule 12.  *See* Reply at 2 n.1 ("CaremarkPCS Health, L.L.C. and Garfield Beach CVS, L.L.C. . . . were only named in the Second Amended Complaint and have not filed any motion under Rule 12.").  Because CaremarkPCS Health, L.L.C. and Garfield Beach CVS, L.L.C. have not previously filed any motion under Rule 12, they cannot be deemed to have waived the argument.  *See 3G Licensing, S.A. v. HTC Corp.,* No. 17-cv-1646, 2019 WL 2904670, at *3 (D. Del. July 5, 2019) (finding that newly added defendant had not waived any arguments under Rule 12(g)(2) even where defendant was "related to or associated with an original defendant"); *see also Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12-cv-3419, 2017 WL 1113080, at *3 (S.D.N.Y. Mar. 10, 2017); *Lunnon v. United States*, No. 16-cv-1152, 2020 WL 1820499, at *6 (D.N.M. Feb. 21, 2020), *report and recommendation adopted*, No. 16-cv-1152, 2020 WL 1329821 (D.N.M. Mar. 23, 2020).

It is appropriate for the Court to fully address the arguments by all Defendants.  Rule 12(g)(2) should be interpreted in light of Rule 1.  *See In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017) ("We read Rule 12(g)(2) in light of the general policy of the Federal Rules of Civil Procedure, expressed in Rule 1.").  Rule 1 dictates that the Federal Rules should be construed "to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.  *See In re Apple*, 846 F.3d at 318 ("Denying late-filed Rule 12(b)(6) motions and relegating defendants to the three procedural avenues specified in Rule 12(h)(2) can produce unnecessary and costly delays, contrary to the direction of Rule 1.").  And in any event, even if the three original Defendants failed to raise this argument in the original motion to dismiss, these Defendants would not be barred from making this same argument in a Rule 12(c) motion.  Rule 12(h)(2) expressly provides that "[f]ailure to state a claim upon which relief can be granted . . . may be raised by a motion under Rule 12(c)," *i.e.*, a motion for judgment on the

pleadings.  *See* Fed. R. Civ. P. 12(h)(2)(B); *see also Legal Additions LLC v. Kowalski*, No. 08-cv-2754-EMC, 2010 WL 335789, at *2 (N.D. Cal. Jan. 22, 2010) (converting Rule 12(b)(6) motion into a Rule 12(c) motion and noting that the legal standards for 12(b)(6) and 12(c) motions are "essentially the same").

The Court will thus consider the merits of Defendants' argument.

B.     Section 1557 of the ACA Broadly Applies to any Health Program or Activity, Any Part of Which Receives Federal Funding

Section 1557 provides as follows:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, *any health program or activity, any part of which is receiving Federal financial assistance*, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

42 U.S.C. § 18116(a) (emphasis added).

Additionally, the implementing regulations for Section 1557 provide that:

> As used in this part, "health program or activity" encompasses *all of the operations of* entities principally engaged in the business of providing healthcare that receive Federal financial assistance . . . . For any entity not principally engaged in the business of providing healthcare, the requirements applicable to a "health program or activity" under this part shall apply to such entity's operations only to the extent any such operation receives Federal financial assistance. . .

45 C.F.R. § 92.3(b) (emphasis added).

To state a claim under Section 1557, then, Plaintiffs must plausibly allege that each Defendant engages in a "health program or activity, any part of which is receiving Federal financial assistance."  *Id.*  Plaintiffs argue that CVS Pharmacy, Inc., is an entity that receives Federal financial assistance that is "principally engaged in the business of providing healthcare," and the SAC's reference to "all of CVS Pharmacy's operations" encompasses the activities of the

1    four subsidiaries by virtue of Section 92.3(b).  Opp. at 11, 14.  Defendants respond that

2    "operations" cannot plausibly be read to encompass separate entities, so Plaintiffs must show that

3    *each* Defendant entity received Federal financial assistance to be liable.  Reply at 3.

4            As discussed below, the statutory language and relevant caselaw does not clearly convey

5    whether "operations" may encompass the activities of separate subsidiary entities of a business

6    engaged in providing healthcare (as opposed to only such entity's internal operations).  However,

7    the text of Section 1557 and its regulatory history indicates that Section 1557 was intended to

8    reach broadly.  Moreover, the caselaw developed from the four civil rights statutes which are

9    incorporated in the ACA provides helpful guidance in determining the parameters of Federal

10   financial assistance under the ACA.  These cases indicate that an entity may be considered a

11   recipient of federal funding where it is an "indirect recipient" or where it exhibits "controlling

12   authority" over a federally funded program; the precise corporate form of the operations is not

13   dispositive.  *See, e.g.*, *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 909 (9th Cir. 2013) (describing

14   indirect recipient of federal financial assistance theory under the Rehabilitation Act); *A.B. by C.B.*

15   *v. Hawaii State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1358 (D. Haw. 2019) (denying motion to

16   dismiss where plaintiff alleged that defendant was subject to Title IX under a controlling authority

17   theory); *Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1235 (N.D. Ala. 2010) (same); *Williams v. Bd. of*

18   *Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1294 (11th Cir. 2007) (same).

19           1.      The Statutory Text of Section 1557 and Related Provisions

20           "[I]n all cases of statutory interpretation, we begin with the language of the governing

21   statute."  *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1085 (N.D. Cal. 2019)

22   (quoting *Beal Bank, SSB v. Arter & Hadden, LLP*, 42 Cal. 4th 503, 507 (2007)); *see Satterfield v.*

23   *Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009).

24           Section 1557 incorporates long-standing anti-discrimination laws (the Rehabilitation Act,

25   Title IX, Title VI, and the Age Discrimination Act) and applies them to healthcare.  Section 1557

26   further provides in more expansive language that an individual shall not "be subjected to

27   discrimination under, any health program or activity, *any part of which* is receiving Federal

28   financial assistance. . ."  42 U.S.C. § 18116(a) (emphasis added).  This language is broader than

prior anti-discrimination statutes referenced in Section 1557:  the Rehabilitation Act, Title IX, Title VI, and the Age Discrimination Act prohibit discrimination under "any program or activity receiving Federal financial assistance," in contrast to the Act which applies to "any health program or activity, *any part of which* is receiving Federal financial assistance."  *Compare* 42 U.S.C. § 18116(a) (emphasis added), *with* 29 U.S.C. § 794, 42 U.S.C. § 2000d, 20 U.S.C. § 1681; and 42 U.S.C. § 6102.

Furthermore, the implementing regulations of Section 1557 state that "health program or activity" encompasses "*all of the operations* of entities principally engaged in the business of providing healthcare that receive Federal financial assistance," again apparently emphasizing the broad reach of the statute.  *See* 42 C.F.R. § 92.3(b) (emphasis added.)

Plaintiffs rely in the first instance on the regulations, in particular on the "all of its operations" provision.  Plaintiffs begin by focusing on CVS Pharmacy, Inc., the parent company of the other Defendants.  Opp. at 6 n.2; MTD at 5 & n.8.  The SAC alleges that CVS Pharmacy, Inc., is an entity that is principally engaged in the business of providing healthcare and receives substantial amounts of federal assistance.  SAC ¶ 135; *see also* Opp. at 11.  Under Section 92.3(b), then, "all of the operations of" CVS Pharmacy fall within Section 1557's anti-discrimination provision.  *See* 42 C.F.R. § 92.3(b) ("'[h]ealth program or activity' encompasses all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance . . . ").  Plaintiffs conclude that "all of" CVS Pharmacy's "operations" with regard to the Program at issue includes the Defendant subsidiaries insofar as they are involved in the Program.  Opp. at 11.

2. *Heart of CardDon*

In support of its argument that CVS's "operations" should be broadly interpreted to include the four Defendant subsidiaries, Plaintiffs point to examples where the "operations" of a covered entity has been construed broadly in analogous contexts.  In *Heart of CarDon*, for example, the court found that an ERISA benefit plan defendant was subject to Section 1557 as part of the "operations" of a separate entity, which was responsible for designing and funding the health plan.  *See T.S. by & through T.M.S. v. Heart of CarDon, LLC*, No. 20-cv-01699, 2021 WL 981337, at *9

(S.D. Ind. Mar. 16, 2021), *reconsideration denied, motion to certify appeal granted*, No. 1:20-cv-01699, 2021 WL 2946447 (S.D. Ind. July 14, 2021).  As *Heart of CarDon* reasoned:

> CarDon is a covered 'health program or activity' subject to Section 1557 because it is principally engaged in the business of providing healthcare and receives federal financial assistance in the form of Medicaid and Medicare payments . . .  So, as soon as CarDon accepted funds through Medicaid and Medicare programs ("Federal financial assistance"), it was "'bound to adhere to the mandates of [Section 504],' in "all of [its] operations," 29 U.S.C. § 794(b).  This, of course, included implementation of the Plan, which, according to T.S., "is designed, funded and controlled entirely by CarDon."  (Filing No. 40 at 22; *see also* Filing No. 31 at 3 ("As 'Plan Sponsor,' CarDon designs the benefits to be offered under the Plan.").)  "All operations" means "all operations," after all.  Because "all of" CarDon's operations are covered by Section 504 of the Rehabilitation Act, T.S.'s claim under Section 1554 [*sic*] of the ACA can, at this stage in the litigation, proceed.

*Id.* (cleaned up).  Importantly, *Heart of CarDon* found that "operations" could include a separate entity.  To be clear, the defendant entities in *Heart of CarDon* consisted of a health care provider and an employee benefit plan (which constitutes a separate legal entity under ERISA, *see* 29 U.S.C. § 1132(d)(1)), so the precise question at issue differs in some respect.  Even so, *Heart of CarDon* supports Plaintiffs' theory that "operations" may sweep across corporate entity lines.  *See* 29 U.S.C. § 1132(d)(1) ("An employee benefit plan may sue or be sued under this subchapter as an entity.").

Defendants respond that "operations" are functions that an agency performs; entities themselves are not operations and thus operations cannot include the work of other separate legal entities.  Reply at 3.  Defendants point out that the implementing regulation in 45 C.F.R. § 92.3(b) includes both "operations" and "entities," and contend that this language makes clear that "operations" is distinct from "entities."  *Id.* at 3–4.  But the fact that the regulations refer to the "operations" of the "entities" does not imply that "operations" cannot include subsidiary entities.  Entities such as corporations may conduct their operations not only through, *e.g.*, divisions or departments, but often through subsidiaries.  The regulation does not state that the "operations" of an entity cannot include other entities assigned to carry out some portion of the operations.[3]

---

[3] Of note, the Oxford English Dictionary defines operations to include, *e.g.*, "a business venture or enterprise," *Operations*, OED Online, Oxford University Press Oxford English Dictionary (3rd ed.

The SAC plausibly alleges that the Pharmacy Defendants and PBM Defendants engage in a "health program or activity" under Section 1557. *See Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 852–53 (D.S.C. 2015) (CVS pharmacies are "principally engaged in the business of providing healthcare" under Section 1557); *cf. Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 976 (N.D. Cal. 2016) (noting that CVS pharmacies "dispense prescription medications").

As entities principally engaged in the business of providing healthcare, "all of the operations" of CVS Pharmacy, Inc. and the other Pharmacy Defendants are covered by Section 1557. *See* 42 C.F.R. § 92.3(b).

Defendants argue that such a broad interpretation disregards corporate identity and the privacy of corporate forms. But holding that subsidiaries of an enterprise engaged in providing healthcare are subject to Section 1557 does not otherwise undermine the corporate structure for other legal purposes. The holding only involves the construction of Section 1557 of the ACA. In that regard, to confine the reach of Section 1557, as argued by Defendants, would conflict with the broad remedial purpose of Section 1557. To ignore the overall interrelationship among the entities which, in the case at bar, design and implement the allegedly discriminatory program and permit the CVS interrelated entities to escape responsibility would exalt form over substance and impair the effectiveness of the anti-discrimination provision of the ACA.

3.   <u>Regulatory Guidance Emphasizes the Breadth of Section 1557</u>

In 2016, the Department of Health and Human Services (HHS) issued guidance addressing the Federal financial assistance requirement of Section 1557 in response to comments recommending that the rule apply "only to the specific health program for which the entity receives Federal financial assistance." *See* 81 Fed. Reg. 31375, 31385 (May 18, 2016). These commentators asserted that "applying the rule to operations or products that are not the direct recipients of Federal financial assistance conflicts with the plain meaning of Section 1557." *Id.* at 31386. HHS unequivocally disagreed and explained that:

---

2004), and a business enterprise may conversely refer to a conglomerate of corporate entities. *See Enterprise*, n., OED Online, Oxford University Press Oxford English Dictionary (3rd ed. 2004) (providing example that "Sinosteel is a state-owned enterprise with eighty-six subsidiaries").

> Section 1557 prohibits discrimination under "any health program or activity, any part of which is receiving Federal financial assistance. . . ." By applying the prohibition if "any part" of the health program or activity receives Federal financial assistance, the law provides that the term "health program or activity" must be interpreted in a manner that uniformly covers all of the operations of any entity that receives Federal financial assistance and that is principally engaged in health insurance, health insurance coverage, or other health coverage, even if only part of the health program or activity receives such assistance. This interpretation serves the central purposes of the ACA, and effectuates Congressional intent, by ensuring that entities principally engaged in health services, health insurance coverage, or other health coverage do not discriminate in any of their programs or activities, thereby enhancing access to service and coverage.

*Id.* HHS then added that:

> This approach is consistent with the approach Congress adopted in the CRRA, which amended the four civil rights laws referenced in Section 1557 and defines "program or activity" to mean "all the operations of . . . an entire corporation, partnership, or other private organization, or an entire sole proprietorship. . . which is principally engaged in the business of providing," among other things, a range of social and health services. The CRRA establishes that the entire program or activity is required to comply with the prohibitions on discrimination if any part of the program or activity receives Federal financial assistance. The CRRA has been consistently applied since its enactment in 1988, and we believe that Congress adopted a similar approach with respect to the scope of health programs and activities covered by Section 1557. If any part of a health care entity receives Federal financial assistance, then all of its programs and activities are subject to the discrimination prohibition.

*Id.*

While the guidance does not expressly address the precise question at issue—namely, whether a corporation's "operations" can encompass, *e.g.*, subsidiaries and affiliated corporate entities—the guidance demonstrates that Section 1557 was intended to reach broadly so that "entities principally engaged in health services" "do not discriminate in any of their programs or services, thereby enhancing access to service and coverage." *Id.* Importantly, the guidance also indicates that the scope of Section 1557 with regard to federal funding for a "program or activity" draws upon the four civil rights statutes which are incorporated in Section 1557.

C.   <u>Indirect Recipients Under Prior Civil Rights Statutes Involving Federal Funding</u>

There is an additional basis to find that the CVS entities are subject to Section 1557. Even under more narrowly worded civil rights statutes referenced in the ACA, the Defendant CVS

entities would be considered direct or indirect recipients of federal funding under the "controlling authority" theory.

1.    The Civil Rights Statutes Incorporated By Section 1557

Section 1557 incorporates by reference the grounds protected by four earlier nondiscrimination statutes—the Rehabilitation Act, Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, and the Age Discrimination Act of 1972, 42 U.S.C. § 6101 (the "ADA"). *See* 42 U.S.C. § 18116(a). The Ninth Circuit has recognized that the incorporated civil rights statutes can provide useful guidance into Section 1557. *See Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 951–52 (9th Cir. 2020) ("Applying section 1557 requires an understanding of its relationship to previous civil rights statutes."). These civil rights statutes are helpful for present purposes because—like Section 1557—an essential element of a claim under the Rehabilitation Act, Title IX, and Title VI is that the relevant program or activity is receiving federal financial assistance. *See* 20 U.S.C. § 794; 42 U.S.C. § 2000d; 20 U.S.C. § 1681; 42 U.S.C. § 6101. These laws have generated an expansive body of caselaw describing the circumstances where one entity's direct receipt of federal funding may bind another entity.

For instance, it is well established under funding statutes that receipt of "federal financial assistance can be direct or indirect." *Sharer v. Oregon*, 581 F.3d 1176, 1181 (9th Cir. 2009) (alterations, citation, and quotation marks omitted). But an entity that "merely *benefits* from federal funding" is not a recipient of federal funds. *See Nat'l Coll. Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999) (emphasis added).

In *Smith*, the Supreme Court reviewed the narrow question of whether the NCAA, which received dues from recipients of federal funds, is for the same reason, a recipient itself. *See id.* at 469. After revisiting its prior decisions in *Grove City College v. Bell*, 465 U.S. 555 (1984) and *United States Department of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597, 606 (1986), the Supreme Court held, "Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of [these statutes]; entities that only benefit economically from federal assistance are not." *Id.* at 468. The Court noted that there was

"no allegation that NCAA members paid their dues with federal funds earmarked for that purpose." *Id.* Because NCAA merely benefitted economically from the receipt of dues from its members, NCAA was not covered under Title IX. *Id.* at 470. The Court expressly declined to consider whether NCAA was covered under Title IX because it allegedly exercised "controlling authority over a federally funding program." *Id.* at 469–70.

Following *Smith,* courts have considered Congress's intent and a party's ability to accept or reject the federal funding to determine whether a party is an "indirect recipient" or "mere beneficiary" of federal funds. *Alfano v. Bridgeport Airport Servs., Inc.*, 373 F. Supp. 2d 1, 6 (D. Conn. 2005) (citing *Paralyzed Veterans* and *Grove City*); *Castle*, 731 F.3d at 909 (denying Rehabilitation Act claim where plaintiff "presented no evidence that Eurofresh affirmatively chose to receive federal monies, and in so doing accepted the concomitant responsibilities of complying with" the Rehabilitation Act). Thus, for instance, the processing and collection of Medicare/Medicaid payments on behalf of another entity may show the ability to accept or reject federal financial assistance. *See Mullen v. S. Denver Rehab., LLC*, No. 18-cv-01552, 2020 WL 2557501, at *14 (D. Colo. May 20, 2020) (finding that there was a genuine issue of material fact as to whether entity was covered under the ACA and Rehabilitation Act where entity maintained and renewed approvals needed for participation in Medicare programs, prepared and filed Medicare reports and claims, and administered and collected private party insurance, Medicare, Medicaid, and other receivables).

In *Alfano*, the plaintiff adequately alleged that defendants Bridgeport Airport Services Inc. and Executive Air Support received Federal financial assistance under the Rehabilitation Act in connection with federal funding that the City of Bridgeport received to redevelop an airport. *Alfano*, 373 F. Supp. 2d at 7. Plaintiff specifically alleged that in "1999, 2000, 2001, and 2002 the City of Bridgeport obtained grants from the Federal Aviation Administration to pay for physical improvements at the Bridgeport Airport," that "the terms of the grants included compliance with the Rehabilitation Act," and that "on information and belief, Defendants were the intended indirect recipients/beneficiaries of the federal grant money because the improvements were for Defendants' benefit and defendants worked with the City in bringing about the improvements."

*Id.* at 5.  *Alfano* held that "[a]t this stage of the proceedings, these allegations adequately state a §

504 claim" and "[w]hether defendants were among Congress's intended recipients of the funds

and whether defendants were in a position to accept or reject the funds are questions that await

further factual development."  *Id.* at 7.  That the two defendants were distinct entities did not

preclude coverage under the Rehabilitation Act.

Other courts have decided that an entity that has "controlling authority" over a federally

funded program is subject to the antidiscrimination provisions under Title IX, even when the

entity does not directly receive federal funding.  In *A.B. by C.B.*, for instance, the plaintiff brought

a putative Title IX class action against the Hawaii Department of Education and an unincorporated

athletic association composed of Department of Education schools.  *A.B. by C.B. v. Hawaii State*

*Dep't of Educ.*, 386 F. Supp. 3d 1352, 1354–55 (D. Haw. 2019).  The athletic organization moved

to dismiss on the basis that it did not receive any federal funds.  *Id.* at 1355.  *A.B.* concluded that

the plaintiff adequately alleged that an unincorporated athletic association was covered under Title

IX by virtue of its controlling authority over the federally funded interscholastic athletic programs.

> Because the Complaint alleges that the OIA had controlling
> authority over the DOE's interscholastic athletic programs,
> including "competitive facilities; scheduling of seasons, games, and
> tournaments; travel; publicity and promotion; and budget,"
> [Complaint at ¶ 16,] the Court concludes that Plaintiffs have
> provided sufficient factual matter to plausibly allege that the OIA is
> the controlling authority over the federally funded DOE's athletic
> programs.  Therefore, the Complaint plausibly alleges that the OIA
> may be subject to the anti-discrimination provisions of Title IX
> under a "controlling authority" theory.

*Id.* at 1357–58.

Courts outside of the Ninth Circuit have also applied the "controlling authority" test to find

that an entity is covered under Title IX.  *See, e.g.*, *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d

265, 271–72 (6th Cir. 1994) (holding that because Kentucky's state laws conferred authority to the

Kentucky State Board of Education ("BOE") and Kentucky High School Athletic Association

("KHSAA") to control certain activities for the federally funded Kentucky Department of

Education, the BOE and KHSAA were both subject to Title IX); *Cmtys. for Equity v. Mich. High*

*Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 735 (W.D. Mich. 2000) (ruling that "any entity that

United States District Court
Northern District of California

exercises controlling authority over a federally funded program is subject to Title IX, regardless of whether that entity is itself a recipient of federal aid"); *Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1235 (N.D. Ala. 2010) (denying motion to dismiss where plaintiffs alleged that defendant "governs, regulates, operates, and controls" the intercollegiate athletics of its member schools and those schools "delegate and assign the authority to do so" to defendant).  In choosing to find an entity with controlling authority covered, the Eleventh Circuit reasoned that "if we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations, we would allow funding recipients to receive federal funds but avoid Title IX liability."  *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007) (citing *Cmtys. for Equity*, 80 F. Supp. 2d at 733–734).

In sum, the federal funding cases under the Rehabilitation Act and Title IX establish that an entity that does not directly receive federal funding may nonetheless be covered where the entity has some ability to accept or reject the federal funding or exercises controlling authority over a federally funded program.  Importantly, an entity may be liable, even though an entirely distinct legal entity is the one which directly receives the federal funds.  The central teaching of the cases is that the *legal* distinctness of the entities involved is not dispositive; rather, what is important is their *functional* role relative to decisions to receive federal funds or their control over the funded program.

As noted above, Section 1557 bans discrimination in "any health program or activity, *any part of which* is receiving Federal financial assistance," language which, if anything, is broader than that of the Rehabilitation Act, Title IX, Title VI, and the Age Discrimination Act, which while prohibiting discrimination under "any program or activity receiving Federal financial assistance," do not contain the italicized language of Section 1557.  *Compare* 42 U.S.C. § 18116(a) (emphasis added), *with* 29 U.S.C. § 794, 42 U.S.C. § 2000d, 20 U.S.C. § 1681, and 42 U.S.C. § 6102.

Turning to the instant matter, the Court concludes that even under the narrower prior statutes, the CVS Defendants would be covered as direct or indirect recipients of federal funds. Under the body of case law interpreting these four funding statutes described above, an entity is

deemed to be an indirect recipient of federal funds if: (1) it had the ability to accept or reject the federal funding that another entity received, or (2) it exercised controlling authority over a federally funded program.  As explained below, the SAC alleges that the Pharmacy Defendants accepted federal funds for the drugs they sold and that the PBM Defendants designed and effectively controlled the discriminatory program at issue.  *See, e.g.*, SAC ¶¶ 135, 136, 149 (alleging that the Pharmacy Defendants received federal funding); *id.* ¶¶ 15, 16, 80 (alleging that Caremark, L.L.C. designed and exhibited control over CSP and various elements of the Program). The direct recipients of federal funds are alleged to have ceded control over the design of the pharmacy benefit program at issue here to the PBM Defendants.  Moreover, CVS Pharmacy, Inc., the parent of the other named defendants, is alleged to have directly received federal financial assistance.  SAC ¶ 135.

As to the first basis for finding indirect receipt of federal funds, Plaintiffs have not clearly alleged that the PBM Defendants are in a position to accept or reject the federal funding provided to the Pharmacy Defendants.  It is not clear, for instance, whether the PBM Defendants process and collect Medicare payments on behalf of the Pharmacy Defendants, which other courts have found may confer indirect recipient status.  *See Mullen*, 2020 WL 2557501, at *14 ("The Court finds that these responsibilities, particularly the processing and collection of Medicare/Medicaid payments on behalf of Orchard Park, establish CCHC may have had (or has) the ability to accept and/or reject federal financial assistance provided to Orchard Park.").  Plaintiffs explained in their opposition brief that "specific financial information at the CVS subsidiary level is not publicly available," *see* Opp. at 9 n.4, so it may be that Plaintiffs do not have access to this information. *See, e.g.*, *Melton by and through Mosier v. California Dep't of Developmental Servs.*, No. 20-cv-06613-YGR, 2021 WL 5161929, at *14 (N.D. Cal. Nov. 5, 2021) ("[T]he vast majority of courts faced with the issue of whether an entity receives federal financial assistance within the meaning of the civil rights laws have concluded that the resolution of the issue requires inquiry into factual matters outside the complaint and, accordingly, is a matter better suited for resolution after both sides have conducted discovery on the issue.").

The SAC does plausibly allege, however, that the PBM Defendants exercise control over

the Pharmacy Defendants which receive federal funds directly.  SAC ¶¶ 135, 149.  Receipt of

funding through Medicare Part D is sufficient for Section 1557.  *See Callum,* 137 F. Supp. 3d at

852.  Indeed, Defendants do not dispute that the Pharmacy Defendants receive Federal financial

assistance.  *See* MTD at 6–8 (asserting that Plaintiffs fail to show that the PBM Defendants

receive Federal financial assistance).

As to the PBM Defendants, as noted above, "an entity that exercises controlling authority

over a federally funded program is also subject to the anti-discrimination provisions of Title IX."

*A.B.*, 386 F. Supp. 3d at 1357; *see also Barrs*, 734 F. Supp. 2d at 1233 (finding complaint alleged

that defendant was "an indirect recipient of federal funding" where defendant "operates" and

"controls" federally funded program and is delegated authority by funding recipients).

Taking all of Plaintiffs' allegations as true, the SAC plausibly alleges that the PBM

Defendants exercise controlling authority over the Program.  The SAC alleges that Caremark,

L.L.C., one of the PBM Defendants, controls key components of the Program.  In particular,

Caremark, L.L.C established the "Specialty Pharmacy Distribution Drug List" that imposed the

relevant restrictions on Plaintiffs' HIV/AIDS medications.  SAC ¶¶ 16, 95.  Caremark, L.L.C. also

"owns and exercises control over CSP."  *Id.* ¶ 15.  CSP is the entity that fills prescriptions and

ships out medications under the Program.  *Id.*  The SAC further alleges that the "reduction or

elimination of the drug benefit is effectuated by way of CSP's and [Defendants'] control over the

Program, [Defendants'] control over whether community pharmacies are designated "out-of-

network," and [Defendants'] control over cost-sharing issues and control over CVS pharmacies

that allow Defendants to establish CVS pharmacies as drop shipment locations and limit or

effectively bar in-person consultations, advice, and monitoring by pharmacists knowledgeable

about HIV/AIDS Medications."  *Id.* ¶ 155(b).

Additionally, the SAC alleges that at least one of the PBM Defendants exercises

controlling authority over at least one of the Pharmacy Defendants.  As noted above, the SAC

alleges that Caremark, L.L.C. "owns and exercises control over CSP."  SAC ¶ 15.  The SAC also

alleges that "[t]he decision to force Class Members to accept CSP as their exclusive provider

under the Program . . . are acts and decisions exclusively in the control and discretion of"

Defendants. *Id.* ¶ 80.  Given these allegations, Plaintiffs have plausibly alleged that Caremark L.L.C., one of the PBM Defendants, exercise controlling authority over CSP, which in turn directly receives federal funding.

Thus, the SAC plausibly alleges that the PBM Defendants may be indirect recipients under a "controlling authority" theory.  *See A.B.*, 386 F. Supp. 3d 1352, 1357–58 (finding that defendant may be subject to Title IX under a "controlling authority" theory where complaint alleged that defendant had controlling authority over Hawaii State Department of Education's federally funded athletic programs).  In sum: even under the more narrowly worded civil rights statutes referenced in the ACA, the Defendant CVS entities would be considered direct or indirect recipients of federal funding.

## V.  CONCLUSION

The SAC plausibly alleges that the Defendant CVS entities function as a cohesive, integrated enterprise in the provision of healthcare under the Program.  All four Defendant entities are plausibly part of the operations of Defendant CVS Pharmacy, Inc., which receives federal funding.  Additionally, even under the more narrowly worded civil rights statutes referenced in the ACA, the Defendant CVS entities would be considered direct or indirect recipients of federal funding.  As a result, the Court finds that Plaintiffs have plausibly stated a claim that each Defendant engages in a "health program or activity, any part of which is receiving Federal financial assistance" under Section 1557.

Defendants' motion to dismiss is therefore **DENIED** because Plaintiffs may plausibly succeed on their claims against Defendants based on the allegations in the SAC.

This order disposes of Docket No. 184.

**IT IS SO ORDERED**.

Dated: August 5, 2022

_____
EDWARD M. CHEN
United States District Judge

23